UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Susan D. Wigenton |
| | | U.S. District Judge |
| v. | : | |
| JOHN A. BENNETT, | : | Criminal No. 09-656 |
| Defendant. | | |

---

GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT JOHN A. BENNETT'S MOTION TO DISMISS

---

JEFFREY D. MARTINO
Chief
MICHELLE O. RINDONE
Assistant Chief
New York Office
Antitrust Division
U.S. Department of Justice


HELEN CHRISTODOULOU
DANIEL TRACER
MIKHAIL VANYO
Trial Attorneys, Antitrust Division
26 Federal Plaza, Room 3630
New York, New York 10278
(212) 335-8000

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................... i

INTRODUCTION ............................................................................................1

BACKGROUND .............................................................................................2

ARGUMENT ..................................................................................................9

  1.  Bennett Environmental's Misrepresentations and Failure to Disclose the Payment of Kickbacks Constituted Fraud ...................................................................11

     A.  The Fraud Charges Properly Allege Specific Intent to Defraud ...............................11

         1. The Fraud Charges Adequately Allege that the Defendant Acted with the Requisite Specific Intent to Defraud the EPA of Money and Property ….......12

         2. The No-Sale Theory Does Not Undermine the Fraud Charges…………….....15

     B.  The Fraud Charges Include Allegations of Material False Statements and Omissions.......................................................................................................... ..18

  2.  Evidence of the Soil Switch is Intrinsic to the Charged Counts and is Admissible at Trial as Evidence of Kickbacks and Fraud……………………………………………………… ...21

     A.  Relevant Background……………………………………………………...22

     B.  The Defendant's Fraud in Connection with the Soil Switch is Intrinsic to the Charged Conspiracy…………………………………………………………………...24

         1.  The Soil Switch Involved Intent to Defraud and Material Misrepresentations and Omissions…………………………………………………………...25

         2.  The Soil Switch is Intrinsic to the Charged Conspiracy………………....28

  3.  The Defendant Has Failed to Demonstrate Improper Pre-Indictment Delay……………...29

     A.  The Government Did Not Deliberately and Improperly Delay Bringing an Indictment Against the Defendant……………………………………………………..... 31

         1.  The Defendant Has Failed to Establish that the Government Delayed Bringing an Indictment in Bad Faith………………………………………………31

         2.  The Government Properly Exercised Its Discretion in Indicting the Defendant on August 31, 2009………………………………………………...34

a.  The Government Did Not Impermissibly Delay Tolling the Statute of Limitations or Misuse the MLAT Process to Obtain Evidence………36

b.  The Government Did Not Act Improperly in Not Responding to Bennett Environmental's 2004 Letter…………………………………...38

B.  The Defendant Fails to Demonstrate Actual Prejudice Caused by Any Purported Pre-Indictment Delay…………………………………………………………………...…39

1.  The Defendant Suffered No Actual Prejudice through the Loss of Electronic Evidence………………………………………………………………………40

a.  The "Lost" Materials Were Not Lost or Were Cumulative…………..41

b.  The Defendant Has Not Demonstrated that the "Lost" Materials Were Exculpatory……………………………………………………………...42

c.  The Government's Delayed Response to DLA Had No Effect on Document Retention……………………………………………………43

2.  The Defendant's Claim of Memory Loss Does Not Establish Actual Prejudice from Pre-Indictment Delay……………………………………...…..44

4.  The Court Properly Tolled the Statute of Limitations under 18 U.S.C. § 3292, and the Defendant was Indicted within the Limitations Period……………………….…………..……...46

CONCLUSION ...................................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*McNally v. United States*, 483 U.S. 350 (1987)…………………………………….......... 14

*Neder v. United States*, 527 U.S. 1 (1999)…………………………………………......... 18

*Rochin v. California*, 342 U.S. 165 (1952)......................................................... ...... 31

*Smith v. United States*, 360 U.S. 1 (1959)......................................................... 32

*United States v. Asher*, 854 F.2d 1483 (3d Cir. 1988)………………………………    13, 14

*United States v. Atiyeh*, 402 F.3d 354 (3d Cir. 2005)..............................    47, 48, 49

*United States v. Basroon*, 38 Fed. App'x 772 (3d Cir. 2002)...................................  27

*United States v. Baxt*, 74 F.Supp.2d 425, 429 (D.N.J. 1999)............................ 30, 33, 38, 40, 44

*United States v. Boyer*, 694 F.2d 58 (3d Cir. 1982)…………………………….............  12

*United States v. Brophy*, No. 13 Cr. 35 (LPS), 2013 WL 4657674 (D. Del. Aug. 30, 2013)
…………………………………………………………………………………….......  10, 11

*United States v. Broughton*, 689 F.3d 1260 (11th Cir. 2012)...............................................  47

*United States v. Cannistraro*, 800 F.Supp. 30  (D.N.J. 1992)....................................    32, 39, 42

*United States v. Chalker*, No. 12 Cr. 0367, 2013 WL 4547754 (E.D. Pa. Aug. 27, 2013)

.........................................................................................................................  19

*United States v. Colton*, 231 F.3d 890 (4th Cir. 2000)...........................................  27

*United States v. Dobson*, 419 F.3d 231(3d Cir. 2005)..........................................  27

*United States v. Ewell*, 383 U.S. 166 (1966).......................................................  31

*United States v. Frank*, 156 F.3d 332 (2d Cir. 1998)..................................  25, 26, 27

*United States v. Fumo*, No. 06 Cr. 319, 2009 WL 1688482 (E.D. Pa. June 17, 2009).........  27

*United States v. Gatson*, No. 13-705, 2014 WL 7182275 (D.N.J. Dec. 16, 2014)………....   10

*United States v. Gouveia*, 467 U.S. 180 (1984)........................................................  30

*United States v. Green*, 617 F.3d 233 (3d Cir. 2010)...........................................  28

*United States v. United States Gypsum Co.*, 550 F.2d 115 (3d Cir. 1977)............................  41

*United States v. Hannigan*, 27 F.3d 890 (3d Cir. 1994)……………………….........   11, 12

*United States v. Harmon*, 379 F.Supp. 1349 (D.N.J. 1974).......................................  33

*United States v. Henry*, 29 F.3d 112 (3d Cir. 1994)………………………………....   17

*United States v. Hoffecker*, 530 F.3d 137 (3d Cir. 2008)....................................   49

*United States v. Huet*, 665 F.3d 588 (3d Cir. 2012)………………………………....  10, 11

*United States v. Ismaili*, 828 F.2d 153 (1987)..........................................................   40

*United States v. Jenkins*, 633 F.3d 788 (9th Cir. 2011).........................................   47

*United States v. Litvak*, 30 F.Supp.3d 143 (D. Conn. 2014)…………………….......  11, 18

*United States v. Lovasco*, 431 U.S. 783 (1977)......................................   30, 31, 32, 33, 34, 38

*United States v. Lyttle*, 667 F.3d 220 (2d Cir. 2012)....................................   47, 48, 49

*United States v. Marion*, 404 U.S. 307 (1971)......................................   30, 33, 39, 40

*United States v. Martin*, 411 F.Supp.2d 370 (S.D.N.Y. 2006)............................. ..   27

*United States v. McBane*, 433 F.3d 344 (3d Cir. 2005)....................................  18, 19

*United States v. McDougal*, 133 F.3d 1110 (8th Cir. 1998)............................   44, 45

*United States v. Meador*, 138 F.3d 986 (5th Cir. 1998)..................................   47, 48

*United States v. Mittelstaedt*, 31 F.3d 1208 (2d. Cir. 1994)............................   20, 21

*United States v. Novak*, 443 F.3d 150 (2d Cir. 2006)…………………………….. 15, 16

*United States v. Osser*, 864 F.2d 1056 (3d Cir. 1988)………………………........   14, 15, 17

*United States v. Otto*, 742 F.2d 104 (3d Cir. 1984)................................................   34

*United States v. Paccione*, 949 F.2d 1183 (2d Cir. 1991).............................. .....   26

*United States v. Perholtz*, 836 F.2d 554 (D.C. Cir. 1987)…………………….............   15

*United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970)…………...   15, 16

*United States v. Russo*, 166 Fed. App'x 654 (3d Cir. 2006)………………….......   11, 12, 16

*United States v. Sebetich*, 776 F.2d 412 (3d Cir. 1985)...........................................   30, 31, 33

*United States v. Shellef*, 507 F.3d 82 (2d. Cir. 2007)…………………………………   15, 16, 20

*United States v. Singleton*, 458 Fed. App'x 169 (3d Cir. 2012)............................................  29

*United States v. Smith*, 776 F.2d 1104 (3d Cir. 1985)…………………………………......  10

*United States v. Starr*, 816 F.2d 94 (2d Cir. 1987)…………………………………....  15, 16

*United States v. Staton*, 605 Fed. App'x 110 (3d Cir. 2015)........................................  32, 38

*United States v. Stradford*, No. 06 Cr. 275, 2008 WL 2275999  (D.N.J. May 30, 2008)......  40

*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991)................................................  25, 26

*United States v. Werme*, No. 89 Cr. 132, 1989 WL 156616 (E.D.Pa. Dec. 26, 1989).........  33

*United States v. Zauber*, 857 F.2d 137 (3d Cir. 1988)…………………………………  10, 18

## Statutes and Other Authorities

Federal Rules of Criminal Procedure 12(b)(3) ......................................................   9

Federal Rules of Criminal Procedure 16 ....... ......................................................  41

Federal Rules of Criminal Procedure 29 ....... ......................................................  10

Federal Rules of Evidence 404(b)........................................................................  29

18 U.S.C. § 371..............................................................................................  1, 11

18 U.S.C. § 1031..............................................................................................  1, 11

18 U.S.C. § 1346...........................................................................................  11

18 U.S.C. § 3292............................................................  34, 46, 47, 48, 49, 50

U.S.S.G. § 1B1.3(a)(2) ...................................................................................  29

## <u>INTRODUCTION</u>

The government respectfully submits this memorandum of law in opposition to the defendant's October 23, 2015 Motion to Dismiss, and accompanying memorandum of law ("Def. Mot."). By his motion, the defendant seeks to have both counts of the Indictment, and portions thereof, dismissed based on four alleged defects in the pleadings and institution of proceedings in this case. For the reasons described below, this motion should be denied in its entirety.

The defendant is charged in two counts, conspiracy, in violation of 18 U.S.C. § 371, and major fraud against the United States, in violation of 18 U.S.C. § 1031, for engaging in a scheme to pay kickbacks and defraud the government, namely the Environmental Protection Agency ("EPA"), at the Federal Creosote Superfund Site in Manville, New Jersey ("Federal Creosote"). In his motion, the defendant focuses his first two arguments on the Indictment itself, arguing that the government has failed to state an offense or adequately plead that the defendant engaged in any fraud, including fraud in connection with the defendant's overbilling of the EPA in connection with soil disposal services (the "soil switch"), as more fully described below. The defendant's second two arguments focus on the institution of proceedings against the defendant, and argue that the defendant was harmed by the government's failure to indict in a timely fashion and that the Indictment was returned beyond the applicable statute of limitations. Each of these arguments should be rejected.

The defendant's fraud is adequately and sufficiently pled in allegations spanning the first ten pages of the Indictment, which lays out in detail how the defendant, as CEO and Chairman of the Board of Bennett Environmental, Inc. ("Bennett Environmental"), engaged in a scheme to defraud the EPA through the payment of secret kickbacks and the fraudulent inflation of Bennett Environmental's bid prices to include the cost of the kickbacks. Moreover, the Indictment was

1

returned in a timely fashion, and within the applicable statute of limitations.  The government pursued its investigation in this case diligently and properly exercised its discretion in determining what investigative steps to take, and when.  *See generally* Affirmation of Resident Agent in Charge Paul A. Brezinski in Opposition to Defendant's Motion to Dismiss, attached hereto as Exhibit A ("Brezinski Decl.").  As such, the defendant's motion should be denied and the government should be allowed to proceed to trial against the defendant.

## **BACKGROUND**

Beginning in or about May 2001, Bennett Environmental was awarded the first in a series of multi-million dollar contracts to treat and dispose of contaminated soil excavated from Federal Creosote.  *See* March 17, 2015 Initial Voluntary Bill of Particulars ("BOP"), attached hereto as Exhibit B, 4.  Additional contracts were awarded to Bennett Environmental in 2002 and 2003 for continued soil treatment and disposal work, as well as some work that involved disposal of the soil only.  *Id*.  All of these contracts were awarded by the prime contractor at Federal Creosote, Sevenson Environmental Services, Inc. ("Sevenson"), which was hired under an interagency agreement between the EPA and the United States Army Corps of Engineers ("USACE") to oversee the cleanup of the site.  *See* Indictment, Count One, ¶ 6.  The work comprised numerous phases, including (a) the cleanup of an area known as Lagoon B (also known as "Phase One"); (b) the cleanup of an area known as Lagoon A (also known as "Phase Two"); and (c) the cleanup of certain other areas around the site, including an area known as Canal B (also known as "Phase Three").  The process by which these contracts were awarded was governed by the Federal Acquisition Regulation system ("FAR").  *See* Indictment, Count One, ¶¶ 6-8.  The FAR imposed two critical conditions on this contract award process: *first*, the contracts were supposed to be awarded on the basis of competitive bidding, and, *second*, kickbacks were strictly prohibited.  *Id*.

2

Nonetheless, beginning in or about December 2001, the defendant and his subordinates at Bennett Environmental embarked on a corrupt scheme with Gordon McDonald, Sevenson's project manager at Federal Creosote, whereby Bennett Environmental agreed to provide a series of kickbacks to McDonald in exchange for his steering of contracts to Bennett Environmental. *See* Indictment, Count One ¶¶ 11-16.  This kickbacks-for-contracts scheme was straightforward: McDonald made sure Bennett Environmental won the bidding for soil treatment and/or disposal contracts and, in exchange, Bennett Environmental's bid prices were marked up to include an extra cost per-ton that Bennett Environmental would return to McDonald and other Sevenson employees in the form of cash, gifts, and gratuities.  *Id*.  The scheme continued until at least as late as August 2004 and took different forms of deceit and payment.  *See* BOP 5-6.

The defendant first met McDonald at a hockey game that Bennett Environmental organized for Sevenson employees to attend in or about December 2001.  *See* Indictment, Count One, ¶ 17(a); BOP 5.  That game was the first in a series of extravagant payments and events that Bennett Environmental organized for the benefit of Sevenson employees.  *See* BOP 5-6.  The hockey game cost Bennett Environmental over $17,000 and included a private suite for Sevenson guests.  The hockey game was intended to be a token of appreciation for Bennett Environmental having won the earlier contract in May in connection with Phase One, and, at the event, Bennett Environmental and Sevenson employees expressed their hope for future business.  The defendant later told his subordinates that the hockey game was money well spent.

After this hockey game, in early 2002, Bennett Environmental bid on Phase Two of the clean-up at Federal Creosote.  Shortly after Bennett Environmental's bid came in, the company was secretly informed by McDonald that Bennett Environmental was not the low bidder.  However, McDonald made clear that he could still steer the contract to Bennett Environmental if

3

the company agreed to pay him a kickback of $13.50 per-ton of soil in Phase Two, and that this $13.50 would be built into Bennett Environmental's bid price for the work. Robert Griffiths, the Bennett Environmental salesman to whom this offer was communicated, immediately asked the defendant if Bennett Environmental could enter into this agreement, and the defendant approved. After they agreed to do this, McDonald upheld his end of the bargain, forcing a rebid for Phase Two by manipulating the specifications to make it appear that the soil was actually more contaminated than it was. This also had the effect of causing other bidders to raise their bids, so that Bennett Environmental could win without having to decrease its bid. Bennett Environmental, on the other hand, through inside information obtained from McDonald, knew the true expected cost of the work and could confidently submit a price that would win and yet still include a $13.50 per-ton kickback. Bennett Environmental would have been willing to do the exact same work for $13.50 less, had the kickbacks not been included in the price. *See* Indictment, Count One ¶ 17(b); Count Two ¶ 2.

In addition to his assistance in steering this Phase Two contract to Bennett Environmental through a rebid in May 2002, McDonald agreed to provide last looks of other bidders' quotations to Bennett Environmental to ensure that it would win at higher prices than it would otherwise put forward. *See* Indictment, Count One, ¶ 17(b); Count Two ¶2. Griffiths, who regularly kept the defendant apprised of matters at Federal Creosote via phone and email, received the defendant's approval and encouragement to gather this last look information. Indeed, shortly before the bidding on Phase Two, the defendant, in response to numerous emails from Griffiths about the receipt of last looks, emailed Griffiths asking him to call the defendant as soon as Griffiths knew the main competitor's bid. Griffiths responded to the defendant the next day by email reaffirming that he would have a last look.

4

The bidding on Phase Two proceeded as planned, and Bennett Environmental was awarded the contract to clean up over 23,000 tons of soil at $498.50 per-ton, which included the $13.50 overcharge.[1]  *See* Indictment, Count Two ¶ 2; June 26, 2015 Supplemental Voluntary Bill of Particulars ("Supp. BOP"), attached hereto as Exhibit C, 1.  The defendant personally reviewed the contract for this work, which came in the form of a purchase order to be countersigned on behalf of Bennett Environmental stating, among other things, that the work would be performed "in strict compliance with the principal contract documents" for the project, documents which incorporated the FAR with its strict prohibition against kickbacks.  Supp. BOP 1.  The purchase orders further stated that the vendor (Bennett Environmental) agreed to comply with all laws, rules, and regulations.  The defendant authorized Griffiths to sign this purchase order on behalf of Bennett Environmental.

After Phase Two commenced, numerous change orders were issued that increased the quantity of Bennett Environmental's work, thereby increasing both the profitability of the contract and the pool of kickback money.  *Id*.  As Bennett Environmental's work on the treatment and disposal of the soil progressed, Griffiths kept the defendant apprised of the amount of money being set aside under the $13.50 per-ton kickback portion of the price to entertain McDonald and other Sevenson employees.  In numerous handwritten notes and emails, Griffiths explained to the defendant and others how various kickbacks for McDonald were accounted for from this set-aside, including a Mediterranean cruise attended by McDonald and other Sevenson executives, for which Bennett Environmental spent over $80,000.  *See* Indictment, Count One ¶

---

[1] Bennett Environmental actually submitted two prices for Phase Two: $498.50 per-ton for soil that was disposed of in a "RCRA Subtitle C or equivalent facility," essentially a more secure, and hence more expensive, form of disposal; and $418.50 per-ton for soil disposed of in a "RCRA Subtitle D or equivalent facility," a less secure, and hence cheaper, form of disposal.  As further discussed below, the EPA initially required the more secure disposal in connection with Phase Two, and therefore, entered into a contract with Bennett Environmental at the higher price.  Later, in November 2002, the EPA decided to allow the remainder of the contract to be fulfilled at the lower price.  Both prices included a $13.50 mark-up to cover kickbacks.

17(c); BOP 5.  For his role in handling the day-to-day arrangements with McDonald, Griffiths received promotions, salary raises, stock options, and commendations directly from the defendant.  The defendant and his co-conspirators never disclosed any of this arrangement, including the inclusion and payment of kickbacks, to the EPA or USACE.  *See* Indictment, Cout One ¶ 13; Supp. BOP 1.

Kickbacks paid by the defendant and his co-conspirators to McDonald took a variety of forms.  *See* Indictment, Count One ¶ 15.  For example, in June 2002, Bennett Environmental paid for Griffiths, along with McDonald and senior executives from Sevenson, to go on the cruise discussed above.  *See* Indictment, Count One ¶ 17(c).  The defendant, however, decided not to attend.  During that time, a Sevenson executive found out about the cruise and provided a copy of the FAR's kickback prohibitions to some of the attendees.  Subsequently, the attendees, in consultation with the defendant, agreed to provide checks to Bennett Environmental to purportedly cover the cost of the cruise, though the defendant and his subordinates never intended to actually cash the checks.  Ultimately, Griffiths and the defendant collected, but never deposited the checks.  Then, after the cruise, another Sevenson executive communicated to the involved parties, including to Bennett Environmental and the defendant, that, in his view, the cruise was inappropriate and violated U.S. law.  The kickbacks also included personal gifts to McDonald, including expensive wine coolers, a plasma television, pharmaceuticals, entertainment, and other trips.  *See* Indictment, Count One ¶ 15; BOP 5-6.  These expenses were detailed on numerous expense reports that Griffiths submitted and were reviewed, at times, by the defendant and his subordinates, including Zul Tejpar and Peter Richardson, vice president and president of Bennett Environmental, respectively.  The defendant approved of and encouraged Griffiths's spending throughout the conspiracy.

6

A significant portion of Bennett Environmental's kickbacks were made to McDonald through McDonald's shell company, GMEC.  *See* Indictment, Count One ¶¶ 13-14; BOP 5-6.  At first, the defendant and others at Bennett Environmental were under the impression that GMEC was actually providing some form of "non-reimbursable expenses" for Sevenson at Federal Creosote.  In other words, Bennett Environmental initially believed that it was kicking back a portion of its contract price to help Sevenson pay for services of a legitimate sub-contractor at the site for which the EPA would not reimburse Sevenson.  In truth, however, this was a shell company McDonald used to obtain kickbacks directly by using phony invoices.  *See* Indictment, Count One ¶ 1(a).  Between June 2002 and April 2003, the GMEC invoices and kickbacks Bennett Environmental paid were between $30,000 and $80,000 per invoice.  *See* BOP 5-6.  As further described in section II.A below, however, after the soil switch, Bennett Environmental's kickbacks to GMEC ballooned to payments of over $250,000.  *Id.*  These were among the costliest outlays that Bennett Environmental was making at that time.  In one such GMEC kickback payment, in or about June 2003, the defendant asked to split a $253,095 kickback payment to GMEC in half, as the size of the payment would have adversely affected Bennett Environmental's quarterly financials.  This increase in kickback payments to GMEC occurred just days after the defendant visited Federal Creosote and met with McDonald to talk, among other things, about the kickbacks.

During this time, the defendant and McDonald often spoke by phone, including on days where GMEC invoices were sent to Bennett Environmental.  Similarly, the defendant spoke with Tejpar on numerous occasions about the scheme.  Whereas the majority of Benentt Environmental's employees worked in its Ontario headquarters, the defendant and Tejpar worked in close proximity in Bennett Environmental's smaller Vancouver office, and the

defendant delegated certain managerial duties at Bennett Environmental to Tejpar.  *See* Indictment, Count One ¶¶ 2-3.  For example, Tejpar approved of some of Griffiths's expense reports, and Tejpar made notes to himself to speak with the defendant about increasing payments to Sevenson, including through GMEC.

Over the course of Bennett Environmental's next three bids in connection with Phase Three for work at Federal Creosote, a similar course of conduct ensued.  *See* Indictment, Count One ¶¶ 17(e)-(f); Supp. BOP 1-2.  Bennett Environmental first bid on a contract to thermally treat soil in April 2003 as part of Phase Three.  *See* Supp. BOP 1.  In connection with that bid, the defendant and his subordinates received confidential bidding information from McDonald in an email, to which Griffiths simply added "please print and delete."  Then in December 2003, Bennett Environmental rebid in a second round of bidding for the same work.[2]  *See* Indictment, Count One ¶ 17(f); Supp. BOP 2.  To make sure Bennett Environmental won the rebid, Griffiths worked with McDonald to put several bid sheets in Bennett Environmental's bid package and early on the morning of the bid, McDonald, in consultation with Griffiths and the defendant, selected the highest from among Bennett Environmental's bid sheets that would still win.  The defendant, McDonald, and Griffiths coordinated this conduct by phone in the early morning hours of the bid date in December 2003.  Additionally, in October 2003, Bennett Environmental bid on a disposal-only contract at Federal Creosote.  *See* Indictment, Count One ¶ 17(e); Supp. BOP 2.  While McDonald discussed an incumbent competitor's bid with an employee of that competitor in his office, McDonald secretly let Griffiths listen in to the conversation over an open phone line.  After hearing the competitor's bid information, Griffiths called the defendant

---

[2] The rebid was the consequence of another bidder's complaint that the contract had been awarded to Bennett Environmental at a higher price that its bid.  The USACE thus called for a rebid, and the status of the contract was in limbo for a number of months.  In the meantime, the defendant made material misrepresentations about this contract to Bennett Environmental's investors, leading to an insider trading investigation against him by the Ontario Securities Commission that resulted in a settlement including fines and penalties.

and told the defendant that he had received a last look at the incumbent's bid prices.  The defendant told Griffiths to bid $121.00 per-ton that day, a price $1.03 per-ton lower than the incumbent's bid.  Bennett Environmental was awarded the contract, worth approximately $12 million, at that price.

Through the kickback payments to McDonald, the defendant and his co-conspirators caused over $1 million of loss to the EPA.  *See* Indictment, Count One ¶ 16.  At the same time, Bennett Environmental substantially profited, as the Federal Creosote contracts were the largest contracts in Bennett Environmental's history until that point.  As Bennett Environmental's CEO and Chairman of the Board, the defendant received substantial personal gain as his company, and his own compensation, bonuses, and stock holdings, grew in value as a direct result of the scheme.  As further described below, the EPA Office of the Inspector General ("EPA-OIG"), and eventually the U.S. Department of Justice, Antitrust Division ("Antitrust Division"), began to investigate the defendant's conduct, and the defendant's fraudulent kickbacks-for-contracts scheme was exposed in the fall of 2006.

## ARGUMENT

The defendant seeks to dismiss both counts of the Indictment, and portions thereof, based on four alleged defects in the pleadings and institution of proceedings: (a) failure to state an offense in connection with counts alleging fraud; (b) failure to state an offense and failure to plead conduct associated with the soil switch; (c) pre-indictment delay; and (d) failure to return an indictment within the statute of limitations.  As further described below, the Indictment sufficiently alleges the conspiracy and fraud charges against the defendant, and it was returned in a timely fashion within the statute of limitations.  Accordingly, the defendant's motion should be denied.

Under Rule 12(b)(3) of the Federal Rules of Criminal Procedure, a defendant must raise
any defects in the institution of the prosecution or in the indictment, including pre-indictment
delay and failure to state an offense, prior to trial. An indictment is "facially sufficient if it (1)
contains the elements of the offense intended to be charged, (2) sufficiently apprises the
defendant of what he must be prepared to meet, and (3) allows the defendant to show with
accuracy to what extent he may plead a former acquittal or conviction in the event of a
subsequent prosecution." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012) (internal
quotations omitted). "Generally, an indictment will satisfy these requirements where it informs
the defendant of the statute he is charged with violating, lists the elements of a violation under
the statute, and specifies the time period during which the violations occurred." *Id.* A bill of
particulars functions as a "supplement[] to the indictment" and is considered a portion of the
pleadings in a criminal case. *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985).

"In analyzing a motion to dismiss under Rule 12, the Court must accept as true the facts
as alleged and determine if those facts constitute a violation of the law under which the
defendant is charged." *United States v. Gatson*, No. 13-705, 2014 WL 7182275, at *1 (D.N.J.
Dec. 16, 2014) (citing *United States v. Zauber*, 857 F.2d 137, 144 (3d Cir. 1988)). "'[A] pretrial
motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the
government's evidence. The government is entitled to marshal and present its evidence at trial,
and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal
Procedure 29 . . . . Thus, a district court's review of the facts set forth in the indictment is
limited to determining whether, assuming all of those facts as true, a jury could find that the
defendant committed the offense for which he was charged.'" *United States v. Brophy*, No. 13

10

Cr. 35 (LPS), 2013 WL 4657674, at *2 (D. Del. Aug. 30, 2013) (quoting *Huet*, 665 F.3d at 595-96).

## POINT I
### Bennett Environmental's Misrepresentations and Failure to Disclose the Payment of Kickbacks Constituted Fraud

Count One of the Indictment charges the defendant with conspiracy to provide kickbacks, to commit major fraud against the United States, and to commit wire fraud, in connection with a scheme to deprive the EPA of money and property, in violation of 18 U.S.C. § 371. Count Two charges the defendant with the substantive crime of major fraud in connection with the execution of that scheme, in violation of 18 U.S.C. § 1031. Accordingly, two of the three objectives of the conspiracy charge in Count One, as well as the entirety of Count Two, charge the defendant with fraud (collectively, the "Fraud Charges"). The defendant argues that the Fraud Charges must be dismissed because of the government's (a) failure to allege specific intent to defraud inasmuch as the only legally cognizable object of the Fraud Charges that is alleged in the Indictment is the intangible right to honest services, whereas the government has not alleged honest services fraud under 18 U.S.C. § 1346; and (b) failure to allege that any of the misrepresentations made in furtherance of the Fraud Charges were material.[3] These arguments misstate the applicable law in this Circuit and ignore critical portions of the pleadings, and therefore should be rejected.

A. The Fraud Charges Properly Allege Specific Intent to Defraud

In the Third Circuit, the elements of mail and wire fraud include the defendant's "specific intent to defraud." *United States v. Russo*, 166 Fed. App'x 654, 659 (3d Cir. 2006); *United States v. Hannigan*, 27 F.3d 890, 892 (3d Cir. 1994). Specific intent is likewise required under the substantially similar wording of the major fraud statute. *United States v. Litvak*, 30

---

[3] Notably, even if the defendant were right (and he is not) that the Indictment failed to allege fraud, Count One would still stand because he has not challenged the separate kickback object alleged in the Indictment.

F.Supp.3d 143, 155 (D. Conn. 2014) (holding that intent to defraud included acting for the purpose of "depriving another of money or property, including material information necessary to make discretionary economic decisions").  The specific intent element may be established with a material misstatement of fact made with reckless disregard for the truth.  *Hannigan*, 27 F.3d 892, n.1 (citing *United States v. Boyer*, 694 F.2d 58, 59-60 (3d Cir. 1982)).  Moreover, "it is well-established that, [w]hen the necessary result of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself."  *Russo*, 166 Fed. App'x at 659 (internal quotations omitted).

1.    The Fraud Charges Adequately Allege that the Defendant Acted with the Requisite Specific Intent to Defraud the EPA of Money and Property

As the Indictment makes clear, the defendant engaged in the fraud and kickback scheme for the purpose of obtaining contracts to perform treatment and disposal contracts at "fraudulently inflated prices," *see* Indictment, Count One ¶ 13, and to obtain contracts "at a price higher than it would have otherwise bid," *see* Indictment, Count Two ¶ 2.  In other words, the object of the defendant's fraud and kickback scheme was to obtain a contract at a higher price, *i.e.* for more money, from the EPA.  While, the government *could* have also charged the defendant with honest services fraud for depriving the EPA of the intangible rights to the defendant and his co-conspirators' fair and honest services, that fact does not bar the government from alleging that the defendant's scheme was calculated to deprive the EPA of tangible rights – money – by including the kickbacks in the prices ultimately charged to the EPA.

Indeed, the alleged misrepresentations themselves, as well as the nature of the scheme itself, readily demonstrate the defendant's specific intent.  The crux of the scheme involved deceiving and lying to the EPA about the fact that Bennett Environmental was getting steered contracts at inflated prices in exchange for including the kickback payments into the prices of

12

those contracts.  *See, e.g.*, Indictment, Count One ¶¶ 13-14 (alleging that the scheme included improper influence in "the award of sub-contracts" at "fraudulently inflated amount[s]" that "included kickbacks.").   Indeed, without the kickbacks, Bennett Environmental would have performed those same contracts at a lower price, *i.e.*, without the kickback.  *Id.* ¶¶ 16, 17(b), 17(e)-(f).  The focus of the misrepresentations and the scheme itself thus plainly show that the defendant acted with the specific intent to enter into fraudulently inflated contracts that were funded by the EPA and thereby deprived the EPA of money.  This scheme – and the monetary object thereof – is legally adequate and well-pled in the Indictment.  *See Id.* ¶ 16 (alleging that the defendant's scheme caused the "EPA to pay more for these sub-contracts than it otherwise would have").

It is also well-settled in this Circuit that the intent to deprive a victim of money in the form of a higher price than the victim otherwise would have paid – even where the scheme also involves the deprivation of honest services – is sufficient to support mail and wire fraud charges. In *United States v. Asher*, 854 F.2d 1483 (3d Cir. 1988), the defendant, a political official in Pennsylvania was convicted of conspiracy and mail fraud, among other offenses, for his role in causing a state contract to be awarded to a company in the business of recovering benefits payments, in exchange for that company's payment of bribes.  *Asher*, 854 F.2d at 1485.  The bribes in *Asher* took the form of campaign contributions made to the state treasurer and the state Republican Party.  *Id.* at 1486.  In exchange, the defendant and others caused the state to enter into a contract with the bribing company under which the company would recover benefits for teachers and other school district employees.  *Id.*  At the same time, the state had received an offer to provide the same benefit recovery services from another company for a "significantly lower" price.  *Id.*  The defendant challenged his convictions for mail fraud on the ground that the

13

scheme had merely defrauded the state out of its right to his intangible services, and not to any money or property, in violation of *McNally v. United States*, 483 U.S. 350 (1987) (holding that the mail and wire fraud statutes did not include schemes to deprive citizens' of their intangible rights to the fair and honest services of their elected officials). *Asher*, 854 F.2d at 1487.

The Third Circuit rejected this argument, holding that where "a violation of the rights involved would result in depriving another of something of value, and the indictment, the proofs and the instructions are based on that fact" the mail fraud charge is proper, even if the scheme also involved the deprivation of intangible rights. *Id.* at 1494. The Third Circuit thus affirmed the conviction, recognizing that the defendant's fraud deprived the State of Pennsylvania of its money and property because the state could have awarded the affected contract to another company at a lower price. *Id.* at 1496. In language that could just as well be applied to the instant case, the Third Circuit stated, "the scheme was clearly aimed at awarding a contract, which would have had the effect of requiring [the victim] to bear the burden of an enhanced cost for a service that was available at a substantially lower price." *Id.*

Similarly, in *United States v. Osser*, 864 F.2d 1056 (3d Cir. 1988), the defendant, a public official in Philadelphia, was convicted of, among other offenses, conspiracy and mail fraud, for his role in a bid-rigging and kickback scheme to award city government contracts to printing companies. *Osser*, 864 F.2d at 1057. After the Supreme Court decided *McNally*, the defendant petitioned for a writ of *coram nobis*, arguing that his convictions for mail fraud should be vacated on the ground that the scheme had merely defrauded the city out of its right to his intangible services, and not to any money or property, in violation of *McNally*. *Id.* at 1057. Evidence at trial, however, had shown that during the one year that the bid-rigging and kickback scheme was suspended, the printing companies' bids dropped by 17 and 45 percent, respectively.

14

*Id.* at 1062-63.  The following year, when the agreement was reinstated, the bids came in 40 percent higher.  *Id.*  Thus, the Court had no trouble finding that the "arrangement worked out by [the defendant] resulted in a substantial monetary detriment to the City."  *Id.* at 1063.  In other words, the defendant's scheme had the effect of overcharging the city for printing contracts because, in the absence of the scheme, the printing companies would have submitted lower bids. Just as in *Osser*, the defendant's scheme here caused Bennett Environmental to overcharge the EPA through the submission of a fraudulently inflated bid pursuant to a corrupt scheme.  *See also United States v. Perholtz*, 836 F.2d 554, 558 (D.C. Cir. 1987) ("Here defendants did more than assert control over the flow of the subcontractors' funds.  Their scheme ensured that the 'negotiated' cost of the subcontracts was *higher than the price at which the subcontractors would have been willing to contract*, and ensured that this higher cost was passed through to the [victim] in its [] contract with the prime contractor.  The defendants' scheme caused the [victim] to pay more than it need have.") (emphasis added).

2.      The No-Sale Theory Does Not Undermine the Fraud Charges

The defendant seeks to undermine this straightforward application of the wire and major fraud statutes to this case by invoking a series of Second Circuit cases that have come to stand for a proposition known as the "no-sale theory."  *See United States v. Shellef*, 507 F.3d 82 (2d. Cir. 2007); *United States v. Novak*, 443 F.3d 150 (2d Cir. 2006); *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987); *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970); Def. Mot. 10-11.  Under the no-sale theory, a fraud charge is insufficient when a fraudulent misrepresentation does "no more than cause [] victims to enter into transactions they would otherwise avoid."  *Shellef*, 507 F.3d at 108.  Rather, to constitute fraud, the scheme must depend "on a misrepresentation of an essential element of the bargain."  *Id*.

15

For instance, in the leading Second Circuit case of *United States v. Regent Office Supply Co.*, agents of the defendant stationary supply company lied about who they were in order to gain access to potential customers. *Regent Office Supply Co.*, 421 F.2d at 1176. However, once the agents got through to the potential customers, the "price and quality of the merchandise [were] always discussed honestly." *Id.* at 1177. The company was convicted at trial based on the peripheral misrepresentations told by the agents but, on appeal, the Second Circuit reversed the mail fraud conviction due to a lack of fraudulent intent inasmuch as there was no "actual harm or injury [] contemplated by the schemer." *Id.* at 1180. Put simply, the misrepresentation had no effect on the fundamental terms of the bargain – for instance, on the price or quality of the stationary. *Id.* ("[T]he customer gets exactly what he expected and at the price he expected to pay.").

The no-sale theory, however, has no application to the present case. The defendant relies solely on Second Circuit precedent to make this argument. There is a notable lack of any approval of or citations to *Shellef, Novak, Starr,* or *Regent Office Supply Co.* in any opinion by the Third Circuit, despite the cases going back over forty years. Rather, the element of specific intent has been described in this Circuit traditionally as "to act knowingly and with a specific intent to deceive for the purpose of causing some deprivation or loss to another of money [or] property." *Russo*, 166 Fed. App'x at 660. There is no additional requirement that the scheme target an "essential element" of a transaction in this Circuit.[4]

---

[4] Second Circuit cases supporting the no-sale theory, especially *Shellef*, which is further described below, are also in some tension with a number of other Second Circuit cases that do suggest that fraud can be found where a victim would not have entered into a transaction had it known of the deception. *See, e.g.*, *United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991); *United States v. Frank*, 156 F.3d 332 (2d Cir. 1998); *United States v. Walker*, 191 F.3d 326 (2d Cir. 1999). Indeed, *Frank*, more fully discussed below, is more analogous to the present case than any other cited by the defendant. In any event, the Second Circuit has recently clarified that the no-sale doctrine is not applicable where the government can, as here, adequately allege actual harm to the victim. *See, e.g.*, *United States v. Binday*, No. 14-2809-cr, 2015 WL 6444932 (2d Cir. Oct. 26, 2015).

For instance, the only Third Circuit case cited by the defendant in connection with intent to defraud, *United States v. Henry*, 29 F.3d 112 (3d Cir. 1994), is not on point.  In *Henry*, the government charged a public official with bank and wire fraud for orchestrating a scheme in which a bank had received last looks in a bidding process that led to the award of governmental financial contracts.  *Henry*, 29 F.3d at 113.  The government's theory was that the scheme deprived the losing banks of the fair opportunity to bid for those contracts.  *Id.*  The defendant was convicted at trial, but the Third Circuit reversed on the ground that the losing banks had no traditionally recognized property rights in a fair and honest opportunity to bid.  *Id.* at 115.  Accordingly, there could be no legally cognizable scheme to defraud by the defendant to deprive the victimized banks of this form of intangible property.  *Id.*  *Henry* adds nothing to the defendant's argument.  *First*, *Henry* speaks only about what constitutes money or property under the statute; the majority opinion does not even mention, let alone find any deficiency in, the element of intent to defraud.  *Second*, *Henry* is concerned with a novel and intangible property right, the "opportunity" to bid.  By contrast, the present case involves no allegations of such potentially novel property rights.  Quite the opposite, in fact, as the alleged scheme targeted the EPA's money.

Moreover, even if the no-sale theory applied, the alleged scheme plainly affected an "essential element" of the targeted transaction – the price.  *See, e.g.*, *Osser*, 864 F.2d at 1063 (finding harm in the "substantial monetary detriment to the City" based on higher prices).  As explained above, the defendant's conduct caused Bennett Environmental to win contracts at prices that were higher than they otherwise would have bid, thereby harming the EPA by causing it to pay additional money.  Accordingly, the alleged fraud included an intent to defraud that

17

targeted a sufficiently essential element of Bennett Environmental's contracts for soil treatment and disposal.[5]

B.  The Fraud Charges Include Allegations of Material False Statements and Omissions

      The defendant attempts to take a second run at the Indictment by repackaging the same argument about lack of intent in a different form, namely, lack of materiality.  In this second attack, the defendant argues that none of the alleged misrepresentations are material for the same reason he argued that the Indictment fails to allege that the defendant acted with the requisite intent to defraud: he claims the misrepresentations did not relate to "an essential element of the bargain."  Def. Mot. 15.  However, for the same reasons that the defendant's intent to defraud is properly alleged in the Indictment, the alleged misrepresentations are material.

      In *Neder v. United States*, 527 U.S. 1, 25 (1999), the Supreme Court held that "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."  This requirement applies to the major fraud statute as well, which employs the same statutory element of a "scheme to defraud."  *See Litvak*, 30 F.Supp.3d at 152.  In the Third Circuit, that simply means that "a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed."  *Neder*, 527 U.S. at 16.  There is no requirement that the false statement actually influence the decision, only that it was "of a type" that would ordinarily do so.  *United States v.*

---

[5] There can also be no serious question that the alleged scheme was intended to deprive the EPA of its intangible and valuable right to control its assets and to material information necessary to make discretionary economic decisions. Because the competitive bidding process at Federal Creosote had to comply with the FAR, no contract could have been awarded to Bennett Environmental based on a noncompliant bid.  Yet, Bennett Environmental's misrepresentations concerning the payment of kickbacks deprived the EPA of material information, and thereby deprived the EPA of the right to control its assets.  *See* Indictment, Count One ¶¶ 6-9.  While the Third Circuit has rejected this theory of mail and wire fraud where there were no attendant allegations of monetary loss, *see United States v. Zauber*, 857 F.2d 137, 147 (3d Cir.1988) (stating that loss of control theory "is too amorphous to constitute a violation of the mail fraud statute"), the Third Circuit has more recently accepted the loss of control theory where the scheme interfered with the victim's exclusive rights to control its money and property, *see United States v. Hedaithy*, 392 F.3d 580, 603 (3d Cir. 2004) (holding that company's intangible interest in the confidentiality of its materials constituted a property right and that the Supreme Court had never rejected the "loss of control" theory of property rights with respect to non-regulatory matters).

*McBane*, 433 F.3d 344, 351 (3d Cir. 2005).  Furthermore, there is no requirement that the indictment actually allege that the representations were material, it is sufficient to allege facts that "warrant the inference of materiality."  *United States v. Chalker*, No. 12 Cr. 0367, 2013 WL 4547754, at *7 (E.D. Pa. Aug. 27, 2013).

Plainly, the defendant's misrepresentations that there would be no kickbacks, and the actual inclusion of kickbacks within Bennett Environmental's inflated contract prices in exchange for inside bidding information were material.  As explained above, the Indictment primarily alleges a scheme to defraud the EPA by increasing the price that the EPA had to pay for soil treatment and disposal.  *See* Indictment, Count One ¶ 13.  Surely, it would or could have influenced the EPA's decisionmaking process to know that it was paying extra money on Bennett Environmental's contracts in order to fund illegal kickbacks.  This information relates directly to the price of the contract, an obviously material element of the bargain.  The Indictment also alleges that the kickback and bidding misrepresentations were made in the context of a contract regulated by a governing set of Federal guidelines that controlled how and under what terms the EPA was able to contract – the FAR.  *See* Indictment, Count One ¶¶ 6-8. The FAR, among other things, has an outright prohibition against kickbacks.  *Id*.  The FAR also required competitive bidding.  Accordingly, the EPA could not have entertained an offer to contract under terms that were not compliant with the FAR.  *See* Indictment, Count One ¶ 6 (alleging that the prime contractor, acting on behalf of the EPA, "was required to award sub-contracts at Federal Creosote subject to a competitive bidding policy under" the FAR).  At the very least, this information meets the minimum legal standard that the information was "a type" of fact that the EPA would normally have wanted to know.  *McBane*, 433 F.3d at 351. Accordingly, the alleged misrepresentations were material.

19

As with the specific intent argument, the defendant seeks to undermine this straightforward materiality analysis by invoking Second Circuit case law relating to the no-sale theory. Def Mot. 15. These arguments are wholly unavailing. As explained above, to the extent that the Second Circuit has imposed a heightened materiality standard under the no-sale theory with a focus on the essential terms of the bargain, that requirement has never been incorporated in this Circuit. Moreover, even under this heightened standard, the facts as alleged in the Indictment – including misrepresentations that affected the price of a contract and its noncompliance with the FAR – do concern essential terms of the contracts at issue. Accordingly, the Indictment sufficiently pleads wire fraud and major fraud against the United States on the basis of material misrepresentations, even under Second Circuit standards.

Finally, the defendant's invocation of *Shellef* and *United States v. Mittelstaedt*, 31 F.3d 1208 (2d. Cir. 1994), in no way alters this analysis. In *Shellef*, the defendant purchased a controlled chemical and, in the process, falsely represented to the selling manufacturers that he would not sell it domestically. *Shellef*, 507 F.3d at 90-91. The defendant then sold the chemical domestically, thereby triggering certain adverse tax consequences. *Id.* The Second Circuit found that this misrepresentation did not go to the nature of the bargain (*e.g.*, the price or quality of the chemicals purchased from the manufacturers), and at best it merely induced the manufacturers to enter into a transaction they would have otherwise avoided, with no actual harm. *Id.* at 109. The present case is thus readily distinguishable from *Shellef* inasmuch as the defendant's misrepresentations here caused actual harm to the EPA by depriving it of money and property, and led it to enter into a contract that violated its governing regulations.

Likewise, *Mittelstaedt* simply stands for the proposition that withheld information in a scheme to defraud is material if, and only if, the information is "of some independent value" or it

bears on the "ultimate value of the transaction." *Mittelstaedt*, 31 F.3d at 1217.  The information

withheld in the defendant's scheme here – the inclusion of kickbacks in Bennett Environmental's

bid submissions – was both.  It would necessarily have had an effect on the EPA's

decisionmaking process (and required a different result), and it caused the EPA to pay more for

its contracts with Bennett Environmental.  The defendant's reliance on these cases fails to

undermine the materiality of the defendant's alleged misrepresentations.  Accordingly, the Fraud

Charges are properly alleged in the Indictment, and the defendant's arguments to the contrary

should be rejected.

## POINT II
### Evidence of the Soil Switch is Intrinsic to the Charged Counts and is Admissible at Trial as Evidence of Kickbacks and Fraud

In addition to the kickbacks and inside bidding information alleged in the Indictment, the

defendant further defrauded the EPA through the soil switch – by obtaining payment for the

disposal of soil in a secure facility when such soil was never disposed of in a secure facility, as

required under the contract.  However, the defendant argues that no liability may be premised on

the soil switch because it is not charged in the Indictment, and because the defendant's conduct

in connection with the soil switch was not fraudulent inasmuch as (a) the soil switch involved no

false statements; and (b) the EPA suffered no harm.  Def. Mot. 24, 28.  To the government's

understanding, the defendant is not actually seeking to dismiss any counts in the Indictment

through this argument, and the argument is thus, in effect, a motion *in limine* to exclude evidence

of the soil switch at trial.  Nevertheless, as a threshold matter, the defendant is wrong to assert

that the soil switch did not constitute fraud.  Moreover, while this conduct was not explicitly

charged in the Indictment, as this Court has previously acknowledged at the trial of co-defendant

Gordon McDonald, the soil switch is intrinsic to the charged counts, and evidence about its

execution and resulting loss to the EPA are therefore admissible at trial to prove the kickback

and fraud objects of the charged conspiracy.

A.  Relevant Background

On July 8, 2002, Bennett Environmental entered into a contract, in the form of a purchase

order that was countersigned by Sevenson, to remove and treat soil in connection with Phase

Two, or Lagoon A, for a price of $498.50 per-ton of soil.  *See* Supp. BOP 1.  The defendant

reviewed and approved of that contract, worth over $11 million dollars to Bennett

Environmental.  In bidding on the contract, Bennett Environmental had submitted two prices –

$498.50 per-ton, assuming the work required disposal in a more expensive Subtitle C-type[6]

landfill, and $418.50 per-ton, assuming the work required disposal in a cheaper Subtitle D-type

landfill.  Ultimately, the contract was awarded at the higher price, under the EPA's direction that

the soil would have to be disposed of in the more expensive Subtitle C-type landfill.  That

contract specifically stated, among other terms, that the disposal of thermally treated soil had to

take place in a Subtitle C or equivalent landfill.

Unbeknownst to the EPA, shortly after Bennett Environmental began removing and

treating soil from Lagoon A, it began to stockpile the soil at its facility in Canada rather than

dispose of it in a Subtitle C-type landfill.  Bennett Environmental did this because the defendant

and his subordiantes did not want to give business to the company it had previously used for

Subtitle C-type landfill disposal.  This was part of an effort by the defendant to damage this

disposal company – both in its reputation and its finances – due to the defendant's fear that this

disposal company would soon be able to compete with Bennett Environmental for soil treatment

work.  The treated Federal Creosote soil was thus not deposited in any landfill whatsoever prior

---

[6] Because disposal was to take place in Canada, Bennett Environmental was to dispose of the treated soil in a secure landfill that was equivalent to a RCRA Subtitle C landfill in the United States.

to November 2002.  Instead, as noted above, the soil remained stockpiled at Bennett Environmental's own property, which was not an approved C-type or D-type landfill. Nonetheless, Bennett Environmental invoiced and billed for the "Transportation, Thermal Treatment and Disposal" of this soil at the contract price of $498.50 per-ton.[7]

On November 12, 2002, the EPA reconsidered its earlier decision and concluded that from then on, treated soil from Lagoon A could be disposed of in the cheaper "Subtitle D equivalent landfill," provided certain conditions were met.  Accordingly, a change order was issued on November 18, 2002, so that, going forward, Bennett Environmental could dispose of the Lagoon A soil in a Subtitle D-type landfill, and thus charge the EPA the lower price from its earlier bid of $418.50 per-ton.  Indeed, on January 14, 2003, Sevenson informed the EPA that this lower price of $418.50 would apply to all shipments from November 19, 2002 and on. Following that change, Bennett Environmental also disposed of the soil that it had stockpiled prior to November 18, 2002, in cheaper Subtitle D-type landfills, despite the fact that Bennett Environmental had already billed the EPA at the Subtitle C rate of $498.50 for this work.  *See* Supp. BOP 1.  Bennett Environmental never disclosed to the EPA that it had not disposed of this soil in a Subtitle C-type landfill.  *Id.*  In addition, contrary to Sevenson's assertion that the lower price would apply from November 19 and on, Bennett Environmental billed the EPA for approximately 279 tons of soil that was shipped on November 19 at the higher price of $498.50 per-ton.  Altogether, this resulted in a significant windfall to Bennett Environmental.

When McDonald later learned about Bennett Environmental's failure to dispose of the soil in accordance with the contract, he told Bennett Environmental employees, including

---

[7] For Lagoon A, unlike Lagoon B, Bennett Environmental was not required to submit certifications of disposal to the EPA as a precondition for payment.  Bennett Environmental originally asked for this change in payment policy for Lagoon A  to receive faster payment, however, it had the additional effect of allowing Bennett Environmental to bill for the stockpiled soil from Lagoon A without having to certify to the EPA that the soil had actually been disposed of pursuant to the contract.

Griffiths, that he would tell the EPA about it unless Bennett Environmental paid him additional kickback moneys, above and beyond the $13.50 per-ton kickback that was built into Bennett Environmental's bid price for the Lagoon A work.  The defendant and his co-conspirators agreed to pay McDonald additional kickbacks rather than inform the EPA that the soil was not disposed of in accordance with the contract.  These additional kickbacks predominantly took the form of payments to McDonald's shell company, GMEC.

Prior to McDonald learning of the soil switch, Bennett Environmental had been paying kickbacks to GMEC in connection with Lagoon A in the range of approximately $30,000 to $80,000.  *See* BOP 5-6.  For a time, following the soil switch, these kickbacks increased dramatically.  *Id.*  For instance, the first major GMEC invoice after the soil switch billed Bennett Environmental for $253,095 on April 24, 2003, just a few days after the defendant traveled to Federal Creosote and discussed the payment of kickbacks with Gordon McDonald.

B.   The Defendant's Fraud in Connection with the Soil Switch is Intrinsic to the Charged Conspiracy

Evidence of the soil switch will comprise important proof at trial as it provided the basis for some of the kickbacks to McDonald (which are themselves alleged in the Indictment and included in the BOP) and engendered additional kickbacks and fraud in the award of subsequent Federal Creosote contracts.[8]  Importantly, without the soil switch payments, the remainder of the charged conspiracy would have collapsed as they prevented McDonald from informing the EPA about Bennett Environmental's use of a cheaper disposal method.  As an initial matter, however, the defendant is wrong to assert that the soil switch itself did not actually involve any fraud, and, instead, involved simply a contract with risk of loss.  Def. Mot. 24.  To the contrary, the defendant and his co-conspirators' conduct in relation to the soil switch actually harmed the EPA

---

[8] The defendant has been on notice of the government's theory regarding the soil switch conduct since at least when the government provided its supplemental bill of particulars on June 26, 2015.

by employing deceit and material omissions to fraudulently charge the EPA for services that were not actually provided.

       1.     <u>The Soil Switch Involved Intent to Defraud and Material Misrepresentations and Omissions</u>

An intent to defraud may be found where the victims do "not receive the services that they believed were being provided." *United States v. Wallach*, 935 F.2d 445, 461 (2d Cir. 1991). On this score, *United States v. Frank*, 156 F.3d 332 (2d Cir. 1998) is instructive. The scheme in *Frank* involved the defendant's removal of sewage: due to Federal sewage dumping regulations, various municipalities contracted with the defendant to have the defendant's company dump sewage 106 miles from the shore. *Id.* 334-35. For this service specifically – dumping the sewage 106 miles from shore – the defendant charged a higher price to customers than when he had been allowed to dump the sewage closer to shore in earlier years. *Id.* The defendant was convicted of mail fraud when it was discovered that he had not been providing the service contracted for – dumping the sewage 106 miles from shore – but rather, had been dumping it closer. *Id.* In affirming the conviction, the court stated that "[a] defendant who has used the mails fraudulently to bill a customer for services that have not been provided may not defeat a mail fraud charge simply by providing alternative services." *Id.* In determining that the defendant had not provided the service for which he had billed the customers, the court specifically noted that the customers had "paid a premium for" the defendant dumping the sewage at 106 miles, rather than closer to shore. *Id.*

Like in *Frank*, the defendant here charged a premium to the EPA for the specific service of disposing of soil in Subtitle C-type landfills. The service was not merely the disposal of soil in any form in which Bennett Environmental saw fit. This is evidenced by the fact that Bennett Environmental specifically acknowledged through its two-tier bid that it would not charge the

25

same premium to dispose of the soil in a Subtitle D-type landfill.  Thus, just as in *Frank* where the service was not merely sewage removal, the service here was not merely soil disposal. Accordingly, when the defendant failed to provide that specific service, he effectively billed the EPA for a service that was not provided, the loss amount being the difference between Bennett Environmental's Subtitle C-type and D-type bid prices.  "[P]roviding alternative services" does not negate the defendant's intent to defraud.  *Wallach*, 935 F.2d at 461.  It is also immaterial that the EPA subsequently allowed Bennett Environmental to dispose of the soil more cheaply beginning in November 2002.  If Bennett Environmental wanted to have that rule applied retroactively, it was free to ask the EPA to do so.  Having made the choice not to ask for that change (probably to avoid having to reveal its deception and rebate its windfall profits to the EPA), the defendant cannot now argue that the EPA had no rights in that money to begin with.

The defendant's hypothetical illustration, *see* Def. Mot. 26, is thus inapposite.  By agreeing to dispose of the soil in a Subtitle C-type landfill at a firm fixed price, Bennett Environmental certainly bore the risk that the *costs of Subtitle C disposal* would increase, just as it would be entitled to any additional profits it might make should the *costs of Subtitle C disposal* have decreased.  That provides no justification, however, to provide an altogether different service to the EPA.  *See United States v. Paccione*, 949 F.2d 1183, 1197 (2d Cir. 1991) ("Here there is no question that Environmental Contractors's customers did not get what they paid for.").

The defendant also erroneously argues that the soil switch involved no "material false statements or deceptive omissions."  Def. Mot. 28-29.  The means and method of the soil switch, as described above, however, certainly involved deceit and material omissions.  Notably, as the government indicated in response to the defendant's earlier motion seeking a bill of particulars,

literal misrepresentations are not required to support a fraud.  *See*, *e.g.*, *United States v. Basroon*, 38 Fed. App'x 772, 780 (3d Cir. 2002); *United States v. Colton*, 231 F.3d 890, 897 (4th Cir. 2000); *United States v. Martin*, 411 F.Supp.2d 370, 372 (S.D.N.Y. 2006) ("[A] misrepresentation or omission is not a necessary element of a 'scheme to defraud' under the wire fraud statute."). A scheme to defraud may involve "a departure from fundamental honesty, moral uprightedness, or fair play and candid dealings in the general light of the community."  *United States v. Dobson*, 419 F.3d 231, 239 (3d Cir. 2005) (internal quotations omitted).  "[O]nce a property right is found to exist, section 1341's language 'any scheme or artifice to defraud' is to be interpreted broadly." *United States v. Fumo*, No. 06 Cr. 319, 2009 WL 1688482, at *10 (E.D. Pa. June 17, 2009) (internal quotations omitted).

Here, the defendant's invoices and billing for $498.50 constituted a misrepresentation that, in light of Bennett Environmental's bid for services and the contract's requirement for Subtitle C-type landfill disposal, would have defrauded the EPA into believing they were getting that service.  It is no different than the false and fraudulent billing in *Frank*, where liability was premised on billing "as if" a different service had been provided.  *Frank*, 156 F.3d at 335.  At the very least, this form of deceitful billing constituted a departure from honest and fair dealings, and had the effect of harming the EPA.  Indeed, Bennett Environmental's payment of over half-a-million dollars in extra kickbacks to McDonald not to reveal the soil switch to the EPA highlights the dishonest and deceptive nature of the scheme.

In addition, the defendant's failure to disclose the soil switch was fraudulent.  *See* Supp. BOP 1.  One of the defendant's co-conspirators, Sevenson, was hired by USACE, on behalf of the EPA, to oversee the cleanup of the site.  Sevenson was entrusted to spend Federal money and oversee numerous aspects of the site on behalf of the EPA and USACE.  Accordingly, Sevenson,

27

and by extension, Gordon McDonald, owed a duty of care to the EPA and was not at liberty to conceal material facts that would hurt the EPA. *See* Indictment, Count One ¶ 9. Thus, as a co-conspirator of McDonald's, the defendant is liable for defrauding the EPA through the soil switch by his failure to disclose, not to mention the defendant's efforts to conceal. *See, e.g.*, *United States v. Schurr*, 794 F.2d 903, 909 n.8 (3d Cir. 1986) ("The result in this case is consonant with the doctrine that conspirators are liable for conspiracy to accomplish whatever foreseeable crimes their co-conspirators commit in the course of accomplishing the main objectives of the conspiracy.").

        2.      The Soil Switch is Intrinsic to the Charged Conspiracy

        The soil switch conduct is intrinsic to the charged counts and is highly relevant conduct to the kickback and fraud objects of the charged conspiracy in Count One. It was part and parcel of a continuing course of conduct among the defendant and his co-conspirators to pay kickbacks for favorable treatment, and it is necessary to explain a significant portion of the kickbacks paid to GMEC. Accordingly, just as the Court admitted evidence of the soil switch at both the trial and sentencing phases of co-defendant McDonald, it is admissible here.

        Evidence of acts related to the crimes charged in an indictment is admissible in the Third Circuit as intrinsic evidence if those acts either (a) "directly prove" the charged offense, or (b) "facilitate the commission of the charged crime." *United States v. Green*, 617 F.3d 233, 249 (3d Cir. 2010). Evidence of the soil switch is relevant here for both of those reasons. First, evidence of the soil switch constitutes direct proof of the fraud object of the conspiracy, as laid out above. Second, the evidence provides direct proof of the defendant's payment of kickbacks, a separate object of the conspiracy charged in the Indictment. *See* Indictment, Count One, ¶¶ 12-15. Indeed, some of the charged kickbacks that are the subject of this case resulted, at least in part,

28

from the soil switch. *See* Indictment, Count One ¶ 17(d); BOP 5-6. Third, lies and kickbacks that came about due to the soil switch facilitated and engendered additional last looks and kickbacks in connection with the fraudulent award of contracts in mid to late 2003, and the soil switch payments were calculated to keep the conspiracy from collapsing by preventing McDonald from informing the EPA about Bennett Environmental's use of a cheaper disposal method. Accordingly, evidence of the soil switch is intrinsically related to the charged crimes and will constitute a significant part of the proof at trial against the defendant. At the very least, evidence of the soil switch should be admissible under Federal Rule of Evidence 404(b) to show the defendant's "intent, plan, knowledge, identity, or absence of mistake or accident." *United States v. Singleton*, 458 Fed. App'x 169, 173 (3d Cir. 2012).[9] Accordingly, the defendant's arguments concerning the soil switch do not raise any grounds for dismissal of the Indictment, and, to the extent that the defendant's arguments suggest otherwise, evidence of the soil switch should be proper and admissible at trial.

### POINT III
### The Defendant Has Failed to Demonstrate Improper Pre-Indictment Delay

The defendant argues that the government deliberately delayed bringing the Indictment against him in this case and that such a delay caused him prejudice through the purported loss of electronic documents and witnesses' memories. Def. Mot. 30-35. His allegations rely upon misstating the law, while his factual assertions are insufficiently proven and, even if true, would not meet the standard required by the Third Circuit.

---

[9] Likewise, the soil switch is relevant conduct under the United States Sentencing Guidelines. *See* U.S.S.G. § 1B1.3(a)(2) (including as relevant conduct all acts and omissions "that were part of the same course of conduct or common scheme or plan"); *see also id.*, Application Note 9 (noting that multiple offenses are part of a common scheme or plan if they involve at least one common factor including, "common victims, common accomplices, common purpose, or similar modus operandi").

"To succeed on a motion to dismiss for preindictment delay, a defendant must meet a heavy burden." *United States v. Baxt*, 74 F.Supp.2d 425, 429 (D.N.J. 1999). The statute of limitations constitutes a defendant's "primary guarantee against the bringing of overly stale criminal charges," *United States v. Marion*, 404 U.S. 307, 322 (1971), and dismissal on grounds of pre-indictment delay is only appropriate where the court "finds the delay to be so oppressive that it violates the Due Process Clause of the Fifth Amendment." *Baxt*, 74 F.Supp.2d at 429. *See also United States v. Lovasco*, 431 U.S. 783, 788 (1977) (noting that Due Process has a "limited role to play in protecting against oppressive delay," and that role is secondary to the statute of limitations). In other words, to dismiss an indictment on grounds of pre-indictment delay under the Due Process clause, a court must find that "compelling respondent to stand trial after the government delayed indictment to investigate further violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency." *Lovasco*, 431 U.S. at 790 (quotations and citations omitted).

A motion to dismiss for pre-indictment delay requires the defendant to satisfy a two prong analysis that was established by a pair of Supreme Court cases, *Marion* and *Lovasco*, which stand as the seminal cases on this subject. As stated by the Third Circuit, "[t]o invoke the *extreme* sanction of dismissal of the indictments under the Due Process Clause, the defendants must prove 'that the government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense.'" *United States v. Sebetich*, 776 F.2d 412, 430 (3d Cir. 1985) (*citing United States v. Gouveia*, 467 U.S. 180 (1984); *Lovasco*, 431 U.S. at 789–90; *Marion*, 404 U.S. at 324) (emphasis added). The defendant falls well-short of meeting his burden on either prong of this standard.

30

A.    The Government Did Not Deliberately and Improperly Delay Bringing an Indictment
      Against the Defendant

In order to meet the first prong of the pre-indictment delay analysis, the defendant must

show more than mere delay.  He must "establish that the delay was designed by the government

to give some tactical advantage over [him]."  *Sebetich*, 776 F.2d at 430.  In other words, the

defendant must "demonstrat[e] prosecutorial bad faith."  *Id*.  The defendant fails to do so.

1.    The Defendant Has Failed to Establish that the Government Delayed Bringing an
      Indictment in Bad Faith

The Supreme Court has instructed courts to exercise restraint in reviewing pre-indictment

delays.  In *Lovasco*, the Supreme Court overturned the lower courts' dismissals based on pre-

indictment delay, stating that "the Due Process Clause does not permit courts to abort criminal

prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an

indictment. Judges are not free, in defining 'due process,' to impose on law enforcement officials

our 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their

judicial function.'  Our task is more circumscribed."  431 U.S. at 790 (quoting *Rochin v.

California*, 342 U.S. 165, 170 (1952)).  The Court went on to make clear that "prosecutors do not

deviate" from the requirements of the Due Process Clause "when they defer seeking indictments

until they have probable cause to believe an accused is guilty;" in fact, it "should be equally

obvious that prosecutors are under no duty to file charges as soon as probable cause exists but

before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable

doubt."  *Id.* at 790-91.  The Court reasoned that forcing prosecutors to indict before they are

ready would lead to errant prosecutions, on the one hand, and failed prosecutions, on the other,

having a "deleterious effect both upon the rights of the accused and upon the ability of society to

protect itself."  *Id.* at 791 (quoting *United States v. Ewell*, 383 U.S. 166, 120 (1966)).  The Court

in *Lovasco* further stressed the need to allow prosecutors time to develop evidence in cases involving multiple defendants or multiple criminal acts, such as the one currently before this Court.  *Id.* at 792-94.

Reviewing the case before it, the Supreme Court in *Lovasco* found that the government's continuing efforts to ascertain the truth, even after it had sufficient evidence to prosecute the defendant,[10] complied with the demands of the Fifth Amendment's Due Process Clause.  In so holding, the Court stated that "[r]ather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt.  Penalizing prosecutors who defer action for these reasons would subordinate the goal of 'orderly expedition' to that of 'mere speed.'"  *Id.* at 795 (quoting *Smith v. United States*, 360 U.S. 1, 10 (1959)).

The Third Circuit, applying this standard, has rejected arguments for improper delay where the government has offered explanations for the duration of its investigation or a gap between the completion of the investigation and bringing charges.  In *United States v. Staton*, 605 Fed. App'x 110, 113 (3d Cir. 2015), the court, citing *Lovasco*, held that a delay of seven years was permissible where that delay was due to the effort required by prosecutors to unravel the defendant's multiple fraudulent schemes.  In *United States v. Cannistraro*, 800 F.Supp. 30, 51-54 (D.N.J. 1992), the court cited the complexity of the investigation and the need to gather foreign-located evidence as legitimate bases for pre-indictment delay.  The court further noted that the loss of evidence due to the delay in bringing charges also harmed the government,

---

[10] The trial court had found that the government had sufficient evidence to prosecute 17 months before it indicted the defendant in *Lovasco*.  *Id.* at 787.

32

undermining the defendant's claim that the government intentionally dawdled to gain a tactical advantage.  *Id.* at 57.

Ignoring this established line of cases, the defendant improperly relies on *United States v. Harmon*, 379 F.Supp. 1349 (D.N.J. 1974), in support of the defendant's claim that the government improperly delayed bringing an indictment against him.  The *Harmon* decision pre-dated the Supreme Court's decision in *Lovasco*, and applied a permissive, and no longer valid, standard that did not require a demonstration of the government's bad faith.  *See United States v. Werme*, No. 89 Cr. 132, 1989 WL 156616 at *6, n.5 (E.D.Pa. Dec. 26, 1989) (holding that the court in *Harmon* "rejected the proposition that dismissal is proper where the defendant shows prejudice and that the government intentionally delayed prosecution to gain some tactical advantage. It is beyond question, however, that this is now the standard in the Third Circuit.") (citing *Sebetich*, 776 F.2d 412, 430).

The defendant also cites *Baxt* for the proposition that heavy caseloads are not an excuse to delay bringing an indictment, but he neglects to mention that the court in *Baxt* rejected the defendant's argument of improper delay.  In *Baxt*, the government's investigation was completely inactive for four years before indictment.  *Baxt*, 74 F.Supp.2d at 430.  Yet, even under such extreme facts and in an opinion in which the court admonished the government for mishandling its caseload, the court held that the defendant "had failed to show intentional delay on the part of the government," noting that the Supreme Court's holdings in *Marion* and *Lovasco* required a showing of "prosecutorial bad faith."  *Id.*  In holding that a lack of diligence did not equate to improper motivation, the court recognized that "the establishment of law enforcement

33

priorities is an executive and not a judicial function," and "the law vests prosecutors with broad discretion in deciding how to allocate prosecutorial resources." *Id.* at 432.[11]

> 2.     The Government Properly Exercised Its Discretion in Indicting the Defendant on August 31, 2009

The defendant presents the following insufficient allegations in support of his claim that the government intended to gain a tactical advantage through pretrial delay:  (a) the government waited to toll the statute of limitations under 18 U.S.C. § 3292 and used an unnecessary and slow MLAT[12] request to collect evidence; and (b) the government, specifically the EPA-OIG, failed to respond to Bennett Environmental's contact in May or June of 2004 expressing an interest in cooperating with its investigation.  Def. Mot. 35.  The defendant cites no actual evidence of prosecutorial bad faith, instead relying on loose innuendo while arguing that the government "made a deliberate decision not to make this prosecution a priority."  *Id.*  Even if this were true, which it avowedly is not, the defendant is asking the Court to do exactly what the Supreme Court has condemned in *Lovasco*, second-guess the government's investigative decisions and demand that the government bring charges before it was ready to do so, putting haste ahead of accuracy. *Lovasco*, 431 U.S. at 795.

According to *United States v. Otto*, 742 F.2d 104 (3d Cir. 1984), the defendant is required "to produce evidence establishing either prejudice or intentional delay before the government must account for the delay" where the indictment was brought within the applicable statute of limitations and "time restrictions found appropriate by Congress."  *Id.* at 108.  Here, the defendant was indicted within the properly tolled statute of limitations, and he has failed to

---

[11] The defendant also cites *United States v. Alderman*, 423 F.Supp. 847 (D.Md. 1976), another pre-*Lovasco* case.  In *Alderman*, the defendant presented actual evidence that a prosecutor intentionally delayed bringing an indictment in an effort to make the defendant "crack" and divulge information that would be useful in other prosecutions.  *Id.* at 856-57.  There is no such evidence (or even such an allegation) here.

[12] "MLAT" request refers to diplomatic assistances requests made under Treaty with Canada on Mutual Legal Assistance in Criminal Matters.

produce evidence supporting his argument of pre-indictment delay.  Nonetheless, the government provides the following context for the timing of the Indictment.

The EPA-OIG formally opened its investigation on or about March 4, 2004, after receiving a complaint alleging bidding improprieties from a bidder that lost a 2003 Federal Creosote contract to Bennett Environmental.  Brezinski Decl. ¶ 2.  Initially, the EPA-OIG coordinated with the U.S. Securities and Exchange Commission to investigate whether Sevenson employees owned stock in Bennett Environmental, as such stock ownership would be a conflict of interest and would explain Sevenson's apparent efforts to award contracts to Bennett Environmental at the expense of its competitors.  *Id.* at ¶ 3.  At that time, the investigation confirmed that certain Sevenson employees, including McDonald, held stock in Bennett Environmental, but the investigation did not uncover any evidence of kickbacks.  *Id.*

The government's investigation into the Bennett Environmental contracts remained focused on securities-related conflicts of interest until 2006.  *Id.* at ¶ 4.  In the fall of 2006, after being subpoenaed by the government, Bennett Environmental began discussions with the government and revealed the existence, but not the full extent, of the company's involvement in kickbacks and fraud at Federal Creosote.  *Id.*  In June 2007, Norman Stoerr, a former Sevenson employee, broke his silence and informed the government of a series of kickback arrangements with multiple subcontractors at Federal Creosote and Diamond Alkali and in which he and McDonald were involved over a number of years.[13]  *Id.* ¶ 5.  While Stoerr was not aware of the entire scheme between McDonald and the defendant, he did report receiving a cruise as a gift from Bennett Environmental, and he disclosed his belief that Bennett Environmental contracts at Federal Creosote charged extra to pay for such gifts.  *Id.*  In May 2008, Tejpar began proffering evidence to the government.  *Id.* at ¶ 8.  Crucially, Griffiths began talking to the government six

---

[13] Diamond Alkali was another Superfund site where McDonald was the Sevenson project manager.

months later, in November 2008, and shed further light on the arrangement between Bennett Environmental, the defendant, and McDonald.  *Id.* at ¶ 9.  Tejpar signed his cooperation agreement on December 15, 2008 and pleaded guilty the same day.  *Id.* at ¶ 8.  On January 13, 2009, the government issued an MLAT request for relevant bank and telephone records located in Canada.  Griffiths signed his cooperation agreement and pleaded guilty on July 6, 2009.  *Id.* at ¶ 9.  Both Tejpar and Griffiths resided in Canada and submitted to United States jurisdiction at the time of their guilty pleas.  The government received the final production of material from Canada on August 7, 2009, and the defendant was indicted less than a month later.

The history of the government's investigation into contracting improprieties at Federal Creosote and Diamond Alkali makes clear that the defendant cannot even point to an actual pre-indictment delay, much less meet his burden of showing bad faith in any such delay.  Each of his baseless allegations shall be dealt with in turn.

a.    The Government Did Not Impermissibly Delay Tolling the Statute of Limitations or Misuse the MLAT Process to Obtain Evidence

As discussed above, the investigation into improprieties at Superfund sites managed by Gordon McDonald was complex and necessarily broad.  As the Court is well-aware, McDonald was engaged in kickback schemes with several contractors at Federal Creosote and Diamond Alkali.[14]  *See* Indictment, Count 5 at ¶¶ 6-8; Indictment Count 7 ¶¶ 5-8.  McDonald's alleged

---

[14] This investigation has culminated in the prosecutions and convictions of several individuals and companies: Gordon McDonald (09 Cr. 656, indicted on August 31, 2009 and convicted by jury verdict on September 30, 2013), James Haas (09 Cr. 656, indicted on August 31, 2009 and pleaded guilty on October 28, 2009), Robert Griffiths (09 Cr. 506, information filed and pleaded guilty on July 6, 2009), Frederick Landgraber (09 Cr. 480, information filed and pleaded guilty on June 25, 2009), National Industrial Supply (09 Cr. 141, information filed and pleaded guilty on March 4, 2009), Victor Boski (09 Cr. 141, information filed and pleaded guilty on March 4, 2009), Christopher Tranchina (09 Cr. 134, information filed and pleaded guilty on February 26, 2009), Zul Tejpar (08 Cr. 912, information filed and pleaded guilty on December 15, 2008), Bennett Environmental, Inc. (08 Cr. 534, information filed and pleaded guilty on July 31, 2008), John Drimak (08 Cr. 522, information filed and pleaded guilty on July 23, 2008), JMJ Environmental, Inc. (08 Cr. 522, information filed and pleaded guilty on July 23, 2008), and Norman Stoerr (08 Cr. 521, information filed and pleaded guilty on July 23, 2008).

36

scheme with the defendant is just one of those illicit arrangements, though it was the most lucrative.

With respect to the Bennett Environmental scheme itself, McDonald, the defendant, and their co-conspirators used shell corporations, dummy invoices, and other complex means to conceal their misconduct. Brezinski Decl. ¶ 6. Stoerr, who became a valuable source of information regarding McDonald's other schemes after he began to provide information in 2007, was almost entirely cut out of McDonald's conspiracy with the defendant. *Id.* at ¶ 5. This meant that the government's potential sources of evidence were limited to certain Bennett Environmental employees, all of whom resided outside of the United States (and the jurisdiction of its law enforcement agencies). *Id.* at ¶ 7. As noted above, Tejpar first proffered information to the government in May 2008, but did not agree to submit to U.S. jurisdiction until he signed his cooperation agreement in December 2008. *Id.* at ¶ 8. Griffiths provided evidence of the scheme involving Bennett Environmental starting in November 2008, and he did not agree to cooperate until July 2009. *Id.* at ¶ 9.

The government made a diplomatic request pursuant to the MLAT in January 2009 for authenticated phone and bank records related to the defendant's alleged criminal conduct directly from the Canadian phone companies and banks that maintained those records. The request was necessary to obtain evidence, confirm witness statements, and obtain authenticated records for admission at trial. A request to toll the statute of limitations was filed shortly thereafter. Prior to making the MLAT request, the government asked Griffiths to provide telephone and bank records, but he was only able to provide those documents that were in his possession and was unable to obtain others sought by the government. *Id*.

Unlike in *Baxt*, where the court still denied the defendant's motion to dismiss, the government did not sit on its hands before indicting or tolling the statute of limitations.  Instead, between 2004 and 2009, the EPA-OIG and the Antitrust Division expended considerable time and resources unraveling the complex kickback and fraud schemes at Federal Creosote (as well as Diamond Alkali), including collecting evidence from the United States and Canada.  *See Staton*, 605 Fed. App'x at 113 (holding a seven year pre-indictment delay did not violate the Due Process Clause where the government was investigating complex fraud schemes).  As for the defendant's related argument that the government needlessly used the MLAT process, *Lovasco* forecloses the defendant's attempts to second-guess the government's approach to evidence collection, particularly where, as here, the government's actions are justified.  431 U.S. at 790 (holding that "the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment" and describing the courts' role as "more circumscribed" in evaluating the government's determination as to when to bring charges against a defendant).

      b.     The Government Did Not Act Improperly in Not Responding to Bennett Environmental's 2004 Letter

The defendant claims that the EPA-OIG failed to respond to a mid-2004 letter proposing cooperation from Bennett Environmental, and the defendant suggests that the EPA-OIG did so in order to not preserve evidence in Bennett Environmental's possession.  This argument is meritless and confusing.  The defendant appears to be suggesting that, at the very start of their investigation, EPA-OIG agents intentionally allowed evidence to be destroyed in order to harm the defense of John Bennett, a man they did not yet know was involved in the kickback-and-fraud scheme that took place at Federal Creosote.  Of course, the destruction of evidence at that time would have harmed the EPA-OIG investigation more than the defendant's future defense.

As the court recognized in *Cannistraro*, where the government faces the same risk of lost evidence due to its delay, the government is not likely to have intended the delay in order to gain a tactical advantage over the defendant.  800 F.Supp. at 57.

At the time of Bennett Environmental's 2004 letter, the EPA-OIG was pursuing a theory that Sevenson employees owned Bennett Environmental stock and had directed contracts to Bennett Environmental in order to raise the company's stock price.  Brezinski Decl. ¶ 3.  The EPA-OIG had not determined the extent of the involvement of Bennett Environmental and its employees.  *Id.*  Whether EPA-OIG agents responded to a letter from Bennett Environmental or not, that decision was well within their discretion to conduct the investigation as they saw fit. The defendant has not demonstrated that such a decision was, or even could have been, taken in bad faith.

B.     The Defendant Fails to Demonstrate Actual Prejudice Caused by Any Purported Pre-Indictment Delay

For the reasons stated above, the defendant has not demonstrated that the government delayed the Indictment in bad faith, and his Due Process argument should be rejected on that ground alone.  The defendant also fails to establish the second prong necessary to substantiate his claim, actual prejudice.  The defendant claims that the alleged pre-indictment delay in this case has led to prejudice through (a) the loss of Bennett Environmental's electronic documents and (b) the fading of witness memories.  For the reasons described below, the defendant has failed to show that these losses actually prejudice him and that they are the result of government action. As a result, he has failed to meet his burden on either prong of the standard, let alone satisfy both.

To carry his burden on the second prong of the pre-indictment delay analysis, the defendant must prove *actual* prejudice.  As the Court framed the issue in *Marion*:  "Appellees

rely solely on the real possibility of prejudice inherent in any extended delay:  that memories will dim, witnesses become inaccessible, and evidence be lost.  In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment."  404 U.S. at 325-26.  *See also United States v. Ismaili*, 828 F.2d 153 (1987) ("The mere possibility of prejudice inherent in any extended delay, or the mere possibility that a witness might become inaccessible and evidence be lost, is not sufficient.") (citing *Marion*, 404 U.S. at 315).[15] Notably, "[c]ourts have interpreted *Marion* to erect a stringent standard for showings of actual prejudice."  *Baxt*, 74 F.Supp.2d at 434.  In order to prevail, "a defendant must demonstrate, with specificity, that the delay resulted in the loss of exculpatory evidence, whether testimonial or documentary, that is not merely cumulative of evidence available from other sources."  *Id.  See also United States v. Stradford*, No. 06 Cr. 275, 2008 WL 2275999, at *6 (D.N.J. May 30, 2008) (holding that "general allegations of prejudice are insufficient to support a Due Process claim."). The defendant has failed to do so here.

1.   The Defendant Suffered No Actual Prejudice through the Loss of Electronic Evidence

The bulk of the defendant's claim of prejudice derives from his argument that, had the EPA-OIG responded to Bennett Environmental's counsel's offer to discuss cooperation in 2004, documents from mid-2003 to mid-2004 would have been spared the company's annual purge. As a matter of fact and law, the defendant has not established prejudice as a result of these purportedly lost documents for the following reasons:  (1) the documents were either not lost or

---

[15] The defendant relies on the *Harmon* decision for the proposition that inherent risks are adequate to maintain a claim of prejudice.  Def. Mot. 30-31.  The holdings of *Marion* and *Ismaili* make clear that defendant's reliance on *Harmon* is misplaced.

were cumulative; (2) they were not exculpatory; and (3) any delay by the government had no effect on the preservation of these documents.

        a.        <u>The "Lost" Materials Were Not Lost or Were Cumulative</u>

In order to establish actual prejudice, the defendant must show that the lost materials were "not merely cumulative" of evidence available from other sources. *United States v. United States Gypsum Co.*, 550 F.2d 115, 119 (3d Cir. 1977) (holding that the death of 36 potential defense witnesses during an 8 year delay did not establish actual prejudice because the defendants did not establish that the "deceased would have proffered testimony not merely cumulative of the evidence already at [the defendants'] disposal."). The defendant here claims that emails from mid-2003 to mid-2004 were lost in the company's regular annual electronic document purge. Def. Mot. 32. However, counsel for Bennett Environmental, DLA Piper LLP ("DLA"), collected electronic documents from the computers of Griffiths, Tejpar, Rick Stern (Bennett Environmental's CFO), and the defendant as part of its internal investigation in approximately 2004 and 2005. Brezinski Decl. ¶ 4. The collected electronic documents include emails and metadata from May 2002 through July 2004. DLA produced relevant documents and metadata from this preserved collection to the government on October 5, 2006. The government produced these documents and metadata to the defendant pursuant to Rule 16 of the Federal Rules of Criminal Procedure on March 9, 2015. Thereafter, the defendant requested a production of all electronic documents and media in Bennett Environmental's possession. The government obtained all of the remaining electronic documents collected by DLA, along with their metadata, and produced them to the defendant by October 7, 2015. In addition, contrary to the defendant's assertions, the government had obtained relevant electronic documents from Tejpar's two laptop computers during its investigation. The government provided those

electronic documents, along with corresponding metadata, to the defendant on April 17, 2015.
More recently, at the defendant's request, the government has now obtained Tejpar's two
computers. The EPA is running the defendant's search terms on both of those computers, and it
in the process of providing responsive electronic documents and emails. Of course, many of
these responsive documents will have already been provided to the defendant in April, and the
only new documents will be those that were labeled irrelevant by Tejpar and his counsel, but
which were still captured by the defendant's broad search terms.

In light of these Bennett Environmental and Tejpar document productions, along with the
extensive discovery in this case, the defendant has failed to establish that any relevant materials
were actually lost in 2004, and that the materials that may have been lost were not cumulative to
those that were retained by DLA or Tejpar.

      b.    <u>The Defendant Has Not Demonstrated that the "Lost" Materials Were
Exculpatory</u>

The defendant's claim that any lost electronic documents or data is exculpatory is pure
speculation. Without a showing that the missing evidence was actually exculpatory, the
defendant cannot establish actual prejudice. *See Cannistraro*, 800 F.Supp. at 57 (holding that the
defendants failed to show actual prejudice where several potential witnesses died during pre-
indictment delay, but the defendants did not establish that the deceased witnesses' testimony
would have been exculpatory, even though the defendants described what the testimony would
have been).

The defendant claims, in particular, that the government has not produced metadata
proving that the defendant received inculpatory emails, Def. Mot. 33, but to the extent that such
evidence is missing, the defendant has provided no basis to conclude that it is exculpatory. In
fact, given that the circumstances surrounding the government's electronic document exhibits

42

will be supported by witness testimony, the metadata is more likely to further inculpate the defendant.  The defendant also argues that missing metadata opens the door for authenticity challenges.  Def. Mot. 32-34.  If anything, this argument reveals that the defendant is helped, not harmed, by any absent metadata.  Either way, the defendant has fallen well-short of establishing that exculpatory evidence has been lost.

c.   The Government's Delayed Response to DLA Had No Effect on Document Retention

As discussed above, the EPA-OIG opened its investigation in March 2004.  In May or June of that same year, Bennett Environmental claims that it approached the EPA-OIG to discuss potential cooperation.  At the time, the EPA-OIG was operating under the theory that Sevenson employees may have owned stock in Bennett Environmental and helped the company to win Federal Creosote contracts in order to increase the value of their holdings.  The EPA-OIG was not aware of Bennett's extensive kickbacks-for-contracts fraud scheme until at least 2006, and it did not have information from co-conspirators Griffiths and Tejpar until 2008.  In fact, according to the EPA-OIG report that the defendant relies upon to establish that the government failed to respond to Bennett Environmental's 2004 overtures, Griffiths and the defendant had not been "fully forthcoming" with Bennett Environmental's special committee investigation in 2004, hampering the company's ability to learn the truth of what occurred at Federal Creosote. Brezinski Decl. ¶ 4, Ex. A-3, 1-2.  In light of the foregoing, the EPA-OIG was focused on different misconduct in 2004 and would not have been in a position to request documents relevant to the kickback and fraud arrangement that is the subject of this prosecution.

Furthermore, the defendant has glossed over the fact that Bennett Environmental's documents, as well as the defendant, Griffiths, and Tejpar, were in Canada in 2004, outside of the government's subpoena power.  Just because DLA sent a letter to the government in mid-

43

2004 to discuss the possibility of cooperation does not mean it would have voluntarily preserved and provided incriminating documents, much less documents related to a crime of which the EPA-OIG, and likely DLA, were unaware at the time.

Finally, as noted above, DLA did preserve Bennett Environmental documents as part of its internal investigation into the Federal Creosote contracts, and the defendant has failed to explain how DLA's preservation efforts would have changed had the EPA-OIG responded to DLA's 2004 letter.

2.   The Defendant's Claim of Memory Loss Does Not Establish Actual Prejudice from Pre-Indictment Delay

The defendant's other claim for lost evidence revolves around his lost memories and the purported lost memories of unspecified "key witnesses."  Def. Mot. 34.  This claim of prejudice is too vague and speculative, and the defendant has not established that pre-indictment delay is responsible for lost memories when it took over five years from the date of indictment for the U.S. government to obtain jurisdiction over him.

In *Baxt*, the court was presented with a similar argument.  Baxt contended that his physical and mental health deteriorated over the course of the investigation, resulting in lost memory and other challenges to mounting a defense.  *Baxt*, 74 F.Supp.2d at 434-35.  In rejecting this argument, the court held that "[t]he defendant must demonstrate, with specificity, that his mental loss or incapacity will prevent him from offering exculpatory evidence that is not merely cumulative of evidence available from other sources."  *Id.* at 435.  Here, the defendant has not specified how purported memory loss will prevent him from offering unique exculpatory evidence.  Instead, he has just claimed that his memory and other memories have faded.  *See United States v. McDougal*, 133 F.3d 1110, 1113 (8th Cir. 1998) ("Even if McDougal's medical condition had impaired his memory, the mere loss of or impairment of memories does not

44

constitute actual prejudice for the purposes of the Due Process Clause.").  Furthermore, the defendant's claim of memory loss from "key witnesses" is facially vague.  He does not identify who these witnesses are, how their memory loss has deprived him of exculpatory evidence, and why that exculpatory evidence is not available from other sources.  Without such information, the defendant cannot carry his burden of establishing actual prejudice.

The defendant faces another hurdle to establishing actual prejudice from memory loss as a result government's purported delay:  his lengthy extradition.  The government first learned of the defendant's kickback-and-fraud conspiracy in 2006, and, as discussed above, the extent of the scheme was developed over the following years, with co-conspirators signing cooperation agreements in December 2008 and July 2009.  The defendant was indicted on August 31, 2009. The defendant, a Canadian citizen residing in Canada, exercised his right to oppose extradition from Canada.  The defendant pursued every avenue available to him, appealing all the way to the Canadian Supreme Court.  These efforts, which the defendant was entitled to undertake, meant that the defendant did not arrive in the United States until November 14, 2014, over five years after he was indicted.  The defendant cites memory loss due to "the passage of time," Def. Mot. 34, but he does not, and cannot, factually distinguish between lost memories due to the government's alleged pre-indictment delay and lost memories due to his post-indictment delay.

Courts have made it clear that delay itself is not a due process violation, only intentional delay undertaken in bad faith that actually prejudices the defendant.  The defendant has not carried his burden to establish that such impropriety occurred here.  Therefore, his motion to dismiss based on pre-indictment delay should be denied.

<u>POINT IV</u>
**The Court Properly Tolled the Statute of Limitations under 18 U.S.C. § 3292, and the Defendant was Indicted within the Limitations Period**

The defendant contends that the district court's tolling of the statute of limitations under 18 U.S.C. § 3292 was invalid on the grounds that the government's application was mere pretext. In this case, the statute of limitations was tolled for approximately six-and-a-half months, from January 13, 2009 until July 31, 2009, by court order. The basis for that tolling was the pendency of the government's request for assistance in collecting documents from the Canadian government under the MLAT. Without the tolling, Count One would have expired on August 18, 2009, thirteen days before a grand jury returned the Indictment against the defendant, while Count Two would have expired on May 15, 2009, three-and-a-half months before the Indictment's return. With the tolling under § 3292, it is undisputed that the indictment was brought within applicable statute of limitations. In fact, with tolling, the government had approximately six months left before the statute of limitations would have run on Count One and three months before it would have run on Count Two. The defendant claims, however, that the government could have obtained the sought-after documents through Griffiths, a co-conspirator to the defendant who has since become a cooperating witness for the government. The defendant's attack on the district court's tolling order is devoid of legal or factual support.

Under 18 U.S.C. § 3292, a district court "shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country." 18 U.S.C. § 3292(a)(1). The government must apply for such tolling, and such application must indicate "that evidence of an offense is in a foreign country." *Id.* In other words,

46

> A plain reading of § 3292 demonstrates that a district court's decision to suspend the running of a statute of limitations is limited to two considerations: 1) whether an official request was made; and 2) whether that official request was made for evidence that reasonably appears to be in the country to which the request was made. If both those considerations are met, the statute of limitations "shall" be suspended.

*United States v. Broughton*, 689 F.3d 1260, 1273 (11th Cir. 2012) (citing 18 U.S.C. § 3292). *See also United States v. Jenkins*, 633 F.3d 788, 797 (9th Cir. 2011) (applying the same standard); *United States v. Atiyeh*, 402 F.3d 354, 364 (3d Cir. 2005) (setting forth the same two-part standard as taken from the legislative history). The court in *Broughton* described § 3292 as a "procedural mechanism that may be used by the government under certain circumstances and that a district court's inquiry is constrained by the boundaries of the two elements required by § 3292." *Id.*

The criteria for filing a proper application under § 3292 are simple and include no requirement that the sought-after evidence be exclusively available via diplomatic request: "[Section] 3292 is satisfied so long as the government presents 'something with evidentiary value,' as opposed to unsupported assertions, 'tending to prove that it is reasonably likely that evidence of the charged offence is in a foreign country.'"[16] *United States v. Lyttle*, 667 F.3d 220, 224 (2d Cir. 2012) (quoting *United States v. Jenkins*, 633 F.3d 788 (9th Cir. 2011)).

The defendant has mischaracterized the law to read in an additional requirement that the government may only toll the statute of limitations under § 3292 where it cannot obtain foreign-located documents through other means. To do so, he quotes out of context dicta from *United*

---

[16] In *Broughton*, the court held that a sworn affidavit by an Assistant United States Attorney setting forth the extent of the investigation and the need to obtain documents located abroad was satisfactory under 18 U.S.C. § 3292. 689 F.3d at 1274. *See also Jenkins*, 633 F.3d at 798 (holding that a sworn declaration of an IRS agent was adequate when it described the investigation and evidence already obtained from abroad that suggested the existence of additional evidence abroad). In support of its § 3292 application, the government here submitted a similar affidavit from Trial Attorney Jeffrey Martino.

*States v. Meador*, 138 F.3d 986 (5th Cir. 1998), to suggest that an application under § 3292 may only be granted where the evidence "must" be obtained via diplomatic request.  Def. Mot. at 36. The quote from *Meador* does not cite the statute.  In fact, it cites the legislative history, and that language merely describes the reason why Congress passed the law, not a requirement narrowing the law's scope.[17]  The defendant cites no case law in support of his contention that the government must establish that it had no alternative means to gather foreign-located evidence before using an MLAT request and tolling the statute of limitations.  This is because courts have held the opposite.

In *Lyttle*, the defendant similarly argued that tolling under § 3292 was inappropriate where the records the government sought via diplomatic request were obtainable by subpoenaing the U.S.-affiliate of a foreign bank.  667 F.3d at 224-25.  The court dismissed this argument, holding that "[e]ven if this were true, nothing in § 3292 suggests that the foreign evidence must be obtainable only through diplomatic channels for the statute of limitations to be suspended. Rather, the plain text of § 3292 requires the district court, upon proper application, to suspend the statute of limitations when the government chooses to pursue foreign evidence through an official diplomatic request, regardless whether it might have been able to obtain the foreign evidence by other means." *Id.* at 225.[18]

The defendant also relies upon *Atiyeh* but the facts presented in that case are clearly distinguishable.  In *Atiyeh*, the government filed its application to toll the statute of limitations

[17] In *Meador*, the court was concerned with the definition of "final action" under the statute, a question that is not related to the defendant's argument about pretext.

[18] The court in *Lyttle* also rejected a related argument that the government did not need the evidence sought in its MLAT request because it already had enough to secure an indictment.  The court held that "[t]he statute's plain text, however, forecloses this argument as well. Section 3292 does not demand that the foreign evidence sought be pivotal to the indictment; rather, it need only be 'evidence of an offense.'" *Id.* (*quoting* 18 U.S.C. §3292).  The court further noted that § 3292 is meant to facilitate more evidence gathering, not less, by suspending the statute of limitations while the government collects foreign-located evidence. *Id.*

48

*after* it had already received all of the requested foreign-located materials through its diplomatic request. 402 F.3d at 363-64. Because it already had the materials in its actual possession, the government's application necessarily failed to state that "evidence of an offense" was in a foreign country at the time of the application. *Id.* On this ground, and this ground alone, the court held that the government was not entitled to a tolling of the statute of limitations under § 3292. *Id.* at 366-67. *See United States v. Hoffecker*, 530 F.3d 137, 160 (3d Cir. 2008) (distinguishing the case before it from *Atiyeh*, and finding *Atiyeh* inapplicable where the government filed its § 3292 application after it had received some, but not all, documents sought in its MLAT request).

The holding in *Atiyeh* is inapplicable to this case. There is no dispute that the government applied to toll the statute under § 3292, and such tolling was granted, months before it had received the requested documents from Canada. The government's application under § 3292 was filed on January 23, 2009, and the court granted the tolling request the same day. Canada's final response to the MLAT request was sent on July 31, 2009 and received by the government on August 7, 2009. To get around these inconvenient facts, the defendant has tried to argue that the government constructively possessed the documents because it could have obtained them from Griffiths. The defendant cites no law supporting this contention.

The government's MLAT request sought documents in the custody of banks and telephone companies located in Canada, as the government asserted in its § 3292 application. *See* Brezinski Decl. ¶ 9, Ex. A-8. The government's preferred method of obtaining these documents is left to its discretion. *See Lyttle*, 607 F.3d at 225. In this case, Griffiths had been unable to collect the documents, and the government sought authenticated records directly from the pertinent banks and telephone companies for ease of admission and the utmost reliability at

49

trial.[19]  The government further notes that, at the time of the MLAT request, Griffiths had no cooperation agreement with the government, and he was in Canada, outside of the government's subpoena power.

In his effort to unravel the district court's 2009 order tolling the statute of limitations in this case under 18 U.S.C. § 3292, the defendant has ignored the law and facts.  To meet the demands of § 3292, the government must have established that a diplomatic request was made and evidence of the offense is located in the country to which that request was made.  The government did so here when it sought to toll the statute of limitations while its diplomatic request for Canadian bank and telephone records was pending.  Accordingly, the statute of limitations was properly tolled, and the Indictment was returned within the applicable statute of limitations.

## **CONCLUSION**

For the foregoing reasons, the defendant's motion should be denied.


Dated:   November 13, 2015                         Respectfully submitted,


                                                   /s/ Daniel Tracer / Mikhail Vanyo
                                                   HELEN CHRISTODOULOU
                                                   DANIEL TRACER
                                                   MIKHAIL VANYO

---

[19] The defendant's argument that all records should have been obtained through Griffiths is surprising.  The defendant spends a considerable portion of his brief suggesting that Griffiths and others manipulated or altered documents to frame the defendant for a crime he did not commit.  He then suggests that the government violated the Due Process Clause and abused the tolling statute by *not* obtaining phone and bank records through Griffiths.