UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

      Plaintiff,

                                  09-cr-656-02 (SDW)

                vs.

JOHN A. BENNETT,

      Defendant.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


# REPLY MEMORANDUM IN SUPPORT OF
# JOHN A. BENNETT'S MOTION TO DISMISS


MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
(212) 856-9600 (telephone)
(212) 856-9494 (facsimile)

*Attorneys for Defendant John A. Bennett*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

I.    THE ALLEGED CONDUCT DOES NOT CONSTITUTE FRAUD .............................. 1

      a.    The Indictment Fails to Allege a Specific Intent to Defraud
            the EPA of Money and Property.……………………………………………...2

      b.    The Indictment Also Fails to Allege Specific Intent to Defraud
            as There Were No Material Misrepresentations…………………………………..10

II.   NO LIABILITY CAN BE PREMISED ON THE "SOIL SWITCH" ............................. 13

III.  THE GOVERNMENT'S DELAY IN BRINGING AN INDICTMENT
      VIOLATED DUE PROCESS............................................................................................. 18

      a.    The Evidence Shows that the Government Intentionally Delayed
            Bringing the Indictment.……………………………………………………...20

      b.    Mr. Bennett Suffered Actual Prejudice From the Delay………………………….. 22

IV.   THE INDICTMENT IS BARRED BY THE STATUTE OF LIMITATIONS………........24

CONCLUSION………............................................................................................................31

i

## TABLE OF AUTHORITIES

### Cases

*Cleveland v. United States*, 531 U.S. 12 (2000) ...............................................................3, 8

*Doe v. United States*, 487 U.S. 201 (1988)...................................................................30

*Neder v. United States*, 527 U.S. 1 (1999)...................................................................12

*Skilling v. United States*, 561 U.S. 358 (2010) ...........................................................3

*Stirone v. United States*, 361 U.S. 212 (1960) ...........................................................14

*United States v. Alkaabi*, 223 F. Supp. 2d 583 (D.N.J. 2002) .......................................3

*United States v. Asher*, 854 F.2d 1483 (3d Cir. 1988) ................................................9

*United States v. Atiyeh*, 402 F.3d 354 (3d Cir. 2005) ...............................24, 25, 27, 28

*United States v. Baxt*, 74 F. Supp. 2d 425 (D.N.J. 1999).............................................22

*United States v. Beckett*, 208 F.3d 140 (3d Cir. 2000)................................................19

*United States v. Besmajian*, 910 F.2d 1153 (3d Cir. 1990) .........................................15

*United States v. Binday*, 14-CR-2809, 2015 WL 6444932 (2d Cir. Oct. 26, 2015) .....................5

*United States v. Bowling*, No. 14-CR-98,
     2015 WL 3541475 (E.D.N.C. May 26, 2015) .................................................12

*United States v. Broughton*, 689 F.3d 1260 (11th Cir. 2012) ......................................28

*United States v. Critchley*, 353 F.2d 358 (3d Cir. 1965) ............................................14

*United States v. DeGeorge*, 380 F.3d 1203 (9th Cir. 2004).........................................28

*United States v. Frank*, 156 F. 3d 332 (2d Cir. 1998).................................5, 16, 17, 18

*United States v. Gross*, 165 F. Supp. 2d 372 (E.D.N.Y. 2001).....................................22

*United States v. Harmon*, 379 F. Supp. 1349 (D.N.J. 1974)........................................19

*United States v. Hedaithy*, 392 F.3d 580 (3d Cir. 2004)............................................3

*United States v. Henry*, 29 F.3d 112 (3d Cir. 1994) ............................................................ passim

*United States v. Hoffecker*, 530 F.3d 137 (3d Cir. 2008)......................................................25, 26

*United States v. Jackman*, 72 F. App'x 862 (3d Cir. 2003)........................................................23

*United States v. Johns*, 742 F. Supp. 196 (E.D. Pa. 1990),
    *aff'd*, 972 F.2d 1333 (3d Cir. 1991) ........................................................................ passim

*United States v. Jones*, 15-CR-00175, 2015 WL 7069295 (D. Nev. Nov. 10, 2015)...................20

*United States v. Kilroy*, 523 F. Supp. 206 (E.D. Wis. 1981) .........................................................24

*United States v. Libby*, 429 F. Supp. 2d 1 (D.D.C. 2006)..............................................................24

*United States v. Lovasco*, 431 U.S. 783 (1977) ................................................................19, 20, 22

*United States v. Lyttle*, 667 F.3d 220 (2d Cir. 2012) ....................................................................28

*United States v. Marion*, 404 U.S. 307 (1971)....................................................19, 22, 23, 27

*United States v. McBane*, 433 F.3d 344 (3d Cir. 2005) ..............................................................12

*United States v. Meador*, 138 F.3d 986 (5th Cir. 1998)..............................................26, 27, 28, 29

*United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994) ..........................................................13

*United States v. New S. Farm & Home Co.*, 241 U.S. 64 (1916) .................................................6

*United States v. Newmark*, No. 06-CR-447,
    2007 WL 839077 (E.D. Pa. Mar. 14, 2007)............................................................................19

*United States v. Novak*, 443 F.3d 150 (2d Cir. 2006) ...........................................................5, 6

*United States v. Osser*, 864 F.2d 1056 (3d Cir. 1988) ...........................................................9, 10

*United States. v. Perdomo*, 929 F.2d 967 (3d Cir. 1991)............................................................24

*United States v. Regent Office Supply Co.*, 421 F. 2d 1174 (2d Cir. 1970)..……………...5, 6, 7, 8

*United States v. Santiago*, 987 F. Supp. 2d 465 (S.D.N.Y. 2013) ...............................................22

*United States v. Schiff*, 602 F.3d 152, 159 (3d Cir. 2010) ...........................................................15

*United States v. Schwartz*, 924 F. 2d 410 (2d Cir. 1991)...............................................................5

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) ............................................5, 6, 8

*United States v. Sinclair*, 433 F. Supp. 1180 (D. Del. 1977)................................7, 8

*United States v. Starr*, 816 F.2d 94 (2d Cir. 1987) ...............................................3, 5

*United States v. Stein*, 488 F. Supp.2d 350 (S.D.N.Y. 2007) ................................24

*United States v. Trainor*, 277 F. Supp. 2d 1278 (S.D. Fl. 2003),
    *aff'd*, 376 F.3d 1325 (11th Cir. 2004) ..............................................................26

*United States v. Weingold*, 844 F. Supp. 1560 (D.N.J. 1994)...............................3

*United States v. Wilson*, 249 F.3d 366 (5th Cir. 2001),
    *modified*, 322 F.3d 353 (5th Cir. 2003) .............................................................31

*United States v. Zauber*, 857 F.2d 137 (3d Cir. 1988)....................................6, 8, 10, 11

*Waste Conversion, Inc. v. Rollins Envtl. Servs. (NJ), Inc.*,
    No. 88-CIV-7792, 1989 WL 79768 (E.D. Pa. July 7, 1989) ..............................6

*Whitfield v. United States*, 543 U.S. 209 (2014)....................................................31

## **Other Authorities**

18 U.S.C. § 1031...................................................................................................12, 13

18 U.S.C. § 1343...................................................................................................12, 13

18 U.S.C. § 1346....................................................................................................3

18 U.S.C. § 3292 ............................................................................................... *passim*

Abraham Abramovsky & Jonathan I. Edelstein,
    *Time for Final Action on 18 U.S.C. § 3292*, 21 Mich. J. Int'l L. 941 (2000) ...................27

Appellate Brief of the United States, *United States v. Frank*,
    Nos. 86-1775, 96-1780, 1997 WL 34650955 (2d Cir. July 28, 1997)..............................17

Federal Rule of Criminal Procedure 12(b)(1) ....................................................15

Federal Rule of Criminal Procedure 16 ..............................................................24

Federal Rule of Evidence 404(b) ..................................................................14, 15

H.R. Rep. No. 98-907, *reprinted at* 1984 U.S.C.C.A.N. 3578 ......................25, 26, 29

Defendant John Bennett respectfully submits this Reply Memorandum in further support of his motion to dismiss.[1]

In Mr. Bennett's moving brief, we set forth legal defects in the pleadings requiring dismissal of the indictment and portions thereof.  Despite its length, the government's opposition fails to substantively address many of the points raised by Mr. Bennett regarding these fundamental defects.  Perhaps now regretting its failure to charge Mr. Bennett under the honest services statute, which expressly was passed to reach the self-dealing and conflicts of interest scenario alleged here, the government attempts to contort the charges to fit within the classic rubric of a fraud aimed at a deprivation of property.  The government's effort fails because it cannot dispute that Bennett Environmental Inc. ("BEI") performed the agreed-upon services at the agreed-upon price.  With regard to the soil switch, the government's opposition agrees to the relief we are seeking by recognizing that, contrary to its position in its Bill of Particulars, the soil switch is not charged as a theory of liability in the indictment.

The government's opposition also fails to provide a legally sufficient explanation for its extraordinary delay prior to Mr. Bennett's indictment, or to rebut the serious prejudice caused by that delay.  Finally, the government fails to salvage its pretextual effort to toll the statute of limitations by offering a stilted reading of 18 U.S.C. § 3292 without support in this Circuit.

## I.    THE ALLEGED CONDUCT DOES NOT CONSTITUTE FRAUD

The government makes three principal arguments in defending its fraud-based charges: (1) absent the kickbacks, BEI could have bid lower; (2) the Environmental Protection Agency (the "EPA") would not have consented to the contract if it was aware that a violation of the

---

[1] Citations in the form "Ex. __" refer to the exhibits to the Declaration of Jacob Mermelstein dated October 23, 2014 in support of Defendant's Motion to Dismiss.

Federal Acquisition Regulation (the "FAR") had occurred; and (3) the kickbacks necessarily increased the price that the EPA had to pay.

As described below, case law in the Third Circuit and elsewhere makes clear that is not enough. Misrepresentations regarding the internal factors that led a private party to propose a particular price are not fraudulent unless there was a misrepresentation about the essential terms of the bargain – i.e. the quality of the goods or services that would be provided at that price. Here, the essential elements of the transactions between the EPA and BEI were unaffected by the fraud scheme alleged in the indictment, and thus the only object of that scheme is a deprivation of the intangible right to honest services, which theory is not charged. Second, that an alleged untruth caused the EPA to enter into a transaction that it otherwise would have avoided is still not sufficient to support federal fraud charges, unless the misrepresentations pertained to the value of the underlying goods or services, which the government does not, because it cannot, contend here. Third, pertinent decisions hold that the assumption that prices charged were inevitably higher as a result of the kickback scheme is legally insufficient to support a charge of fraudulent deprivation of money or property.

    a.  The Indictment Fails to Allege a Specific Intent to Defraud the EPA of Money or Property

The government's attempt to transform undisclosed self-dealing into criminal fraud without relying on the honest services statute is an effort to fit a square peg into a round hole. At base, the government contends that the charges are legally adequate because BEI's bids were artificially inflated by kickbacks and, absent those kickbacks, BEI would have been willing to offer a lower price to the EPA. That argument fails because the alleged misrepresentations go only to BEI's own internal considerations leading it to arrive at the price that it was willing to offer, and do not alter the economic and other essential elements of the bargain itself. Because

2

the government made the tactical decision not to charge Mr. Bennett under the honest services

statute, 18 U.S.C. § 1346, it cannot now rely on a theory of intangible harm or undisclosed self-

dealing, and is required to identify a tangible interest of the intended victim—i.e. money or a

traditionally-recognized property right.  See, e.g., Cleveland v. United States, 531 U.S. 12, 18-26

(2000); United States v. Hedaithy, 392 F.3d 580, 590 (3d Cir. 2004); United States v. Henry, 29

F.3d 112, 115 (3d Cir. 1994); United States v. Alkaabi, 223 F. Supp. 2d 583, 588 (D.N.J. 2002).

To be actionable, any contemplated harm must affect the nature of the bargain itself.  See

United States v. Weingold, 844 F. Supp. 1560, 1574 (D.N.J. 1994) ("the Government must

demonstrate that the scheme was devised with the specific intent to defraud . . . [and that] the

deceit must have gone to the nature of the bargain") (internal quotation marks and citation

omitted).  Accordingly, as a matter of law, there cannot be contemplated harm or specific intent

to defraud if a customer obtains the benefit of the bargain.  United States v. Starr, 816 F.2d 94,

99-100 (2d Cir. 1987); see also Skilling v. United States, 561 U.S. 358, 400 (2010) (citing Starr,

816 F.2d 99-100, and distinguishing the conduct described therein from honest-services fraud).

The government's opposition tries, but fails, to distinguish United States v. Henry, 29

F.3d 112 (3d Cir. 1994), a case strikingly similar on the facts.  As set forth in Mr. Bennett's

moving brief, in Henry, a public official was charged with bank and wire fraud for running a

scheme in which a favored bank received confidential information about its competitor's bids as

part of a bidding process that resulted in the award of the government agency's deposits.  The

Third Circuit affirmed the dismissal of the charges prior to trial on a defense motion, holding

that, even if there had been an intent to deceive, there was no traditionally recognized property

right to a fair and honest bidding process.  In other words, acting deceitfully was not the same as

conduct targeted to an essential element of the relevant transactions.  As here, the circumstances

3

in Henry could have allowed for speculation that the chosen bidder would have made a more favorable bid, and the government agency would have gotten a better deal if there had been an untainted bidding process.  Indeed, in Henry, like here, the allegation was that, in exchange for a cash contribution and other benefits, the defendant repeatedly disclosed competing bids to a favored bank, allowing the favored bidder "to narrowly outbid [] other banks by offering a slightly higher rate of interest" and thereby receive the desired business, namely, deposits of the agency's funds.  29 F.3d at 113.  And, as here, speculation as to a potentially better result of a hypothetical "fair" bidding process does not make out a deprivation of a traditional, tangible right constituting "money or property," and cannot save a charge actually based on an intangible rights theory.  If there is no discrepancy between the pecuniary benefits the alleged victim reasonably anticipated and those actually received – if the victim got what it paid for – there can be no deprivation of "money or property" and thus no fraud liability.

In response, the government describes the instant case as supposedly involving a clear-cut property right – "the EPA's money" – while Henry was supposedly "concerned with a novel and intangible property right, the 'opportunity' to bid."  Gov't Brief at 17.  In fact, both Henry and this case similarly allege a corruption of the process by which a particular company was chosen for the opportunity to receive millions of dollars in government funds.  Indeed, in affirming the dismissal of the indictment in Henry, the Third Circuit rejected the simplistic notion that the government advances here, and the dissent advanced in Henry, i.e., that an indictment is well-pled merely because government funds were the ultimate object of the scheme.  See Henry, 29 F.3d at 116 ("It is irrelevant that, as the government points out, the scheme allegedly afforded its participants tangible benefits-over $34,000,000 in deposits" from government funds).  Henry thus teaches that an intangible rights case is not transmuted into a

classic "money or property" case merely because the case *involved* money. Instead, the alleged victim also must have received less than the full economic benefit of its agreed-upon bargain. That further condition is not met here.

Rather than substantively responding to the real deficiencies in the indictment that Mr. Bennett raises in his opening brief, the government devotes nearly half of its response to a failed effort to manufacture a split between the law of the Second and Third Circuits. According to the government, in the Third Circuit "there is a notable lack of any approval" of the so-called "no-sale theory," which holds that untruths, even if significant enough to cause a person to enter into a transaction that such person otherwise would have avoided, are still not be sufficient to support federal fraud charges unless they expose that person to economic harm. See Gov't Brief at 16. This conclusion appears to be premised solely on the fact that a few particularly well-known cases in the long line of decisions developing the "no-sale theory"—namely, United States v. Shellef, 507 F.3d 82 (2d Cir. 2007), United States v. Novak, 443 F.3d 150 (2d Cir. 2006), United States v. Starr, 816 F.2d 94 (2d Cir. 1987), and United States v. Regent Office Supply Co., 421 F. 2d 1174 (2d Cir. 1970)—are not regularly cited in decisions from the Third Circuit.[2]

_____

[2] The government inexplicably suggests that there is "some tension" within the Second Circuit itself as to the viability of the Shellef. In support, the government cites to several *pre-Shellef* Second Circuit cases, including United States v. Schwartz, 924 F. 2d 410 (2d Cir. 1991) and United States v. Frank, 156 F. 3d 332 (2d Cir. 1998). These cases unsurprisingly did not cite Shellef because it had not yet been decided. Moreover, these cases cited *with approval* Starr and Regent Office Supply, and reaffirmed the "no sale" doctrine, but on the specific facts, the courts held that the alleged misrepresentations at issue *did* go to the essence of the bargain and thereby caused a discrepancy between the benefits reasonably anticipated and actual benefits received. In particular, Schwartz expressly held that the defendants' misrepresentations caused a loss of valuable good will, and Frank held that the promised services were never provided at all. As just recently reaffirmed in United States v. Binday, No. 14-CR-2809, 2015 WL 6444932, at *6 (2d Cir. Oct. 26, 2015), another case cited by the government: "it is not sufficient, . . . to show merely that the victim would not have entered into a discretionary economic transaction but for the defendant's misrepresentations . . . we have repeatedly rejected application of the mail and

In fact, there is no real difference between relevant Second and Third Circuit law on this issue. Both Circuits agree that specific intent requires not only that a defendant act knowingly and with intent to deceive but also that the scheme target an essential element of the transaction – contrary to the government's suggestion otherwise. See Gov't Brief at 16. Compare, e.g., Novak, 443 F.3d at 159 (to establish specific intent to defraud, the harm contemplated must "affect the very nature of the bargain itself") with Waste Conversion, Inc. v. Rollins Envtl. Servs. (NJ), Inc., No. 88-CIV-7792, 1989 WL 79768, at *9 (E.D. Pa. July 7, 1989) ("[A] 'scheme to defraud' requires more than an intent to deceive. It requires an intent to injure someone by that deception." (citing Regent Office Supply, 421 F.2d at 1180-81)). Similarly, in United States v. Zauber, 857 F.2d 137, 146-48 (3d Cir. 1988), the Third Circuit held that where a pension fund received the benefit of the promised return on an investment, the fact that the investment was secured via self-dealing and kickbacks was immaterial, because deprivation of the right of control *how* the pension fund's money was invested did not constitute the loss of a tangible property right. This legal conclusion is also not a new one. For over a hundred years, courts have held that false statements made to entice a purchaser into a transaction are not fraudulent unless the actual article for sale is different from "the character or kind represented." See, e.g., United States v. New S. Farm & Home Co., 241 U.S. 64, 70 (1916).

A cursory examination of decisions from district courts in this Circuit further demonstrates acceptance of the substance of what the government here labels the "no-sale theory," even if the courts do not use that particular nomenclature. For example, in United States v. Johns, 742 F. Supp. 196 (E.D. Pa. 1990) aff'd, 972 F.2d 1333 (3d Cir. 1991), the government

---

wire fraud statutes where the purported victim received the full economic benefit of its bargain." Id. (citing Shellef). Here, of course, the EPA received the full benefit of its bargain.

had argued that the victim company "lost its 'property' right to control how its money [was] spent;" "was deprived of its 'property' right to know material information concerning the amount its suppliers were willing to charge;" and that "the kickback scheme increased the prices charged to [the company] by the amount of the kickbacks to [the defendant]." Id. at 214. The court held that the government's theory did not make out a fraud because losing the right to control how money was spent or the right to control material information concerning a supplier's prices did not constitute property loss as a matter of law. Id. Particularly relevant here, in so holding, the court rejected the government's premise that prices charged to the victim company were inevitably higher as a result of the kickback scheme. Id. at 214-16. The court emphasized that the government cannot succeed on a theory of constructive loss "due to the legal fiction that it is entitled to the kickback money regardless of overcharge." Id. at 214.

Likewise in United States v. Sinclair, 433 F. Supp. 1180, 1189-90 (D. Del. 1977), the court accepted the "no-sale theory" developed in Regent Office Supply, 421 F.2d at 1180-81, albeit ultimately finding it inapplicable on the facts. In Sinclair, the court acknowledged that under Regent Office Supply "the solicitation of a purchase by means of false representations not directed to the quality, adequacy, or price of the goods to be sold or otherwise to the nature of the bargain does not constitute a scheme to defraud," but concluded that, in the case before it, "the misrepresentations by the defendant were directed to the bargain to which [the victims] believed they had assented." The Sinclair court further observed that under Regent Office Supply, a fraud charge could not be upheld where there was "no proof that the goods were not equal to the value paid," and where the government merely established that certain false representations were made by the defendant, but failed to show that any cognizable injury to the alleged victims could have resulted from them. Rather, under Regent Office Supply the government must establish "an

intent to defraud because the falsity of the representations has been shown to have affected [the victim's] understanding of the bargain and to have influenced their assessment of the value of the bargain to them."  Id. at 1189-90.

The government also argues that because any kickbacks violated the Federal Acquisition Regulation ("FAR"), and the EPA would not knowingly enter into a contract that violates the FAR, BEI must have defrauded the EPA.  That is precisely the argument that the applicable case law teaches is unavailing and demonstrates the fundamental insufficiency of the government's fraud charges.  See Shellef, 507 F.3d at 107-09.  If no discrepancy exists between the benefits reasonably anticipated from a transaction and those actually received, no fraud liability attaches even if the deceit at issue induced the victim to enter into a transaction that it otherwise would have avoided. Therefore, even if the EPA was induced into contracting with BEI due to BEI's deceit in concealing the kickbacks, (which is not the case), fraud liability conditioned on a traditional "money or property" theory does not follow, where, as here, the government received the services that it agreed to purchase at the prices it agreed to pay.  As the Third Circuit held in United States v. Zauber, the right to control how one's assets are spent is not itself a tangible property right.  857 F.2d at 146-47.  Moreover, a regulatory interest such as the integrity of a licensing process is not a property interest.  Cleveland, 531 U.S. at 20.  Just like in Regent Office Supply and in Henry, the government here alleges "an intent to deceive . . . not an intent to defraud."  Sinclair, 433 F. Supp. at 1189.

As a fallback position, the government also argues that even if the "no-sale theory" applies, the fraudulent scheme alleged in the indictment affected an essential element of the targeted transactions: the price.  According to the government, the indictment makes clear that the alleged scheme included supposed improper influence in awarding sub-contracts at

8

fraudulently inflated amounts and that, without the kickbacks, BEI would have performed those same contracts at a lower price. The government relies on United States v. Asher, 854 F.2d 1483 (3d Cir. 1988) and United States v. Osser, 864 F.2d 1056 (3d Cir. 1988) to argue that the intent to deprive a victim of money in the form of a higher price than the victim otherwise would have paid, even if the scheme also involves the deprivation of honest services, is sufficient to establish the commission of fraud. These cases are distinguishable from this one. As in Johns, 742 F. Supp. 196, here the circumstances do not support the government's hypothesis that, without kickbacks, the EPA would have spent less money on these contracts.

In United States v. Asher, the defendant was convicted of conspiracy and mail fraud for causing a state contract to be awarded to a company in exchange for bribes from the company in the form of campaign contributions, when the state had received a concrete offer to provide the same accounting services from another company at a "significantly lower" price. Asher, 854 F.2d at 1486. The Third Circuit affirmed Asher's conviction, specifically because the jury could not have convicted Asher of honest services fraud "without also having found that Asher was involved in a scheme, the sole purpose of which was to ensure" that the state entered into a "contract at a substantially greater cost . . . than a contract obtained through traditional competitive bidding." Id. at 1495-96. Indeed, the government submitted evidence that Arthur Young, Inc., a "nationally recognized accounting firm," was willing and able to perform the same services but at a substantially lower cost. Id. Here, the government's fraud theory is not premised on the claim that other subcontractors had offered to do the project for less money, and there is no such allegation in the indictment. Indeed, BEI's bid was the best available. Unlike in Asher, here the theory of loss is that, hypothetically, absent the bribe, BEI *itself* would have bid lower. In reality, the EPA would actually have paid *more* money if it chose one of BEI's

9

competitors over BEI, which is fatal to the government's fraud theory.  See Henry, 29 F.3d at 114 n.3; accord Zauber, 857 F.2d at 146 (rejecting fraud charges alleging investment returns had been diminished by investment decisions influenced by kickbacks, because no "better deal was available").

United States v. Osser, too is inapposite.  In Osser, the defendant, who was also a public official, was convicted of conspiracy and mail fraud for his role in a collusive bidding scheme in which two firms worked together to ensure that they would be the only firms getting all of the contracts.  864 F.2d at 1057.  Here, multiple vendors submitted bids for work at the Federal Creosote site and the government does not allege any collusion among the vendors.  See Indictment, Count 1, ¶ 16.  In each round of bidding, the EPA reviewed all of the bids submitted, checked whether each bidder was capable of carrying out the work it promised, and ultimately determined that BEI's offer presented the best deal.  The government cannot proceed on a theory of constructive loss based on "the legal fiction that it is entitled to the kickback money regardless of overcharge."  Johns, 742 F. Supp. at 214.

The "object of the contract" – soil treatment and disposal at the Federal Creosote site at the agreed-upon price – thus did not diverge from what had been agreed upon.  As in Henry, even without the alleged exchange of information regarding its competitors' bids, BEI still might have made the same bids or been the only company capable of handling the project.

b. The Indictment Also Fails to Allege Specific Intent to Defraud as There Were No Material Misrepresentations.

The government also cannot establish specific intent to defraud because any alleged failure to disclose that kickbacks were paid in exchange for bid information or even that

kickbacks were included in bid prices, is immaterial as a matter of law.[3]

The government recycles another version of its prior argument to contend that the alleged misrepresentations or omissions were material because they necessarily would have inflated BEI's contract prices.  But the EPA and the USACE evaluated BEI's bid for each project, and each time the EPA determined that the price in which BEI offered to do the project was a fair and adequate price.  The claim that BEI might have been able to transport and thermally treat the soil for less money or that the company could have offered the EPA a better price if it made less of a profit margin on the project is both speculative and beside the point.  By the government's own admission, the EPA was expecting soil treatment and disposal at "fair market prices" (Indictment, Count 1, at ¶ 6), which, by definition, include some profit for the vendor. Moreover, as a matter of logic, the possibility that the seller could have accepted a lower profit margin exists in virtually every commercial arrangement.  Speculation about hypothetical lower bids is insufficient as a matter of law.  See Henry, 29 F.3d at 114-15, 118 n.1; Johns, 742 F. Supp. at 214-15; Zauber, 857 F.2d at 146.

Indeed, the price that BEI bid to do each of the projects was only one of a multitude of factors that the EPA and the USACE considered when deciding which subcontractor to choose for each particular project, including the technical capacity of the subcontractor, the speed with which the work could be completed, the subcontractor's safety record and other non-monetary factors.  The EPA and USACE require that such other factors be considered precisely because a

---

[3] For purposes of this motion only, the Defense assumes as it must the truth of the indictment's allegations regarding kickbacks.  Any suggestion by the government that Gordon McDonald's conviction demonstrates the adequacy of the indictment would be misplaced, however, because Mr. McDonald did not move pretrial to dismiss the indictment on any of the grounds identified in Mr. Bennett's moving brief, and the allegations against Mr. McDonald are distinct and far broader than those alleged against Mr. Bennett.

lower initial bid does not necessarily correlate to a lower overall cost.  Significantly, the government has not alleged that – after inclusion of these necessary factors – there was any other company capable of performing at an overall better value.  Indeed, at the trial of Mr. Bennett's co-defendant, Gordon McDonald, the government's own witnesses testified that BEI's technology, speed, and other pertinent qualities were "vastly superior" to those of its competitors.[4]  Moreover, the government concedes that with respect to the very first round of bidding – the sole bidding round conducted without any alleged improprieties – BEI was fairly and honestly selected as being the best competitor for the job.  Gov't Brief at 2-3.  Given that the government does not (and cannot) argue that any bidder was capable of providing a better overall value to the government, any supposed misrepresentations concerning the bidding process itself could not have been material.

      The government does not contest that, as explained in Mr. Bennett's opening brief, under 18 U.S.C. §§ 1031 and 1343, fraud "require[s] a misrepresentation or concealment of material fact."  Neder v. United States, 527 U.S. 1, 22-23 (1999) (wire fraud requires material misstatement or concealment); United States v. Bowling, No. 14-CR-98, 2015 WL 3541475, at *10 (E.D.N.C. May 26, 2015) (major fraud "requires a material misrepresentation or omission").  In general, a false statement is "material" if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed."  Neder, 527 U.S. at 16 (quotations omitted).  Accord United States v. McBane, 433 F.3d 344, 351 (3d Cir. 2005).

---

[4] See United States v. McDonald, September 20, 2013 Trial Transcript at 27 (Testimony of Robert Griffiths).

Here, the details of BEI's *and its competitors' bids* were submitted to the EPA and the EPA applied established criteria to each bid proposal in order to compare and evaluate them.  In each of the four contracts, the EPA, through the USACE, reviewed the bids and approved of BEI as the vendor for the project after determining that, in its own view, the services to be provided were at least as valuable as the quoted price.  Any alleged omissions regarding purported kickbacks paid behind the scenes thus could not have been material to the EPA's decision to approve a proposal by BEI and to award it the subcontract.  "To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction."  United States v. Mittelstaedt, 31 F.3d 1208, 1217 (2d Cir. 1994).  Any failure to disclose that BEI could have bid at a lower price or that BEI had failed to comply with some of the EPA's requirements for the bidding process was not material to the transactions between BEI and the EPA and thus not in violation of the wire or major fraud statutes.

Accordingly, for the foregoing reasons, as well as those discussed in Mr. Bennett's opening brief, Count One of the indictment as charged against Mr. Bennett must be dismissed to the extent that it charges a conspiracy to violate 18 U.S.C. §§ 1031 and 1343, and Count Two of the indictment must be dismissed in its entirety.

## II.      NO LIABILITY CAN BE PREMISED ON THE "SOIL SWITCH"

As we stated in Mr. Bennett's moving brief, any theory of fraud based on the so-called "soil switch" must be dismissed for three independent reasons: (1) the government has previously acknowledged, and this Court has previously ruled, that this conduct is not charged in the indictment; (2) BEI had a contractual entitlement to the moneys it received; and (3) the indictment fails to allege any false statements or deceptive omissions with respect to the soil switch.

13

In response, the government concedes that the soil switch theory is *not* charged in the indictment.  See Gov't Brief at 21 ("[T]his conduct was not explicitly charged in the Indictment . . .").  That acknowledgement is welcome but surprising, because the government specifically had identified the soil switch as a basis of liability in its Supplemental Bill of Particulars, necessitating the instant motion.  As the government now recognizes, its Supplemental Bill of Particulars inappropriately purported to broaden the indictment to include conduct that the Court had already ruled – and that the government had previously agreed – was not charged in the indictment returned by the grand jury against Mr. Bennett.  See Ex. J, at 134-135 (the Court: "It's not a part of indictment . . . the conspiracies are pretty clear and laid out in the indictment . . . and that's not one of them.").  The government makes no effort to counter, and thus accepts, Mr. Bennett's argument, set forth on pages 21-22 of his opening brief, that it may not expand or amend the charges in the indictment by means of a bill of particulars.  See Stirone v. United States, 361 U.S. 212, 216 (1960); United States v. Critchley, 353 F.2d 358, 362 (3d Cir. 1965).

By its abandonment of the "soil switch" as a theory of liability, the government has agreed to the relief Mr. Bennett seeks in the instant motion to dismiss concerning the soil switch. Nonetheless, the government devotes nine further pages of its brief to addressing an issue that is not before the Court:  whether *evidence* of the soil switch should be admissible at trial as relevant uncharged conduct, either under 404(b) or otherwise.  See Gov't Brief at 29 ("At the very least, evidence of the soil switch should be admissible under Federal Rule of Evidence 404(b) . . . . evidence of the soil switch should be proper and admissible at trial.").  Contrary to the government's suggestion, the instant motion was not "in effect, a motion *in limine*," Gov't Brief at 21, but rather a straightforward motion to dismiss a theory of liability that the government

14

expressly and unjustifiably included in its bill of particulars.[5]  Admissibility of evidence

generally, including other uncharged crimes or other wrongful acts, is a distinct issue that will be

addressed through *in limine* motions at the appropriate time.  Because the government has not yet

provided notice under 404(b) of its intent to introduce any evidence of such other uncharged bad

acts, and a briefing schedule for *in limine* motions has not yet been set, addressing the

admissibility evidence of this uncharged conduct would be premature.

Should the government provide notice of its intent to offer evidence of the soil switch at

trial under Rule 404(b) or another evidentiary ground, setting forth how it contends that its

proffered evidence meets the relevant standard, Mr. Bennett will respond at that time.  Without

prejudice to such arguments Mr. Bennett may make at such time, at a minimum, the government

must be precluded from describing this uncharged conduct as a "fraud."  Such characterization

would seriously and unfairly prejudice Mr. Bennett, and will necessitate an extended additional

mini-trial on the complex and technical underlying facts concerning the so-called soil switch –

going well beyond the circumstances set forth in Mr. Bennett's opening brief – that will further

demonstrate the soil switch itself could not be accurately described as a "fraud."

The government's premature arguments concerning admissibility also do not support its

description of this conduct as "fraudulent."[6]  As described in Mr. Bennett's moving brief, BEI

---

[5] Contrary to the government's suggestion, a motion to dismiss is the proper vehicle for resolving
the validity of a theory of criminality identified in the government's bill of particulars,
irrespective of whether it will result in the dismissal of an entire count.  See United States v.
Schiff, 602 F.3d 152, 159 (3d Cir. 2010) (affirming dismissal of "predicate legal theories"
identified in bill of particulars); Fed. R. Crim. P. 12(b)(1) ("A party may raise by pretrial motion
any defense, objection, or request that the court can determine without a trial on the merits.")

[6] Because the government has acknowledged this conduct was not charged in the indictment, the
government is not entitled to a presumption that its factual allegations are true.  Cf. United States

had a contractual entitlement to the moneys it received and no false statement or deceptive

omission was made with respect to the soil switch.  In its opposition, the government makes a

number of concessions that further undermine its assertion that this conduct was in any sense

"fraudulent."  In particular, the government acknowledges that BEI's delay in disposing of soil

was not done with deceptive intent, but rather for a legitimate business purpose.[7]  The

government also acknowledges that BEI was able to obtain an additional profit only because

publicly-disclosed regulatory changes in the intervening period – issued by the EPA itself –

allowed BEI to save money by disposing of soil in a less expensive type of landfill.  Further, the

government concedes that BEI's invoices to Sevenson contained no statement concerning

whether soil *had* been disposed, or any discussion of when or where soil *would be* disposed, and

that BEI "was not required to submit certifications of disposal to the EPA as a precondition for

payment."  Gov't Brief at 23 n.7.  The government cites no case holding that a numerical price,

without any misleading description of the services provided, could give rise to fraud liability

merely because the contracted-for services had not yet been provided by that date – particularly

in a contract that did not require certifications of completion prior to invoicing.

　　　The government's reliance on United States v. Frank, 156 F.3d 332 (2d Cir. 1998) is

misplaced.  In Frank, defendants were employees of a disposal company that had been hired by

municipalities to dispose of sewage 106 miles from shore, but instead illegally dumped that

sewage much closer to shore, which was both in violation of federal regulations at the time, and

---

v. Besmajian, 910 F.2d 1153, 1154 (3d Cir. 1990) ("[T]he district court accepts as true the
factual allegations set forth in the indictment.").

[7] The government's attempt to tarnish BEI by describing its intent as to inflict "damage" on
competitor's "reputation and finances," Gov't Brief at 22, is both irrelevant and unsupported by
the facts.

"could have subjected the municipality to fines and to the loss of its environmental permit."  Id.
at 335.  Notably, the defendants in that case did not merely charge a higher price than their
services warranted, but also affirmatively falsified their billing records for the purpose of
concealing the actual proximity to shore at which the sewage had been disposed – a crucial fact
that is omitted from the government's description of the case.[8]  See Gov't Brief at 25.  Here,
unlike in Frank, BEI disposed of all soil in an appropriate lawful facility as required by its
contract with Sevenson[9] and then-existing environmental regulations.  The EPA was not at risk
of any fine or adverse consequence, and no allegation is made that any invoice was falsified.
Rather, BEI simply delayed disposing of some soil until the price of disposal happened to fall
due to an intervening regulatory change instituted by the EPA itself.

       The government's attempt to suggest the EPA received something less than it bargained
for also is without foundation.  By the government's own description, the EPA's objective was to
have soil disposed in a lawful manner, consistent with its own regulations.  Originally, the EPA
decided that the soil required disposal in a "Subtitle C or equivalent" landfill, but within a few

---

[8] See Frank, 156 F.3d at 335 ("[F]or the purpose of concealing [their] 'short-dumping,' both
defendants participated in the falsification of billing-related records.").  Indeed, the extent of the
falsification of records was a crucial point that was addressed at length in the government's
briefing in that case.  For instance, the trial record demonstrated that the defendants had directed
subordinates to keep two separate sets of books, with one set containing "made up amount" of
sludge to be used "to create a phony 'official' document" for billing purposes, had represented to
the customers that their invoices were for the specific service of disposing the soil at 106 miles
off-shore, and had been "complicit[] in falsifying billing records to conceal the illegal dumping
from the municipalities."  Appellate Brief of the United States, United States v. Frank, Nos. 86-
1775, 96-1780, at *10, *11, *35 (2d Cir. July 28, 1997) (quoting trial transcript), available at
1997 WL 34650955.

[9] In this regard, it is important to recognize that there was no contractual relationship between
BEI and the EPA.  BEI was hired by Sevenson, which in turn was hired by the USACE, which in
turn was hired by the EPA.  At no time was BEI in contractual privity with the EPA.  Contrary to
the insinuations in the government's opposition, BEI did not provide a service "to the EPA," and
BEI did not, and could not have, billed the EPA for its services.

months, the EPA reconsidered and concluded that disposal in a cheaper "Subtitle D or equivalent" landfill was adequate.  See Ex. H.  Thus, unlike in Frank, the purported "victim" has acknowledged that the disposal location was adequate.  In addition, the price BEI was contractually permitted to charge was determined at the time it removed the soil.  The government may be unhappy that a subsequent change in the law resulted in extra profit for BEI – but this unhappiness does not constitute a criminal violation.  Indeed, as the government fails to contest, it does not even constitute a contractual breach.

* * * *

In sum, a ruling by the Court confirming the government's newfound recognition (contrary the position it took in its Supplemental Bill of Particulars) that the "soil switch" is not charged and cannot form a basis for fraud liability at trial will resolve this prong of the instant motion.  Although the parties have previewed portions of their position regarding the admissibility at trial of evidence of the soil switch, a ruling on that issue should await full briefing from the parties via *in limine* motions prior to trial.

## III.   THE GOVERNMENT'S DELAY IN BRINGING AN INDICTMENT VIOLATED DUE PROCESS

This case presents one of the unusual instances where the government's lengthy and unjustified delay in seeking Mr. Bennett's indictment warrants dismissal.  In an attempt to excuse its lengthy procrastination and avoid the consequences of its own actions, the government glosses over multi-year unexplained delays, and selectively quotes case law in order to portray a legal standard that would be virtually impossible for any defendant to meet.  Ultimately, the government's explanations do not reveal any legitimate reason for the delay in prosecuting Mr. Bennett, or otherwise serve to justify the prejudice he has suffered.

18

The government is correct that, as set forth in Mr. Bennett's moving brief, an indictment should be dismissed for pre-indictment delay when (1) the delay between the crime and indictment actually prejudiced the defense; and (2) the government's delay was a deliberate attempt to obtain an improper tactical advantage.  United States v. Beckett, 208 F.3d 140, 150-51 (3d Cir. 2000).  The government is mistaken, however, that so long as it offers *some* purported explanation, the Court is required to conclude the government acted in good faith and with appropriate diligence.[10]  See Gov't Brief at 32.  The Supreme Court has emphasized that the question of whether the prosecutor's delay in indicting violated the defendant's due process rights requires the Court to examine closely the circumstances of each individual case.  See United States v. Marion, 404 U.S. 307, 324-25 (1971) (court could not determine "when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution" and stating that balancing the sound administration of justice and the rights of the defendant to fair trial will "necessarily involve a delicate judgment based on the circumstances of each case"); United States v. Lovasco, 431 U.S. 783, 797 (1977) (refusing to set a bright-line rule and charging the lower courts with "the task of applying the settled principles of due process . . . to the particular circumstances of individual cases").  Consideration of those case-specific facts here compels the conclusion that the prejudice caused by the government's extensive and unjustified delay prior to indictment violates Mr. Bennett's due process rights.

---

[10] The government quibbles with Defendant's citation to United States v. Harmon, 379 F. Supp. 1349, 1350 (D.N.J. 1974).  Gov't Brief at 33.  Recent case law, however, supports the primary holding of Harmon, namely, that in cases in which the government does not proffer any real reason for the delay, the court may infer "that there was an intent by the government to secure a tactical advantage over the defendant."  See, e.g., United States v. Newmark, No. 06-CR-447, 2007 WL 839077, at *7 (E.D. Pa. Mar. 14, 2007) (ultimately finding that Harmon was distinguishable on the facts from the case before the court).

a.    <u>The Evidence Shows that the Government Intentionally Delayed Bringing the Indictment</u>

The government's opposition fails to offer any cogent explanation for its extraordinary delay prior to indictment, but instead suggests that the Court should not inquire too deeply into the prosecutors' "investigative decisions."  Gov't Brief at 34-38.  Although the Supreme Court has instructed courts not to "abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment," <u>Lovasco,</u> 431 U.S. at 790, it has not instructed courts to blindly accept a prosecutor's explanation (or lack thereof) for a lengthy delay.[11]  "The reasonableness of the delay must be considered in the light of the period of time between the alleged offense and the indictment, and must be considered in the context of events occurring during that period."  <u>United States v. Jones</u>, 15-CR-00175-LDG, 2015 WL 7069295, at *2 (D. Nev. Nov. 10, 2015) (dismissing indictment because government intentionally treated the investigation as a "low priority" and the defendant suffered actual prejudice).

Here, the government's struggle to explain its delay begins with the acknowledgment that, following a written overture from BEI's attorney in mid-2004 offering to cooperate, the government ignored that overture and waited *more than two years* before issuing an initial request to BEI for documents in 2006.[12]

---

[11] Indeed, in <u>Lovasco</u>, the government conceded that "a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution" might constitute a due process violation.  <u>Id.</u> at 795 n. 17.

[12] The government's (non-)explanation of the rationale for that two-year delay consists of the following:  "Whether EPA-OIG agent's responded to a letter from Bennett Environmental or not, that decision was well within their discretion to conduct the investigation as they saw fit."  Gov't Brief at 39.

The government argues that there is no guarantee that BEI would have voluntarily preserved and provided incriminating documents, even if the government had made a timely request – notwithstanding the well-recognized reality that public companies like BEI effectively have no choice but to cooperate in criminal investigations, and that BEI had hired the major international law firm of DLA Piper to conduct an extensive internal investigation into BEI's contracting activities at the Federal Creosote site, and that BEI had written to the government expressly offering to cooperate.  The government also argues that because BEI was located in Canada it might theoretically have refused to comply with a government subpoena.  These speculative post-hoc explanations are completely belied by the actual record.  Indeed, when BEI belatedly *did* receive a government subpoena (which apparently was served on BEI without difficulty at a Westford, Massachusetts address), BEI immediately confirmed it would comply, and its counsel volunteered to conduct multiple in-person meetings and teleconferences with the DOJ in order to walk them through the evidence uncovered in its internal investigation.  The fact is that more than two years were lost because, for no valid reason, the government failed to act upon BEI's offer to assist.

By the government's account, the EPA-OIG opened its investigation into BEI on March 4, 2004.  Gov't Brief at 35.  However, it was not until more than five years later that the government charged Mr. Bennett.  The government admits that it knew as early as the fall of 2006 of BEI's involvement in the alleged kickbacks and fraud at the Federal Creosote site.  Id. By June 2007, the government had signed up Norman Stoerr as a cooperator, and Stoerr allegedly told the government about a series of kickback arrangements at the Federal Creosote site and his belief that BEI increased the price of its bids to account for the kickbacks.  Gov't Brief at 35-37.  However, the government did not charge Mr. Bennett for another two years.

21

Even after Zul Tejpar began cooperating with the government in May of 2008, the government still filed a Mutual Legal Assistance Treaty ("MLAT") request to toll the statute of limitations and did not indict Mr. Bennett until well over a year later.  Id. at 36.  Although "the statute of limitations constitutes the primary safeguard against the filing of stale criminal charges," United States v. Baxt, 74 F. Supp. 2d 425, 429 (D.N.J. 1999), if the government can so effortlessly extend the statute of limitations, this "primary safeguard" becomes effectively worthless.

       b.      Mr. Bennett Suffered Actual Prejudice From the Delay

Mr. Bennett has further suffered "actual prejudice" as defined by applicable Supreme Court doctrine.  The length of the delay in this case has been coupled with the government's lack of effort to mitigate the potential adverse effects of the delay and in particular, the failure to preserve and maintain evidence.  Actual prejudice, "in the context of the Marion/Lovasco paradigm . . . generally means the loss of documentary evidence or the unavailability of a key witness."  United States v. Santiago, 987 F. Supp. 2d 465, 485 (S.D.N.Y. 2013); see also United States v. Gross, 165 F. Supp. 2d 372, 380 (E.D.N.Y. 2001) (a "claim of prejudice . . . may result from the loss of documentary or testimonial evidence that would have been available to the defense had the charges been brought more promptly").

As explained in Mr. Bennett's moving papers, the "lost materials" are not cumulative of evidence already in Mr. Bennett's possession.  When the investigation began, BEI retained at least one year's worth of electronic files in a backup magnetic tape server.  See Ex. M, at 4-5.  The key allegations in this case depend upon which emails were received and opened by Mr. Bennett.  The loss of crucial metadata, and any server log files or internet information services ("ISS") log files, has fundamentally undermined Mr. Bennett's ability to defend himself at trial, because that data has the unique and irreplaceable capacity to demonstrate that specific emails

that the government has indicated it will rely on at trial were never actually received or opened by Mr. Bennett.

Most critically, the near-complete lack of response emails from Mr. Bennett to any of the pertinent emails indicates that the lost metadata would have been helpful to his case by establishing that he did not open those emails.  Indeed, of numerous emails relied upon by the government in the detailed case statement that the government used to support extradition, only one purports to have a response from Mr. Bennett.  The missing electronic files, which would contain evidence, including metadata, regarding whether such files were actually received or opened on Mr. Bennett's own computer, therefore "possess[] an apparent exculpatory value," United States v. Jackman, 72 F. App'x 862, 866 (3d Cir. 2003).  The government's argument that any evidence lost in 2004 would have more likely "harmed the EPA-OIG's investigation more than the defendant's future defense," Gov't Brief at 38, is pure hopeful speculation, belied by the actual circumstances.  The circumstances – the lack of responding emails from Mr. Bennett – point to the contrary.

Similarly, because the acts alleged in this case took place over a decade ago, it is indisputable that witnesses' memories have faded.  That the defendant and some of his colleagues and associates are octogenarians only increases the likelihood that critical testimony will be lost.  In Marion, 404 U.S. at 326, the Supreme Court noted that the appellees were relying "on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence will be lost[,]" yet the Court held that these general possibilities alone were not enough to justify dismissal of the indictment, absent a more particularized basis for finding prejudice.  Here, the circumstances go well beyond these "possibilities": critical metadata and other electronic evidence of apparent exculpatory value has

been irretrievably lost.  In light of the totality of the circumstances, the intentional delay by the government in bringing the indictment and the actual prejudice that Mr. Bennett has suffered as a result of the delay warrant dismissing the indictment against him.

## IV.    THE INDICTMENT IS BARRED BY THE STATUTE OF LIMITATIONS

The government acknowledges in its opposition that the indictment was brought after the limitations periods would ordinarily have expired for Counts One and Two, but it argues that it should be entitled to tolling under 18 U.S.C. § 3292.  That position is foreclosed by United States v. Atiyeh, 402 F.3d 354 (3d Cir. 2005) which is controlling here.  The government attempts to distinguish Atiyeh by arguing that Atiyeh invalidated a tolling order where the government already had the documents in its possession, whereas here, the government merely had the requested documents in its constructive possession, custody, or control.  Gov't Brief at 49.  That distinction is immaterial.  In the analogous context of construing the government discovery obligations under Rule 16 of the Federal Rules of Criminal procedure, courts have routinely held that physical possession is not determinative, if the party has the practical ability to access those items.[13]  Here, Mr. Griffiths had agreed to cooperate, and had specifically represented that he would be willing to provide the government with documents concerning his bank or other

---

[13]  See, e.g., United States. v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991) (construing Brady obligation to include "constructive possession," because "[t]o do otherwise would be inviting and placing a premium on conduct unworthy of representatives of the United States Government."); United States v. Libby, 429 F. Supp. 2d 1, 5 (D.D.C. 2006) ("Courts have in the main been more concerned with fairness to the defendant, on the one hand, and the government's ease of access to the documents sought, on the other, than with the issue whether the documents are actually within the physical possession of the prosecutor."); United States v. Kilroy, 523 F. Supp. 206, 215 (E.D. Wis. 1981) (government had constructive possession, custody or control over documents held by private party that was voluntarily cooperating with the government); accord United States v. Stein, 488 F. Supp. 2d 350, 360-64 (S.D.N.Y. 2007).

accounts in Canada.  Because those documents were within the government's practical access, its 18 U.S.C. § 3292 application was ineffective under Atiyeh.

Even if the government were correct that this case was not controlled by a straightforward application of Atiyeh, there are compelling doctrinal and policy reasons why the Court should not accept the government's attempt to toll the statute of limitations here.  No Third Circuit authority supports tolling under 18 U.S.C. § 3292 where the documents sought were not necessary to bring an indictment, could have been obtained more quickly and efficiently without use of an MLAT, and the MLAT request was made as a mere pretext in order to toll the statute of limitations.  Relying exclusively on decisions that are not binding on this Court, and upon a stilted reading of the statute, the government contends that Section 3292 grants the government an unreviewable power to extend the statute of limitations in virtually every criminal case that touches another country.  That reading is contradicted by the language of Section 3292, read in the context of its purpose and history.  To the extent that other courts have interpreted 18 U.S.C. § 3292 as authorizing tolling in such circumstances, this court should not follow them.

Section 3292 enacted an unusual tolling provision to enable the government to extend the statute of limitations by up to three years in the particular circumstance where documents essential to the bringing of charges were obtainable only in foreign lands.  As explained in United States v. Hoffecker, 530 F.3d 137, 157 (3d Cir. 2008), "Congress enacted section 3292 in response to '[t]he use of offshore banks to launder the proceeds of criminal activities and to evade taxes,' which 'ha[d] become an increasing problem for federal prosecutors.'"  Hoffecker, 530 F.3d at 157 (citing H.R. Rep. No. 98-907, at 2 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3578, 3578)). Congress explained that:

> Once funds are traced to offshore banks, federal prosecutors face serious
> difficulties in obtaining records from those banks in both the investigative

> and trial stages of a prosecution. . . . The procedures that must be
> undertaken in other countries in order to obtain the records generally take
> a considerable period of time to complete. . . . If the records are essential
> to the bringing of charges, the delay in getting the records might prevent
> filing an information or returning an indictment within the time period
> specified by the relevant statute of limitation.

Hoffecker, 530 F.3d at 158 (citing H.R. Rep. No. 98–907, at 2–3).  See also H.R. Rep. No. 98-

907, at 2 (describing the legislation's "purpose" as being "to extend [the] statute of limitation[s]

and speedy trial act deadlines when evidence located in foreign countries *must* be obtained")

(emphasis added); United States v. Meador, 138 F.3d 986, 992 (5th Cir. 1998) (same); H.R. Rep.

No. 98–907, at 4, reprinted in 1984 U.S.C.C.A.N. at 3578 (recognizing that "[t]he bill . . .

permits a Federal court, upon application of the prosecutor, to suspend the running of the statute

of limitation for such time *as is necessary* (up to 3 years) to obtain evidence from a foreign

country") (emphasis added).

    The statute is unusual in several respects.  First, "§ 3292 is unique in that it is apparently

the only provision which permits tolling of the statute of limitations based on matters which are

beyond the defendant's ability to influence."  United States v. Trainor, 277 F. Supp. 2d 1278,

1282 (S.D. Fl. 2003), aff'd 376 F.3d 1325 (11th Cir. 2004).  Second, the statute does not define

key terms, requiring consideration of its legislative history.  For instance, the statute "says

nothing about how the application or motion is to be presented to the judge," id. at 1283, does

not specify whether an individual defendant must be named in the application, and states that a

tolling order is only warranted when it "*reasonably*" appears that "*evidence of an offense*" is

located in a foreign country, but does not define either of those terms.  Given that the statute was

intended to address unavoidable delay, not to provide prosecutors with a tool to use as a matter

of course to extend the limitations period by unnecessarily asking a foreign governments for

documents, it is apparent that those undefined terms impose a requirement that the MLAT be

26

reasonably *necessary*; that is, that the documents be material to the case and could not be obtained more quickly and efficiently without use of an MLAT.  See Meador, 138 F.3d at 992.

As commentators have observed, 18 U.S.C. § 3292 created an "unprecedented procedure for tolling the statute in certain cases *where it was necessary* to obtain foreign evidence" and thus courts should not allow it to be misused, such as by prosecutors who "have deliberately failed to pursue requests for foreign evidence in a timely manner in order to obtain the benefit of the full three years' tolling or have applied for tolling even when the foreign evidence has already been obtained."  Abraham Abramovsky and Jonathan I. Edelstein, Time for Final Action on 18 U.S.C. § 3292, 21 Mich. J. Int'l L. 941, 944-45 (2000) (emphasis added).  The statute also must be read in the context of the vital role that Congress and the courts ascribe to statutes of limitations.  As the Supreme Court has observed numerous times, statutes of limitations must be strictly construed by courts because they are essential to protect defendants' rights to adequately defend themselves and obtain a timely resolution of criminal charges.  Marion, 404 U.S. at 322-23 (explaining reason for strict adherence to statutes of limitations).

In its most detailed examination of the statute to date in Atiyeh, the Circuit rejected a similar attempt by the government to use a Section 3292 application as a pretext to toll the statute of limitations when the government already had possession, custody, or control of the documents that it claimed to seek from a foreign country.  In that case, after extensively reviewing the history of the statute, the court concluded that "the legislative history confirms that Congress was concerned only with the prejudice the Government suffers when it *must* obtain foreign evidence . . . ."  Id. at 365 (emphasis added).  The court also emphasized that the statute must be read as a Congressional attempt to "balance[] the Government's need to obtain evidence

from abroad, and the delays this may entail, against the defendant's interest in repose if charges are not brought with reasonable promptness." Id.

As support for its claim that it should be entitled to tolling even where the documents could be obtained by other means and were not essential to the bringing of charges, the government relies on two cases: United States v. Lyttle, 667 F.3d 220, 224 (2d Cir. 2012) and United States v. Broughton, 689 F.3d 1260, 1273 (11th Cir. 2012). Lyttle contains only a brief discussion of this point, cites no case law concerning Section 3292, and has never been cited (on this point or any other) in this Circuit.[14] Broughton supports Mr. Bennett's position, not the government's. The court in Broughton held that Section 3292 incorporates an "implicit requirement of relevance and reasonableness," and upheld the district court's tolling order only after verifying that the government had established "the *necessity* of certain information *found only* in Costa Rica." Broughton, 689 F.3d at 1274-75 (emphasis added); cf. United States v. DeGeorge, 380 F.3d 1203, 1215 (9th Cir. 2004) (stating that district courts should not "simply rubber-stamp the government's request" but should "hold the government to its burden.").

The government also fails in its effort to dodge the Fifth Circuit's decision in United States v. Meador, which strongly supports reading a due diligence requirement into Section 3292. 138 F.3d at 992. Although the court was interpreting a different statutory term in Section 3292 (the definition of "final action," an event that terminates the tolling period) the Court's reasoning is equally applicable to the event that begins the tolling period. In Meador, the government had argued that any response to a request by a foreign country should not be deemed

---

[14] Lyttle concerned the government's entitlement to tolling where documents arguably could have been obtained through the U.S. branch of a Hungarian bank via domestic process. That case, however, did not address whether the government would be entitled to tolling where the requested documents *already* were within its constructive possession, custody or control.

a "final action" unless the U.S. prosecutor is satisfied with the response.  <u>Meador</u>, 138 F.3d at

992.  The Fifth Circuit rejected that interpretation and expressed unease at the government's

attempt to stretch Section 3292 beyond the purpose for which it was passed, explaining:

> This reading would rend the statutory scheme detailed in § 3292.  If Congress
> wished to provide the government with a blanket three-year suspension period to
> collect evidence from foreign countries, it could have done so . . . . The purpose
> of § 3292, apparent from its structure and legislative history, is to compensate for
> 'delays attendant in obtaining records from other countries.' . . . This provision
> should not be an affirmative benefit to prosecutors, suspending the limitations
> period, pending completion of an investigation, whenever evidence is located in a
> foreign land.  It is not a statutory grant of authority to extend the limitations
> period by three years at the prosecutors' option.

<u>Meador</u>, 138 F.3d at 993-94 (quoting H.R. Rep. No. 98-907, at 2-3 (1984), reprinted in 1984

U.S.C.C.A.N. 3579).  The full quotation above makes clear that – contrary to the government's

portrayal of the case as <u>obiter</u> <u>dicta</u> that Mr. Bennett's moving brief quoted "out of context" (<u>See</u>

Gov't Brief at 47-48) – the court in <u>Meador</u> was directly concerned with circumstances where, as

here, the government attempts to use the tolling statute as a pretext for the deliberate purpose of

gaming the statute of limitations, where evidence could have been obtained more easily via

standard means.

      Notably, in its extensive responding papers, the government does not expressly deny that

it made an MLAT request to Canada for the purpose of tolling the statute of limitations.  In its

carefully-worded opposition, the government suggests that its MLAT was necessary to ensure

that the records were of the "utmost reliability," although the government studiously avoids

stating that it had any concern regarding the reliability of records provided by Mr. Griffiths

himself.  Gov't Brief at 49.  The government's subsequent representations to the Court make

plain that it viewed Mr. Griffiths as fully reliable.  For instance, in connection with Mr. Griffiths'

sentencing, the Court granted a downward departure after concluding, based on the government's

representations, that Mr. Griffiths had provided "truthful, complete, and reliable information, and also he went above and beyond, quite frankly, of where one would expect an individual to go," including by providing information and traveling "at his own expense on several occasions to meet with the government and to work with them." United States v. Griffiths, 09-cr-506, Transcript of Sentencing at 9-10 (September 12, 2011).[15] In any event, if the government had a bona fide concern that Mr. Griffiths would alter his account records, the government could easily have requested that the Court order Mr. Griffiths to sign an authorization allowing the government to obtain those records directly from the relevant companies. See Doe v. United States, 487 U.S. 201, 217-18 (1988). Moreover, in seeking its tolling order, the government represented that it *had* sought these records from Mr. Griffiths, suggesting that the government's supposed concern with document alteration is a post-hoc explanation of more recent origin.

The Government's opposition is notable for its complete lack of any explanation why Mr. Griffiths would have been "unable" to obtain documents for his own bank and telephone accounts. The Government's non-explanation mirrors a conclusory statement made by Jeffrey Martino, DOJ Trial Attorney, in his January 15, 2009 declaration in support of the government's *ex parte* application for suspension of the running of the statute of limitations. In particular, Mr. Martino represented to the Court that the MLAT request to Canada was required because Mr. Griffiths was "seeking to cooperate," and would have had access to these records, but for unexplained reasons had been "unable to obtain" those records. See Ex. C, at ¶ 5.

---

[15] At Mr. Griffiths' re-sentencing, the government likewise agreed with defense counsel's representation that Mr. Griffiths been "fully cooperative . . . he provided accurate accounts . . . he provided documents that [the government] otherwise would not have." Id., Transcript of Re-Sentencing at 8-9 (June 20, 2013) (emphasis added). At a second re-sentencing, the Government again trumpeted Mr. Griffiths' "monumental" cooperation, and agreed with defense counsel's representation that Mr. Griffiths "had the highest quality of reliability." Id., Transcript of Second Re-Sentencing at 8 (October 10, 2013).

In light of the government's failure to provide any explanation for why Mr. Griffiths was "unable" to obtain his own account records, the defense respectfully requests that should the Court find that further development of the record is required to support dismissal of the indictment, the Court conduct a hearing, as was held in United States v. Wilson, 249 F.3d 366, 372-73 (5th Cir. 2001), *abrogated on other grounds by* Whitfield v. United States, 543 U.S. 209, 212 (2014). During such a hearing, Mr. Griffiths and Jeffrey Martino may be examined regarding Mr. Griffiths' access to his Canadian account records, and the accuracy and completeness of the government's representations to the Court on these issues. In Wilson, much like in this case, the government obtained a tolling order under Section 3292 based on its conclusory assertion that it had sent an MLAT request to the government of the Bahamas. Wilson, 249 F.3d at 371. The Fifth Circuit remanded for an evidentiary hearing in order to test the accuracy of the government's representation that it actually sent the discovery request to the Bahamas. Id. at 373. On appeal after the remand, the Fifth Circuit found that the government failed to produce adequate documentary evidence that the letter of request was sent, and on that basis, the tolling order was held invalid. United States v. Wilson, 322 F.3d 353, 361 (5th Cir. 2003).

So too here, the Court should not simply accept the government's improbable and conclusory assertion that Mr. Griffith was "unable" to obtain his own account records, but should hold an evidentiary hearing to examine the circumstances and assess the accuracy of the assertions that formed the basis of the tolling order.

## **CONCLUSION**

For all of the foregoing reasons, we request that the Court grant Mr. Bennett's motion to dismiss the indictment.

Dated: New York, New York
November 24, 2015

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.


By:  _____/s/ Robert Anello_____
         Robert J. Anello
         Richard F. Albert
         Jacob W. Mermelstein
         Jocelyn Courtney Kaoutzanis
         565 Fifth Avenue
         New York, NY 10017
              (212) 856-9600

32