UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,                    :

      Plaintiff,                              :

             vs.                      :       09-cr-656-02 (SDW)

JOHN A. BENNETT,                              :

      Defendant.                             :

                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**DEFENDANT JOHN A. BENNETT'S MEMORANDUM OF LAW IN SUPPORT OF HIS
RENEWED MOTION FOR A JUDGMENT OF ACQUITTAL OR, ALTERNATIVELY, FOR A
NEW TRIAL**

MORVILLO, ABRAMOWITZ, GRAND,
IASON & ANELLO, P.C.
565 Fifth Avenue
New York, NY 10017
(212) 856-9600 (telephone)
(212) 856-9494 (facsimile)

*Attorneys for Defendant John A. Bennett*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ................................................................................... 2

I.    The Indictment ......................................................................................... 2

II.   The Trial.................................................................................................... 3

   A.   BEI and the Federal Creosote Superfund Site ................................. 3

   B.   The Phase I Contract ........................................................................ 5

   C.   The Phase II Contract....................................................................... 5

   D.   The Phase III Contracts.................................................................... 7

   E.   The BEI Purchase Orders................................................................. 7

III.  The Verdict ............................................................................................... 8

ARGUMENT ..................................................................................................... 9

I.    THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL ON BOTH
      COUNTS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29 ...... 9

   A.   The Court Should Enter A Judgment Of Acquittal On Count Two............................. 10

     1.   Applicable Law ......................................................................... 10

     2.   Discussion ................................................................................ 11

      a.   The Government Failed To Prove Beyond A Reasonable Doubt That Anyone At
          BEI Knowingly Made A Material Misrepresentation............................................. 11

      b.   The Government Failed To Prove Beyond A Reasonable Doubt That Mr. Bennett
          Acted With Specific Intent To Defraud ................................................................. 17

   B.   The Court Should Enter A Judgment Of Acquittal On Count One ............................. 20

     1.   The Government Failed To Prove The Major Fraud Object Beyond A Reasonable
          Doubt .................................................................................................................. 20

     2.   The Government Failed To Prove The Anti-Kickback Object Beyond A
          Reasonable Doubt............................................................................................... 20

II.   THE COURT SHOULD ORDER A NEW TRIAL ON ANY SURVIVING COUNTS
      PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33 ..................... 24

A.   The Jury Heard Improper Lay Opinion Testimony That BEI Paid Illegal Kickbacks And That Mr. Bennett Knew This ........................................................................... 24

   1.   Relevant Facts .............................................................................................. 25

   2.   Applicable Law ............................................................................................ 28

   3.   Discussion ................................................................................................... 28

B.   The Government's Improper Remarks During Closing Arguments Deprived Mr. Bennett Of A Fair Trial .............................................................................................. 32

CONCLUSION ........................................................................................................................ 37

# TABLE OF AUTHORITIES

## Cases

*Chiarella v. United States,*
    445 U.S. 222 (1980)........................................................................ 10

*Neder v. United States,*
    527 U.S. 1, 25 (1999)............................................................ 9, 10, 11, 15

*Pappas v. Middle Earth Condo Association,*
    963 F.2d 534 (2d Cir. 1992)........................................................... 33

*United States v. Anderskow,*
    88 F.3d 245 (3d Cir. 1996)............................................................. 29

*United States v. Bowling,*
    No. 14-CR-98, 2015 WL 3541475 (E.D.N.C. May 26, 2015)......................... 10

*United States v. Brodie,*
    403 F.3d 123 (3d Cir. 2005)....................................................... 8, 9, 12

*United States v. Brooks,*
    681 F.3d 678 (5th Cir. 2012) ......................................................... 15

*United States v. Burger,*
    No. 99-CR-439 (SI), 2000 WL 33910676 (N.D. Cal. June 6, 2000)............... 22

*United States v. Cannon,*
    88 F.3d 1495 (8th Cir. 1996) ........................................................ 33

*United States v. Caraballo-Rodriguez,*
    726 F.3d 418 (3d Cir. 2013)........................................................... 9

*United States v. Cassese,*
    428 F.3d 92 (2d Cir. 2005)........................................................... 19

*United States v. Ciavarella,*
    716 F.3d 705 (3d Cir. 2013) ......................................................... 15

*United States v. Curtis,*
    635 F.3d 704 (5th Cir. 2011) ........................................................ 15

*United States v. Dixon,*
    658 F.2d 181 (3d Cir. 1981)........................................................... *23*

*United States v. Fenzi*,
670 F.3d 778 (7th Cir. 2012) ........................................................ 31

*United States v. Figueroa-Lopez*,
125 F.3d 1241 (9th Cir. 1997) ...................................................... 28

*United States v. Gambone*,
314 F.3d 163 (3d Cir. 2003)............................................................ 9

*United States v. Gole*,
158 F.3d 166 (2d Cir. 1998)..................................................... 10, 16

*United States v. Henry*,
29 F.3d 112 (3d Cir. 1994)............................................................ 18

*United States v. Heppner*,
519 F.3d 744 (8th Cir. 2008) ....................................................... 15

*United States v. Hodge*,
150 F.3d 1148 (9th Cir. 1998) ..................................................... 14

*United States v. Holzwanger*,
No. 10-CR-714 (JAP), 2012 WL 762490 (D.N.J. March 8, 2012)................... 8

*United States v. Johns*,
742 F. Supp. 196 (E.D. Pa. 1990) ................................................ 18

*United States v. Johns*,
972 F.2d 1333 (3d Cir. 1991)........................................................ 18

*United States v. Johnson*,
231 F.3d 43 (D.C. Cir. 2000) ....................................................... 32

*United States v. Johnson*,
302 F.3d 139 (3d Cir. 2002)......................................................... 32

*United States v. Jones*,
No. 02-CR-527, 2003 WL 21362798 (E.D. Pa. June 10, 2003) ....................... 9

*United States v. Mastrangelo*,
172 F.3d 288 (3d Cir. 1999)......................................................... 32

*United States v. Meises*,
645 F.3d 5 (1st Cir. 2011)............................................................ 31

*United States v. Modica*,

    663 F.2d 1173 (2d Cir. 1981) ........................................................................ 32

*United States v. Nguyen*,

    504 F.3d 561, 568 (5th Cir. 2007) .............................................................. 10

*United States v. Rea*,

    958 F.2d 1206 (2d Cir. 1992) ...................................................................... 29

*United States v. Recognition Equip. Inc.*,

    725 F. Supp. 587 (D.D.C. 1989) .................................................................. 8

*United States v. Riddle*,

    103 F.3d 423 (5th Cir. 1997) ...................................................................... 28

*United States v. Rybicki*,

    354 F.3d 124 (2d Cir. 2003) ................................................................. 10, 15

*United States v. Singleton*,

    702 F.2d 1159 (D.C. Cir. 1983) ................................................................... 8

*United States v. Solivan*,

    937 F.2d 1146 (6th Cir. 1991) ......................................................... 32, 33, 35

*United States v. Somsamouth*,

    352 F.3d 1271 (9th Cir. 2003) .................................................................... 15

*United States v. Sorich*,

    523 F.3d 702 (7th Cir. 2008) ...................................................................... 15

*United States v. Stadtmauer*,

    620 F.3d 238 (3d Cir. 2010) ....................................................................... 29

*United States v. Stalnaker*,

    571 F.3d 428 (5th Cir. 2009) ...................................................................... 10

*United States v. Vega*,

    813 F.3d 386 (1st Cir. 2013) ...................................................................... 28

*United States v. Weingold*,

    844 F. Supp. 1560 (D.N.J. 1994) ......................................................... 10, 16

*United States v. White*,

    492 F.3d 380 (6th Cir. 2007) ...................................................................... 28

*United States v. Zauber,*

    857 F.2d 137 (3d Cir. 1988) ........................................................................... 18

*Watson v. United States,*

    552 U.S. 74 (2007) ........................................................................................ 33

## **Statutes, Rules, and Other Authorities**

18 U.S.C. § 1031 ........................................................................... 2, 3, 10, 11

18 U.S.C. § 1341 ..................................................................................... 3

18 U.S.C. § 371 ...................................................................................... 2

41 U.S.C. § 53 ....................................................................................... 2

41 U.S.C. § 54 ................................................................................ *passim*

41 U.S.C. § 8701 ................................................................................... 23

41 U.S.C. § 8702 ............................................................................. *passim*

41 U.S.C. § 8707 ............................................................................. *passim*

Federal Rule of Criminal Procedure 29 .......................................................... *passim*

Federal Rule of Criminal Procedure 33 ......................................................... 1, 27

Federal Rule of Evidence 701 .................................................................. *passim*

Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 701.05 .................. 36

Defendant John A. Bennett respectfully submits this memorandum of law in support of his renewed motion for a judgment of acquittal on both counts pursuant to Federal Rule of Criminal Procedure 29 or, alternatively, for a new trial on any surviving count pursuant to Federal Rule of Criminal Procedure 33.

## PRELIMINARY STATEMENT

The Court should enter a judgment of acquittal on both counts, as the government has failed to prove beyond a reasonable doubt that Mr. Bennett committed either of the charged offenses.  With respect to Count Two, which charged Mr. Bennett with committing major fraud against the United States, the government failed to prove any material misrepresentation whatsoever, or that Mr. Bennett acted with intent to defraud.  With respect to Count One, which charged Mr. Bennett with conspiracy to commit major fraud and to violate the Anti-Kickback Act, the government failed to prove either of these two objects.  The proof on the major fraud object was insufficient for the same reasons the proof on Count Two was insufficient.  The proof on the anti-kickback object was likewise insufficient because the government failed to show that Mr. Bennett acted improperly under the Act.  To the extent either count survives Mr. Bennett's Rule 29 motion, the Court should order a new trial under Rule 33 because Mr. Bennett's trial was compromised by improper testimony from a key government witness, who impermissibly told the jury what the anti-kickback rules provide, how those rules applied here, what Mr. Bennett must have known about them, and what result to reach.  Mr. Bennett's trial was further compromised by improper comments in the government's summation, where the government urged the jury to convict because Mr. Bennett came to this country from abroad and otherwise misstated the evidence.

**STATEMENT OF FACTS**

This case arose out of the environmental cleanup work performed by the company Mr. Bennett founded, Bennett Environmental Inc. ("BEI"), at the Federal Creosote Superfund site in Manville, New Jersey, from late 2001 until August 2004.

**I.  The Indictment**

On August 31, 2009, the government filed the indictment charging Mr. Bennett and one other individual in two counts.[1]  Count One charged Mr. Bennett with participating in a conspiracy, in violation of Title 18, United States Code, Section 371, from December 2001 through August 2004, with three unlawful objects: (1) to provide kickbacks to a prime contractor to improperly obtain or reward favorable treatment, in violation of Title 41, United States Code, Sections 53 and 54 (the "Anti-Kickback Act")[2]; (2) to commit major fraud against the United States, namely the Environmental Protection Agency (the "EPA"), in violation of Title 18, United States Code, Section 1031; and (3) to commit wire fraud, in violation of Title 18, United States Code, Section 1341.  Count Two charged Mr. Bennett with committing major fraud against the United States on May 15, 2002, in violation of Title 18, United States Code, Section 1031(a).

---

[1] The indictment also charged two other defendants with a number of additional counts involving matters unrelated to the Federal Creosote site, including tax fraud, and obstruction.  Those charges are not relevant here.

[2] In 2011 Congress re-codified the Anti-Kickback Act without substantive change, placing it at 41 U.S.C. §§ 8702 & 8707.

## II. **The Trial**

### A. **BEI and the Federal Creosote Superfund Site**

In 1992, Mr. Bennett formed BEI to treat contaminated soil using a state-of-the-art proprietary thermal treatment process that he developed and refined.  He served as CEO of the company until approximately February 2004.  One of the dozens of environmental remediation projects BEI worked on was the Federal Creosote Superfund site, in Manville, New Jersey.  (GX 26a at 98-100).[3]

From approximately 1910 through 1950, the site became contaminated with creosote, a wood preservative that causes skin irritation and respiratory problems.  In the late 1990s, the EPA contracted with the U.S. Army Corps of Engineers ("ACE") to oversee remediation at the site.  The ACE hired Sevenson Environmental Services Inc. ("Sevenson") as its prime contractor, and Sevenson hired multiple subcontractors, including BEI, to perform remediation work. (2/22/16 Tr. at 76).

BEI's work at the site involved transporting thousands of tons of contaminated soil to Canada and treating that soil through high-temperature incineration.  (2/26/16 Tr. at 48-49).  This work was carried out in three phases.  In each phase, Sevenson was supposed to gather bids from subcontractors and select a winning bid.  BEI had a number of crucial competitive advantages as compared to any potential competitor, including that BEI's kiln was the only plant in North America designed exclusively to handle contaminated soil in large volumes (D 5005; 3/3/2016 Tr. at 12); its kiln was far closer than any other to the Federal Creosote site (D 6513; 2/26/2016 Tr. at 59); it had no outstanding environmental violations (2/26/2016 Tr. at 77); and it was the

---

[3] "GX" refers to a government exhibit at Mr. Bennett's trial; "D" refers to a defense exhibit at trial; "[DATE] Tr." refers to the trial transcript for the specified date; and "Docket Entry" refers to an entry on the Court's docket for this case.

only facility with the storage capacity to accept soil on the EPA's required schedule (D 5005). As a result of these advantages, BEI was able to get dirt off of the Federal Creosote site significantly faster than its competitors, which translated into a significant cost savings to the EPA due to the fixed costs associated with the site.  (2/26/16 Tr. at 58-59).  In contrast, BEI's competitors had significant disadvantages compared to BEI, including serious financial difficulties (2/26/16 Tr. at 74); extensive prior environmental violations (2/26/16 Tr. at 76); a poor reputation in the industry (2/24/16 Tr. at 135; 2/26/16 Tr. at 70-71, 76); and insufficient capacity to complete the work in the time frame required by the EPA.  (2/26/16 Tr. 69-78; 3/3/16 Tr. at 25).

For Phases I and II, and for one of the Phase III contracts, the winning bid was supposed to be selected based on which subcontractor provided the "best value," based on both the subcontractor's price as well as the subcontractor's technical ability.  (2/22/16 Tr. at 141-43; 2/23/16 Tr. at 158; 2/26/16 Tr. at 140; 3/1/16 Tr. at 91-92).

**B.  The Phase I Contract**

On November 20, 2000, BEI put in a bid for Phase I of the Federal Creosote project and, in early 2001, BEI was selected as the winning bidder as a result of the competitiveness of BEI's price and its superior technology.  (2/26/16 Tr. at 53-54, 165; 3/1/16 Tr. at 173-74).  There was no evidence at trial of any impropriety in connection with the Phase I bidding.  After BEI had begun its work on Phase I, in December 2001, BEI hosted a group of Sevenson employees in an executive party suite to watch a hockey game as a networking event, in the hopes of getting work on a number of other large, privately-funded jobs Sevenson was managing.  (2/23/16 Tr. at 93-94; 2/25/16 Tr. at 139-42, 162).

**C.  The Phase II Contract**

On March 4, 2002, Sevenson issued a Request for Proposal ("RFP") for Phase II of the Federal Creosote site's remediation.  (GX 26a at 35).  By this time, a Sevenson employee named Gordon McDonald was the project manager of the site.  In additional to its significant technical competitive advantages, as the incumbent subcontractor, BEI had a significant additional advantage over its competitors by virtue of having a better understanding of site conditions and having built up a track record of successful performance.  (2/26/16 Tr. at 154-55, 170; 3/1/16 Tr. at 114).  BEI submitted its initial bid of $498.50 per ton on March 14, 2002.  (2/26/16 Tr. at 121-22; 3/1/16 Tr. at 75).  Due to a change in soil specifications and quantity of soil, however, the contract had to be re-bid.  (2/26/16 Tr. at 165-66).

At some point before the re-bid formally was announced, McDonald informed Robert Griffiths, a BEI employee who testified as a cooperating witness for the government, that BEI was not the low bidder for Phase II.  (2/23/16 Tr. at 120-21; 2/26/16 Tr. at 121).  According to Griffiths, he and McDonald then entered into an agreement whereby, in exchange for BEI making payments to cover certain of Sevenson's expenses, McDonald would provide BEI with

5

information concerning its competitors' bids. (2/23/16 Tr. at 123, 126, 133). In particular, after BEI already had submitted its initial bid of $498.50 per ton on March 14, 2002, Griffiths met with McDonald on March 28, 2002, at a Ramada hotel in Manville, New Jersey. (2/23/16 Tr. at 125-26, 183). At this meeting, Griffiths and McDonald supposedly agreed that "an amount of $13.50 per ton" would be paid to McDonald, in return for McDonald providing BEI with a "last look" at competitors' bids, which would enable BEI to beat those bids if it chose to do so. (2/23/16 Tr. at 125-26, 183).

After the rebid formally was announced, McDonald told Griffiths on May 6, 2002, that Safety Kleen, BEI's only competitor for this phase, was expected to submit a bid of approximately $400 per ton. Griffiths suggested in an email that if Safety Kleen came in "at 400 on the nose," it might "be prudent for us to become the low bidder by a dollar or two." (GX 223). Nevertheless, notwithstanding this suggestion, on May 15, 2002, BEI submitted a bid of $498.50 per ton, which was exactly the same as BEI's initial bid. (3/1/16 Tr. at 75-76). As it turned out, the information that Griffiths received regarding Safety Kleen's bid was incorrect— Safety Kleen actually bid $520 per ton (GX 26a at 57)—and BEI won the Phase II contract.[4]

After BEI won the Phase II contract, McDonald explained to Griffiths how BEI should pay the money that was owed for Sevenson's expenses. In particular, in June 2002, McDonald asked Griffiths to send wire transfers from BEI to a company called "GMEC," which was actually a shell company McDonald controlled. (2/24/16 Tr. at 59; 2/29/16 Tr. at 15-16). Initially, Griffiths thought that GMEC was a legitimate soil testing company and once he learned what GMEC actually was, he hid the truth about the company from others at BEI, using fake

---

[4] Even after the bidding on Phase II had concluded, no one at BEI was aware of its competitor's actual bids. On May 16, 2002, one day after BEI submitted its bid, Griffiths relayed to BEI management—incorrectly—that Safety Kleen's price was $578 per ton. (*See* D 6509; 2/26/16 Tr. at 135-36).

invoices that made it seem like GMEC actually was doing work for BEI.  (2/23/16 Tr. at 133).

Zul Tejpar, the other BEI employee who testified as a cooperating witness for the government,

did not learn that GMEC was actually a shell company for McDonald until 2007 and when he

found out, it was a "shock" to him.  (3/3/16 Tr. at 4-5).  In addition to wire transfers BEI made to

GMEC, Griffiths also provided McDonald, among other things, with a Mediterranean cruise in

September 2002, and a plasma television and wine cooler in December 2002.  (2/22/16 Tr. at

23).

### D.  The Phase III Contracts

A year later, in June 2003, BEI won the subcontract for Phase III and issued a press

release announcing the award.  (2/29/16 Tr. at 48, 69).  This prompted another company, Clean

Harbors, which had submitted a lower bid than BEI, to protest, arguing that it should have been

awarded the contract.  (2/24/16 Tr. at 162, 165).  The ACE investigated the protest, and the

contract was ultimately rebid in October and November 2003.  Again, BEI won.  According to

Griffiths, he won the bid for BEI by printing out and submitting over a hundred different bid

pricing sheets to McDonald, which would enable McDonald to pick out a winning bid after

seeing competitors' bids.  (2/24/16 Tr. at 180).  In 2003, BEI also bid on, and was awarded, a

contract that did not require thermal treatment, but only required BEI to transport soil to a secure

landfill for disposal, and Griffiths was again assisted by McDonald.  (2/24/16 Tr. at 189-90).

### E.  The BEI Purchase Orders

For each of the bids BEI won, Griffiths signed a purchase order with the ACE (2/23/16

Tr. at 77-78; *see*, *e.g.*, GX 25a, 26a), and he showed the purchase orders for Phase I and Phase II

to Mr. Bennett, who had given Griffiths permission to sign on behalf of BEI (2/23/16 Tr. at 86-

87, 173-74).  The Phase I purchase order contained a certification stating that BEI would

"furnish all requirements to perform and complete the following all in strict compliance with the

prime contract documents for the above-referenced project as prepared by [the ACE], Kansas City District." (GX 25a at 19). The Phase II purchase order contained a similar certification stating that BEI would "furnish all requirements to perform and complete the following, all in strict compliance with the principal contract documents for the above referenced project." (GX 26a at 24).

The references to "prime contract documents" and "principal contract documents" in the Phase I and Phase II contracts, respectively, were, according to Griffiths and another witness, Mari Shannon from the ACE, references to Sevenson's prime contract with the ACE. (2/23/16 Tr. at 81; 3/1/16 Tr. at 112). Although the government introduced copies of the prime contract documents into evidence at trial (GX 3a through 4c; 2/23/16 Tr. at 82), and although those documents included a requirement that Sevenson and its subcontractors comply with the Anti-Kickback Act (GX 3a at 18-19; 3/1/16 Tr. at 120), the ACE itself did not provide those documents to subcontractors like BEI, relying instead on Sevenson to do that. (3/1/16 Tr. at 90-91; 3/1/16 Tr. at 117-18). No evidence establishes, however, that Sevenson ever provided the prime contract documents to BEI. To the contrary, the evidence demonstrated that BEI never received a copy of the prime contract documents from Sevenson or anyone else. (2/23/16 Tr. at 84; 2/26/16 Tr. at 80-81; 3/1/16 Tr. at 125).

### III. **The Verdict**

On March 16, 2016, the jury found Mr. Bennett guilty of both counts. With respect to Count One, the jury indicated that it found that the government had established the first and second alleged objects of the conspiracy (kickbacks and major fraud), but not the third object (wire fraud). (3/16/16 Tr. at 7).

**ARGUMENT**

**I.    THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL ON BOTH COUNTS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29**

Federal Rule of Criminal Procedure 29 requires this Court to set aside a guilty verdict returned by the jury and enter a judgment of acquittal where "the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29.  In reviewing the sufficiency of the evidence, this Court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilty beyond a reasonable doubt based on the available evidence."  *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (internal quotation marks omitted).  Although a finding of insufficiency should be "confined to cases where the prosecution's failure is clear," *id.* (internal quotation marks omitted), the "Court is obligated to take a hard look at the evidence and accord the government the benefit of only '*legitimate* inferences.'"  *United States v. Recognition Equip. Inc.*, 725 F. Supp. 587, 588 (D.D.C. 1989) (emphasis added) (quoting *United States v. Singleton*, 702 F.2d 1159, 1163 (D.C. Cir. 1983)).  This Court should only "sustain the jury's verdict 'if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision.'"  *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (quoting *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003)); *see United States v. Holzwanger*, No. 10-CR-714 (JAP), 2012 WL 762490, at *9 (D.N.J. March 8, 2012) (granting defendants' Rule 29 motion and ordering judgment of acquittal on wire fraud charges).

Because Mr. Bennett moved for a judgment of acquittal at the close of the government's case pursuant to Rule 29(a) (3/4/16 Tr. at 72, 220-24), and this Court reserved decision on the motion under Rule 29(b) (3/4/16 Tr. at 224), this Court is "required to . . . determine whether an

acquittal [is] appropriate based solely on the evidence presented by the government," and that review does not consider "evidence presented in the defense case." *Brodie*, 403 F.3d at 133-34; *see* Fed. R. Crim. P. 29(b) ("[i]f the [trial] court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved").[5]

### A. The Court Should Enter A Judgment Of Acquittal On Count Two

#### 1. Applicable Law

The major fraud statute makes it a crime to "knowingly execute[], or attempt[] to execute, any scheme or artifice with the intent (1) to defraud the United States; or (2) to obtain money or property by means of false or fraudulent pretenses representations, or promises" in connection with federal contracts worth $1,000,000 or more. 18 U.S.C. § 1031.

To prove a scheme to defraud, the government must prove "materiality of falsehood." *Neder v. United States*, 527 U.S. 1, 25 (1999) (addressing mail, bank, and wire fraud statutes); *see United States v. Rybicki*, 354 F.3d 124, 146 n.20 (2d Cir. 2003) (en banc) ("The phrase 'scheme or artifice to defraud' requires 'material misrepresentations.'"); *United States v. Bowling*, No. 14-CR-98, 2015 WL 3541475, at *9-*10 (E.D.N.C. May 26, 2015) (requirement of "materiality of falsehood" "applies to the major fraud statute in section 1031"); *see also* Docket Entry 261 at 18 (government agrees that "requirement" that it prove "materiality of falsehood" applies under major fraud statute)).[6]  "In general, a false statement is material if it has a natural

---

[5] At the conclusion of the trial, Mr. Bennett also moved under Rule 29(c) of the Federal Rules of Criminal Procedure and the Court reserved decision.  (3/14/16 Tr. at 209; 3/16/16 Tr. at 9). Under Mr. Bennett's Rule 29(c) motion, to the extent the Court does not grant Mr. Bennett's Rule 29(a) motion, the Court must alternatively consider not only the evidence introduced during the government's case-in-chief, but all of the trial evidence.  *See*, *e.g.*, *United States v. Jones*, No. 02-CR-527, 2003 WL 21362798, at *2 (E.D. Pa. June 10, 2003).

[6] A scheme to defraud also can be committed by the omission or concealment of a material fact, but only where a defendant failed to speak when he had a duty to do so.  *See Chiarella v. United*

10

tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder*, 527 U.S. at 16 (internal quotation marks omitted).  In addition, because major fraud is a specific-intent crime, the government must prove that the "defendant knew the scheme involved false representations."  *United States v. Stalnaker*, 571 F.3d 428, 436 (5th Cir. 2009) (wire fraud) (quoting *United States v. Nguyen*, 504 F.3d 561, 568 (5th Cir. 2007)).

To show that a defendant acted with "intent to defraud," the government must prove that harm or loss to the victim was contemplated by the wrongdoer.  *United States v. Weingold*, 844 F. Supp. 1560, 1574 (D.N.J. 1994) (to prove a violation of the mail fraud statute, "the Government must demonstrate . . . that some actual harm or injury was at least contemplated"); *United States v. Gole*, 158 F.3d 166, 167 (2d Cir. 1998) ("Fraudulent intent is established when some actual harm or injury was *contemplated* by the schemer.") (internal quotation marks omitted) (emphasis in original).

### 2.  Discussion

#### a.  The Government Failed To Prove Beyond A Reasonable Doubt That Anyone At BEI Knowingly Made A Material Misrepresentation

The Court should order a judgment of acquittal on Count Two because the government failed to prove in its case-in-chief that Mr. Bennett or anyone else associated with BEI knowingly made a material misrepresentation—a "material[] falsehood," *Neder*, 527 U.S. at 25—in furtherance of the alleged scheme to defraud.  At trial, the government argued in summation that it had proved this element by showing that Mr. Bennett himself "lied" in purchase orders where, the government claimed, Mr. Bennett allegedly "stated that Bennett

---

*States*, 445 U.S. 222, 235 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak").

Environmental was to be in strict compliance . . . [w]ith the Anti-Kickback Act." (3/15/16 Tr. at

14 (gov't summation arguing Bennett's "lies" were "committed to paper"), 41-42 (gov't

summation: "And to cover this all up and still get the contracts, the defendant had to lie about it.

You can see the purchase order")).[7]  The evidence, however, showed nothing of the sort.

  As an initial matter, the purchase order between BEI and Sevenson for Phase II (the only

phase at issue on Count Two)—which was signed by Griffiths, not Mr. Bennett (GX 26a at 24;

2/23/16 Tr. at 73)—did not say that BEI "was to be in strict compliance" with the Anti-Kickback

Act.  Rather, the Phase II purchase order stated only that BEI would "furnish all requirements to

perform and complete the [specified work], all in strict compliance with the principal contract

documents for the above referenced project."  (GX 26a at 24).

  Although the prime contract documents between Sevenson and the ACE themselves

contained a reference to the Anti-Kickback Act (GX 3a at 18-19), evidence at trial failed to

establish that anyone at BEI, including Mr. Bennett, ever saw those prime contract documents.

(3/1/16 Tr. at 194).  Government witness Mari Shannon, from the ACE, testified that the ACE

does not communicate anti-kickback requirements to subcontractors, and instead relies on prime

contractors like Sevenson to communicate these requirements to subcontractors.  (3/1/16 Tr. at

90-91).  But the government studiously avoided calling any witness from Sevenson who could

say whether this was done, and Griffiths himself confirmed that he did not ever "receive or . . .

view a copy of the prime contract."  (2/23/16 Tr. at 84; 2/26/16 Tr. at 80-81).

  Not only did the evidence fail to establish that BEI ever received the prime contract

documents, but the government's evidence did not even establish that the phrase "principal

---

[7] At trial, the government did not press a theory of fraud based on a non-disclosure in violation
of a duty to disclose.

contract documents" in the Phase II purchase order (GX 26a at 24) was a reference to the prime contract documents.[8]

The government's theory that Mr. Bennett materially misrepresented in the Phase II purchase order that he would comply with the Anti-Kickback Act and not pay unlawful kickbacks thus relies on a series of illegitimate inferences.  First, the jury would have to infer that Mr. Bennett was aware that the purchase order Griffiths signed contained the reference to "principal contract documents;" second, the jury would have to infer that Mr. Bennett understood at the time that "principal contract documents" was a reference to the prime contract between the ACE and Sevenson; third, the jury would have to infer that Mr. Bennett knew the contents of the prime contract, even though no evidence demonstrated that he had ever seen it; fourth, the jury would have to infer that Mr. Bennett understood at the time the purchase order was signed that Griffiths' arrangement with McDonald amounted to a "kickback" in violation of the Anti-Kickback Act, even though Griffiths himself testified he did not view the arrangement as a kickback at that time (2/23/16 Tr. at 133); and fifth, the jury would have to infer that Mr. Bennett intended to have Griffiths lie by signing the purchase order.

---

[8] By comparison, the Phase I purchase order stated that BEI would perform "in strict compliance with the prime contract documents for the above-referenced project as prepared by [the ACE]." (GX 25a at 19 (emphasis added)). The government specifically elicited testimony from Griffiths that this was a reference to the contract between Sevenson and the ACE (2/23/16 Tr. at 81), but the government avoided asking Griffiths directly about the Phase II purchase order.  In the defense case, Mr. Bennett testified that by the time of his trial testimony—ten years after the alleged acts—he understood that the reference to principal contract documents in the purchase order was a reference to Sevenson's contract, which he understood to include rules against kickbacks.  (3/9/16 Tr. at 23-24).  The Court is not permitted to consider this testimony, however, in assessing Mr. Bennett's Rule 29(a) motion, because this Court is "required to . . . determine whether an acquittal [is] appropriate based solely on the evidence presented by the government," and that review does not consider "evidence presented in the defense case." *Brodie*, 403 F.3d at 133-34.

The evidence does not sufficiently support any of these inferences.  Like Mr. Bennett, the government's own witness, Richard Puvogel from the EPA, testified that he had never seen the prime contract between the ACE and Sevenson.  (2/22/16 Tr. at 151).  Because he had not seen the prime contract, Mr. Puvogel refused to speculate even as to the length of the prime contract, much less its contents (2/22/16 Tr. at 151), notwithstanding his 25 years of experience with the EPA (2/22/16 Tr. at 68).  Mr. Puvogel did confirm, however, that he had never seen a prime contract "similar to" the one for the Federal Creosote job in all his years at the EPA.  (2/22/16 Tr. at 151).

Given that even an EPA veteran could not testify to the contents of the prime contract, since he had not seen it, the mere evidence that Mr. Bennett may have seen a reference to "principal contract documents" in a purchase order that Griffiths signed was far from sufficient to prove that Mr. Bennett knew the contents of the prime contract, much less that Mr. Bennett intended to make a material misrepresentation regarding BEI's compliance with a specific clause in that prime contract.  Whatever Mr. Bennett and Griffiths may have known about the Anti-Kickback Act itself, the government presented no evidence that they ever knowingly *lied* to anyone about BEI being in compliance with the Act.

The government's failure to prove in its case-in-chief that Mr. Bennett knowingly made any material misrepresentation regarding compliance with the Anti-Kickback Act requires this Court to grant a judgment of acquittal.  For example, in *United States v. Gee*, two defendants were convicted of mail and wire fraud at trial based on their involvement in the production of equipment that buyers could use to descramble encrypted cable television programming.  *United States v. Gee*, 226 F.3d 885, 890-91 (7th Cir. 2000).  At trial, the government sought to establish the element of a material misrepresentation by claiming that "end-users misrepresented and

14

concealed the use of the illegal descrambler units from cable operators," and the jury found the defendants guilty. *Id.* at 892. On appeal, however, the Seventh Circuit reversed the mail and wire fraud convictions, writing that whatever the devices' capabilities, the "government did not proffer any evidence that defendants made any false or misleading statements," so "no rational jury could have found the essential element of a material falsehood." *Id.*; *see also United States v. Hodge*, 150 F.3d 1148, 1151 (9th Cir. 1998) (reversing conviction for wire fraud where government failed to prove certifications in government contract were intended to be false). As in *Gee* and *Hodge*, no rational jury could have found the essential element of a knowing material falsehood in this case.

The government appears to have recognized the weakness of its proof showing that Mr. Bennett made or knew of any material misrepresentation in connection with the Phase II bidding, as the government sought to convince the Court at various points that the government did not need to demonstrate a material misrepresentation. For example, at trial, during a colloquy with the Court, the government argued that "we don't believe that literal misrepresentations are necessary and it's enough that this was a scheme to defraud and it deprived the Government of money and property." (3/4/16 Tr. at 222). This statement, however, runs contrary to a wall of authority from multiple Courts of Appeals. *See, e.g.*, *United States v. Rybicki*, 354 F.3d 124, 146 n.20 (2d Cir. 2003) (en banc) ("The phrase 'scheme or artifice to defraud' requires 'material misrepresentations'").[9]

---

[9] Since *Neder*, the Courts of Appeals have repeatedly held that to show a scheme to defraud under the mail, bank, and wire fraud statutes, the government must prove either a material misrepresentation or the omission of a material fact coupled with a duty to disclose. *See United States v. Ciavarella*, 716 F.3d 705, 728-29 (3d Cir. 2013) (scheme to defraud can be proved through"[f]raudulent representations," which "include the concealment of material facts and a failure to disclose information when the defendant is under a known legal duty to disclose"); *United States v. Rybicki*, 354 F.3d 124, 146 (2d Cir. 2003) (en banc) (the "fundamental principles

In any event, the government ultimately sought to prove this case at trial through evidence of material misrepresentations.  In particular, after noting its belief that "literal misrepresentations" were not required, the government argued to the Court during a colloquy that the proof showed "that there were misrepresentations," to wit, "the purchase order" for Phase II.  (3/4/16 Tr. at 222-23).  Further, in summation, the government repeatedly emphasized its position that the proof showed affirmative lies, rather than a duty-based omission or concealment.  (3/15/16 Tr. at 14 (arguing the proof showed Bennett's "lies . . . committed to paper"), 14 (asking the jury to look at "[d]ocuments where Bennett often lied" about being "in strict compliance"), 42 (arguing that "to cover this all up and still get the contracts, the defendant had to lie about it.  You can see the purchase order"), 69 (arguing that "signing contracts when they said they wouldn't pay kickbacks, that's a lie")).  But the proof on this element was not sufficient.

On the whole, even in the light most favorable to the government, the evidence failed to establish that Mr. Bennett either made or knew of any material misrepresentations to anybody in connection with the Phase II contract charged in Count Two.  Mr. Bennett's conviction on Count Two should be reversed on this basis alone.

---

of the law of fraud" include that "[a] material misrepresentation is an element of the crime") (emphasis omitted); *United States v. Brooks*, 681 F.3d 678, 700 (5th Cir. 2012) ("[t]o prove wire fraud, the government must prove . . . material falsehoods"); *United States v. Curtis*, 635 F.3d 704, 718, n.49 (5th Cir. 2011) ("A false or fraudulent material misrepresentation is an element of the offense of wire fraud[.]");*United States v. Heppner*, 519 F.3d 744, 748-49 (8th Cir. 2008) ("In order to be convicted of mail fraud, a defendant must have made a material falsehood . . . "); *United States v. Sorich*, 523 F.3d 702, 708 (7th Cir. 2008) ("the only elements of mail fraud are (1) a scheme to defraud (*entailing a material misrepresentation*), (2) an intent to defraud, and (3) the use of the mails" (emphasis added)); *United States v. Somsamouth*, 352 F.3d 1271, 1276 (9th Cir. 2003) (noting that "material misrepresentation" is "one of the elements of mail fraud"); *Gee*, 226 F.3d at 891 ("[i]n 1999, the Supreme Court ruled that a 'scheme to defraud' under the wire and mail fraud statutes must include the element of a material falsehood").

**b. The Government Failed To Prove Beyond A Reasonable Doubt That Mr. Bennett Acted With Specific Intent To Defraud**

The Court should also enter a judgment of acquittal on Count Two because the evidence was insufficient to prove that Mr. Bennett acted with specific intent to defraud the government. To show that Mr. Bennett acted with "intent to defraud," the government had to prove that Mr. Bennett at least "contemplated" that some "harm or loss" would befall the EPA as a result of the alleged misrepresentation in the purchase order for Phase II of the Federal Creosote project. *See Weingold*, 844 F. Supp. at 1574; *Gole*, 158 F.3d at 167-68. The government sought to demonstrate that Mr. Bennett contemplated harming the EPA by submitting to Sevenson a higher bid than it would have absent the kickbacks, but the evidence fell well short of making this showing. Instead, the evidence showed that BEI's bid on Phase II remained identical both before and after any alleged kickbacks were paid, thereby demonstrating the complete absence of intent to harm to EPA.

Throughout the trial, the government pressed its theory that BEI's bid on Phase II was higher than BEI would have otherwise bid if it had not been paying kickbacks, and thus resulted in harm to the EPA. In particular, in both its opening statement and its summation, the government argued that BEI submitted an initial bid of $485 per ton for the Phase II contract in early 2002, and shortly thereafter, Mr. Bennett and others at BEI reached a corrupt agreement whereby McDonald would provide BEI with confidential inside information regarding BEI's competitors' bids, in exchange for kickbacks. According to the government, as a result of that agreement, BEI and Mr. Bennett "agreed to add an extra $13.50 to its bid price to cover the cost of the kickbacks," part of which would go to McDonald and the rest of which would be "extra profit to Bennett Environmental." (2/22/16 Tr. at 30-31 (gov't opening)). The government specifically argued that the evidence showed that BEI submitted an initial bid of $485 for Phase

17

II, and then, in a re-bid of the contract on May 15, 2002, BEI put in a bid of $498.50 per ton, an increase of $13.50. (2/22/16 Tr. at 30-31 (gov't opening); 3/15/16 Tr. at 181 (gov't rebuttal summation)).

The evidence actually introduced at trial, however, bore little resemblance to the government's story. Rather, the evidence showed that on March 14, 2002, BEI submitted its initial bid for Phase II of $498.50 per ton, not $485 as the government claimed. (3/1/16 Tr. at 75). On March 28, 2002, after BEI had submitted this bid, Griffiths and McDonald met and allegedly agreed that an amount of $13.50 per ton would be paid to McDonald in exchange for McDonald providing BEI with a "last look" at competitors' bids. (2/23/16 Tr. at 125-26, 183; GX 213). On May 6, 2002, after a rebid was announced, McDonald told Griffiths that BEI's only competitor for this phase, Safety Kleen, was expected to submit a bid of approximately $400 per ton, and Griffiths suggested in an email that if Safety Kleen came in "at 400 on the nose," it might be "prudent for us to become the low bidder by a dollar or two." (GX 223). On May 15, 2001, however, notwithstanding Griffiths' suggestion, BEI again submitted a bid of $498.50 per ton, which was exactly the same as BEI's initial bid. (3/1/16 Tr. at 75-76).

In its summation, the government argued that it had proven Mr. Bennett's "intent to defraud" with respect to Count Two by showing that BEI "w[on] contracts guaranteed at inflated prices that included the kickbacks." (3/15/16 Tr. at 69 (gov't summation)). But the evidence did not show that BEI won the Phase II contract—the sole contract at issue in Count Two—at an "inflated" price that included kickbacks. In the absence of any proof that BEI intended to overcharge the EPA as a result of the kickbacks, the government cannot establish that BEI intended to harm the EPA. Speculation that the absence of a kickback would have translated into a lower bid price is insufficient as a matter of law to establish fraudulent intent, since a kickbacks

18

may be paid out of a bidder's own profit rather than from the government's pocket.  *See United States v. Henry*, 29 F.3d 112, 114-15 (3d Cir. 1994); *United States v. Zauber*, 857 F.2d 137, 146-48 (3d Cir. 1988).  While the government has sought in past cases to argue that "it is entitled to the kickback money *regardless of* overcharge," that theory has been conclusively rejected.  *United States v. Johns*, 742 F. Supp. 196, 214 (E.D. Pa. 1990), *aff'd*, 972 F.2d 1333 (3d Cir. 1991) (emphasis in original).

The absence of proof of any intent to overcharge the EPA alone requires this Court to order Mr. Bennett acquitted of Count Two, but the failure of proof here went beyond that.  The evidence not only failed to show any overcharge with respect to Count Two, but, in fact, affirmatively demonstrated the absence of any overcharge, in that it demonstrated that BEI maintained a consistent bid both before and after it purportedly agreed to pay McDonald $13.50 per ton.  This evidence is at least equally consistent with the theory that BEI intended to pay the $13.50 from its own funds as it is with the theory that BEI intended to pass this cost on to the EPA as an overcharge.  Moreover, the failure of the evidence to show a material misstatement is consistent with the fact that BEI had no need to commit fraud to get the Phase II contract.  Rather, the evidence showed BEI was overwhelmingly the most experienced and best value firm for the job.  "[A]t the end of the day, if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury *must necessarily* entertain a reasonable doubt"—and this Court must enter a judgment of acquittal. *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (emphasis added) (internal quotation marks omitted).  Because the evidence was insufficient to prove Mr. Bennett intended to harm the EPA in the Phase II bidding, his conviction should be reversed.

19

### B. **The Court Should Enter A Judgment Of Acquittal On Count One**

#### 1. **The Government Failed To Prove The Major Fraud Object Beyond A Reasonable Doubt**

For the same reasons the proof did not support Mr. Bennett's conviction on Count Two, it failed to support the jury's finding that the government had proved the major fraud object of the conspiracy charged in Count One.  Although Count Two was limited to the Phase II bidding, and Count One also encompassed the bidding in Phase III, that distinction makes no difference.  The government did not allege any additional material misrepresentations to support Count One, beyond the purchase orders discussed above, which did not amount to material misrepresentations in the absence of evidence that BEI received the prime contract documents.  Nor did the government introduce any additional evidence that BEI would have bid lower during the Phase III bidding and that it raised its price based on improper information received from McDonald.  For these reasons, the proof was insufficient to support the major fraud object in Count One.

#### 2. **The Government Failed To Prove The Anti-Kickback Object Beyond A Reasonable Doubt**

The proof was also insufficient to support the anti-kickback object charged in Count One.  To prove a violation of the Anti-Kickback Act, the government must prove that a subcontractor provided money or some other thing of value to a prime contractor "to improperly obtain or reward favorable treatment" in connection with the contract.  41 U.S.C. § 8701.  To prove this object, the government principally relied upon evidence of what it alleged were kickbacks provided to McDonald: (1) wire transfers to GMEC; (2) the hockey game; (3) the Mediterranean cruise, and (4) the plasma television and wine cooler that Griffiths gave to McDonald.  But the evidence did not prove beyond a reasonable doubt that Mr. Bennett conspired to provide these

kickbacks to McDonald and Sevenson as part of an effort to improperly obtain or reward favorable treatment, as opposed to an effort simply to build general good will.

First, as to the GMEC payments, the evidence failed to prove beyond a reasonable doubt that Mr. Bennett knew that GMEC was a shell company for McDonald. Rather, the evidence showed that once Griffiths himself realized that GMEC was a shell for McDonald, he deliberately hid this from Mr. Bennett. (3/7/16 Tr. at 92-94). Although Griffiths claimed at one point to have told Mr. Bennett about GMEC (2/24/16 Tr. at 60), the truth is that when Griffiths first met with the government, years before his trial testimony, Griffiths told the government that he had never told Mr. Bennett that GMEC was associated with McDonald. (3/7/16 Tr. at 94). The failure of proof on this point is evident in the jury's finding that the government did not prove the wire fraud object charged in Count One, which was based on the wire transfers to GMEC.

Second, with respect to the hockey game, both of the government's cooperating witnesses testified that the hockey game was not intended by anyone at BEI to serve as a kickback to Sevenson. (2/25/16 Tr. at 139-42; 3/2/16 Tr. at 49-50; 3/3/16 Tr. at 89). The game occurred on December 14, 2001, after BEI had won and was actively working under the Phase I subcontract; McDonald was not yet project manager of the site; and Griffiths testified that he did not enter into a conspiracy with McDonald until the following spring. (2/26/16 Tr. at 124). The game was nothing more than a networking event.

Third, with respect to the cruise, Griffiths testified that he "framed" the cruise for Mr. Bennett as a way for BEI to get future private jobs with Sevenson by building its relationship with Sevenson, not as a way to get an improper advantage in bidding. (2/25/16 Tr. at 143-44). In a contemporaneous email, Griffiths portrayed the cruise to Mr. Bennet as relating to two

prospective private jobs in particular.  (GX 247).  A second cooperating witness similarly testified that the purpose of the cruise was "relationship building" and "mak[ing] sure we had strong relationships" with Sevenson, not to obtain or reward favorable treatment.  (3/2/16 Tr. at 110).  The evidence also showed that Mr. Bennett was deliberately excluded from key communications regarding the cruise, including a call with Sevenson's CFO (GX 248) and emails regarding efforts to obtain reimbursement after the cruise (GX 267).

Fourth, with respect to the plasma television and wine cooler, the evidence showed that Griffiths disguised the wine cooler on his expense reports so as to appear to be a legitimate purchase of a "sample cooler" to store soil samples (2/25/16 Tr. at 87) and that Mr. Bennett did not learn about the television until a month after it had already been purchased and shipped (GX 348 at 352; 3/2/16 Tr. at 100).

On the whole, to the extent Mr. Bennett was aware of these various payments and gifts to McDonald at the time they were given, there was no basis in the evidence for the jury to find that Mr. Bennett intended to act "improperly."  To the contrary, the proof on this object of Count One was at least equally consistent with the theory that Mr. Bennett sought properly to obtain good will from McDonald in the hopes of additional private projects in the future.

The weakness of the government's proof that Mr. Bennett acted "improperly" is underscored by the government's failure to prove that BEI ever received the prime contract documents from Sevenson.  Without those documents, nothing put BEI on notice regarding what conduct would be considered "improper" by the EPA and the ACE.  This lack of notice is fatal to the government's case.  See *United States v. Burger*, No. 99-CR-439 (SI), 2000 WL 33910676, at *4-*5 (N.D. Cal. June 6, 2000) (granting defendant's motion to dismiss indictment charging violation of Anti-Kickback Act where defendant never received the prime contract or any other

notice from HUD, the contracting agency, regarding "what aspect of defendant's conduct is considered 'improper,' thereby constituting a 'kickback' under the statute").

For all these reasons, no rational trier of fact could have found Mr. Bennett guilty of conspiracy to commit major fraud and to provide kickbacks. The Court should enter a judgment of acquittal on both counts.

**II.    THE COURT SHOULD ORDER A NEW TRIAL ON ANY SURVIVING COUNTS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33**

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case."  *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002).  Rule 33 motions may be granted where a jury's verdict "may have been seriously tainted by improper lines of questioning at trial," or where there is improper and prejudicial argument by the prosecutor.  *United States v. Dixon*, 658 F.2d 181, 193 (3d Cir. 1981).  In the present case, the jury's verdict was compromised by both.  To the extent either count survives Mr. Bennett's Rule 29 motion, the Court should order a new trial.

**A.    The Jury Heard Improper Lay Opinion Testimony That BEI Paid Illegal Kickbacks And That Mr. Bennett Knew This**

Mr. Bennett was denied a fair trial because the Court permitted a key government witness, former ACE employee Mari Shannon, over Mr. Bennett's objection, to give her lay opinion as to what the Anti-Kickback Act provides, what she expected subcontractors like Mr. Bennett to know about the anti-kickback rules and their alleged inclusion in the purchase orders BEI entered, and worst of all, how those rules prohibited the conduct in this case.  This testimony was inadmissible under Federal Rule of Evidence 701 because it was not based on Ms. Shannon's personal perception as a lay witness and was actually disguised expert testimony about the anti-kickback laws, and because it was not helpful to the jury as it merely told the jury in a conclusory fashion what result to reach.  Not only should the Court have excluded it, but the fact that the jury heard it undermined the fairness of Mr. Bennett's trial.  As described above, the

24

government failed to present any evidence that Sevenson ever gave a copy of the prime contract containing the anti-kickback rules to Mr. Bennett and BEI, or that the payments and gifts to McDonald were given "improperly."  But the government was impermissibly able to fill these gaps in its proof with Ms. Shannon's testimony, which told the jury that an experienced member of the ACE who knew how the anti-kickback rules worked thought Mr. Bennett was guilty. Without this inadmissible testimony, there is good reason to think that Mr. Bennett would have been acquitted.  In these circumstances, the interests of justice require a new trial.

## 1.  Relevant Facts

At the outset of Ms. Shannon's testimony, the government elicited that she had a master's degree, had served in the Army, and had worked for the ACE for almost 20 years, finishing her service as chief of the military construction branch in contracting.  (3/1/16 Tr. at 80-82). Turning to the Federal Creosote site, Ms. Shannon explained that she was involved in the project because her "mentor" was the "contract specialist" assigned to the site, so they "talked a lot about that project," and they reviewed "consent packages" together.  (3/1/16 Tr. at 83).  Ms. Shannon, however, never visited the Federal Creosote site.  (3/1/16 Tr. at 85).

Next, the government elicited that Ms. Shannon had been "studying" the Federal Acquisition Regulation that incorporated anti-kickback rules for "my whole life."  (3/1/16 Tr. at 89).  Then, over Mr. Bennett's objection, the government displayed a portion of the prime contract—which there was no evidence Mr. Bennett ever saw—and asked Ms. Shannon to read the definition of "kickbacks" and the anti-kickback rules to the jury.  (3/1/16 Tr. at 98).  After she set out these rules, the government asked her to "put that in everyday terms" for the jury, which she did, again over Mr. Bennett's objection, explaining that the anti-kickback rules meant "that you can't get a reward or any kind of compensation for doing something for another

contractor." (3/1/16 Tr. at 103). She emphasized: "You can't be paid. . . . It's not authorized. It's illegal." (3/1/16 Tr. at 103).

The government asked Ms. Shannon whether bidders like Bennett "were aware of the rules prohibiting kickbacks" and "the rules prohibiting obtaining confidential competitive bid information." (3/1/16 Tr. at 106-07). Again over Mr. Bennett's objection, Ms. Shannon answered that subcontractors like BEI were aware of these rules. (3/1/16 Tr. at 106-07).

The government next displayed a purchase order Griffiths had signed on behalf of BEI and asked Ms. Shannon to read the certification that BEI would act "in strict compliance with the principal contract documents." (3/1/16 Tr. at 112). After she did so, the government asked her "[b]ased on your experience at the Army Corps, what if anything do these terms in Bennett Environmental's purchase order say about kickbacks?" (3/1/16 Tr. at 113). Of course, the purchase orders said nothing about kickbacks; they merely said that BEI agreed to comply with the prime contract, which BEI never received. Nevertheless, Ms. Shannon replied that they say "[t]hat you can't give kickbacks, you can't take kickbacks." (3/1/16 Tr. at 113).

The most prejudicial and improper part of Ms. Shannon's testimony came at the end, when the prosecutor enumerated the various things of value and payments BEI allegedly made to McDonald and Sevenson in this case. With respect to each item, the government asked Ms. Shannon both whether these were prohibited kickbacks, and whether a subcontractor like Mr. Bennett would have known that:

> Q   Now based on you[r] experience at the Army Corps, would a subcontractor paying for expensive meals and parties for the prime contractor be acceptable under the anti-kickback rules?
> A   Not at all.
> . . . .
> Q   . . . [W]ould you expect subcontractors to know that?
> A   Yes, I would expect them to know that they shouldn't be doing it.

> Q        Alright. . . . [B]ased on your experience at the Army Corps, would paying for sports and concert tickets for the prime contractor be acceptable under the anti-kickback rules?
>
> A        Not at all.
>
> Q        And would you expect subcontractors to know that?
>
> A        I would.
>
> Q        And based on your experience at the Army Corps, would buying gifts like plasma TVs, wine and computers for prime contractor employees be acceptable under the anti-kickback rules?
>
> A        Not at all.
>
> Q        And would you expect subcontractors to know that?
>
> A        I would.
>
> Q        And based on your experience in the Army Corps, would paying for luxury cruises for prime contractor employees be acceptable under the anti-kickback rules?
>
> A        Not.
>
> Q        And would you expect subcontractors to know that?
>
> A        I would.
>
> Q        And based on your experience at the Army Corps, would it be acceptable for a subcontractor to wire hundreds of thousands of dollars to the project manager at a site?
>
> A        No.
>
> Q        And would you expect subcontractors to know that?
>
> A        Yes.

(3/1/16 Tr. 121-23).  After the first question in this series, Mr. Bennett objected that it was

improper "expert testimony about how the law applies."  (3/1/16 Tr. at 122).  The government

responded that Ms. Shannon's testimony was "not expert testimony" because it was "based on

her knowledge from working at the Army Corps."  (3/1/16 Tr. at 122).  The Court overruled the

objection and allowed the testimony to proceed.  (3/1/16 Tr. at 122).[10]

    At the conclusion of this testimony, defense counsel argued that this testimony was

"incredibly prejudicial" in that the Court permitted Ms. Shannon to "get on the stand and give a

legal conclusion."  (3/1/16 Tr. at 157).  Defense counsel requested a "mistrial" or at least a

---

[10] Ms. Shannon's testimony was particularly improper in light of the government's protestation that defense expert Christopher Ryan's testimony would be inappropriate if used as a "proxy" to portray what Mr. Bennett might have thought or understood (3/2/16 Tr. at 187).  Disregarding its efforts to cabin Mr. Ryan's testimony, the government repeatedly utilized Ms. Shannon as a proxy for what Mr. Bennett would have likely known and understood.

"curative instruction."  (3/1/16 Tr. at 157).  The Court denied both requests.  (3/1/16 Tr. at 159,

195).

In summation, the government called attention to Ms. Shannon's testimony,

characterizing her as one of the "victims of the scheme" and emphasizing her expectation that

subcontractors "knew the rules."  (3/15/16 Tr. at 12, 20).

### 2.  Applicable Law

Rule 701 of the Federal Rules of Evidence provides that a lay witness may testify in the

form of an opinion only where her opinions are "(a) rationally based on the witness's perception

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule

702."  Fed. R. Evid. 701.

### 3.  Discussion

Ms. Shannon's testimony as to what the Anti-Kickback Act provides, and that the

payments and gifts McDonald and Sevenson allegedly received in this case from BEI (i.e., the

wire transfers to GMEC, the hockey game, the cruise, the wine cooler, and the television) were

illegal kickbacks—and that subcontractors like Mr. Bennett must have known this—was

improper lay opinion testimony and should have been excluded, as it failed Rule 701's

requirements.

First, Ms. Shannon's testimony was not based on her personal perception, and was

instead improper expert testimony based on her specialized expertise regarding the anti-kickback

rules, such that it should have been excluded under Rules 701(a) and (c).  The government

defended her testimony at trial by arguing that it was "based on her knowledge from working at

the Army Corps."  (3/1/16 Tr. at 122).  But the mere fact that Ms. Shannon may have

encountered the anti-kickback rules in the course of her job does not make her testimony regarding those rules nontechnical or nonspecialized.

As multiple courts have confirmed in fraud cases, although lay witnesses may testify to their opinions under Rule 701 when they apply "familiar reasoning processes to their job experience," lay witnesses are not permitted to give their opinions concerning the application of technical laws and regulations like the Anti-Kickback Act. *United States v. Vega*, 813 F.3d 386, 393-95 (1st Cir. 2013) (holding "it was error to admit" testimony of lay witnesses "without qualifying them as expert witnesses," where one "described the anti-kickback statute" and the other said that payments at issue "were kickbacks"); *United States v. White*, 492 F.3d 380, 399-405 (6th Cir. 2007) (holding that Medicare auditors could not testify about meaning of certain Medicare terms as lay witnesses); *United States v. Riddle*, 103 F.3d 423, 428-29 (5th Cir. 1997) (reversing conviction and ordering new trial because, among other reasons, bank auditor who testified as a lay witness that defendant's conduct fell outside of sound banking practices impermissibly "functioned not as a witness relaying his own observations so much as a knowledgeable bank examiner who could provide the jury with an overview of banking regulations and practices and who could authoritatively condemn [the defendant's] actions"); *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997) (holding it was error to admit testimony based upon the "percipient involvement," of DEA agent who had not been qualified as expert witness, since testimony required specialized knowledge outside the experience of the average juror).  Because Ms. Shannon's testimony was expert testimony regarding her specialized knowledge of the anti-kickback rules, it should have been excluded.

Second, Ms. Shannon's testimony also did not help the jury understand any fact in issue, as Rule 701(b) requires.  Rather, her testimony did nothing more than tell the jury in a

conclusory fashion what it should find, repeating over and over again that each and every

payment and benefit to Sevenson alleged in this case was an illegal kickback, and that she would

expect subcontractors like Mr. Bennett "to know that."  (3/1/16 Tr. 121-23).  By telling the jury

what result to reach, this testimony ran headlong into Rule 701(b)'s prohibition, which is

"designed to exclude lay opinion testimony that amount[s] to little more than choosing up sides"

and "that 'merely tell[s] the jury what result to reach.'"  *United States v. Stadtmauer*, 620 F.3d

238, 262 (3d Cir. 2010) (quoting *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992))

(other internal quotation marks omitted).

  Ms. Shannon's testimony was particularly prejudicial because it told jury what Mr.

Bennett *must have* known, and in doing so gutted Mr. Bennett's defenses of lack of knowledge,

and that any payments and gifts were to generate good will.  Multiple courts have recognized

that testimony regarding what a defendant "must have known" generally should not be admitted

under Rule 701(b).  *See United States v. Anderskow*, 88 F.3d 245, 250 (3d Cir. 1996) ("we

conclude that Alevy's subjective belief that Anchors 'must have known' fails to meet Rule

701(b)'s 'helpfulness' requirement. . . . Since it was for the jury to determine whether he 'must

have known' that the Trust was engaged in a large-scale fraud, Alevy's opinion on the

subject . . . essentially turned him into a thirteenth juror"); *Rea*, 958 F.2d at 1215-16 (holding

that testimony by a witness that the defendant "had to know" failed to meet Rule 701's

helpfulness requirement).  For this reason as well, Ms. Shannon's testimony should have been

excluded.

  Ms. Shannon's testimony was not only inadmissible under all three prongs of Rule 701,

but was so prejudicial as to require a new trial.  First, Ms. Shannon was presented to the jury as a

long-time Army veteran, who had most recently been the chief of the military construction

branch at the ACE, and who had been studying the relevant regulations her "whole life." (3/1/16 Tr. at 82, 89). This gave her opinions regarding how those regulations applied in this case and regarding what Mr. Bennett would have known tremendous weight, as the jurors were effectively told that an experienced member of the ACE had concluded that Mr. Bennett had committed a crime. Second, the most prejudicial part of her testimony came at the very end and went on at significant length, thereby ensuring its impact on the jury. (3/1/16 Tr. at 121-23). Third, the government capitalized on the Court's error in admitting Ms. Shannon's testimony by repeatedly emphasizing the testimony in summation. The government went so far as to characterize Ms. Shannon as one of the "victims of the scheme," and reminded the jury that Ms. Shannon "expected contractors and subcontractors to know the rules." (3/15/16 Tr. at 13 (gov't summation)). A few minutes later, rather than asking the jury to look at the actual evidence of what Mr. Bennett knew about the contents of the prime contract—which he actually never got— the government instead expressly asked the jury to rely on Ms. Shannon's speculative guesswork, reminding the jury that "Miss Shannon explained that she expected that parties that contracted with the Government as prime or subcontractors" like Mr. Bennett "knew the rules and would abide by them." (3/15/16 Tr. at 19-20 (gov't summation)). The erroneous admission of Ms. Shannon's testimony can only be remedied by a new trial.

The Court of Appeals for the First Circuit has ordered a new trial based in part on the very error that occurred here, which it referred to as the "usurpation problem":

> The usurpation problem that arises when a witness testifies to opinions based on evidence that was also available to the jurors is compounded when the witness is a government agent whose testimony . . . is effectively a judgment on the question of guilt or innocence . . . . The jurors were told that . . . an experienced government agent had rejected appellants' . . . defense and concluded that they were participants in the [crime]. Given the effect on juries of the government's imprimatur . . . it was patently unfair for [the agent] to present his view of appellants' culpability. It is the jury's singular responsibility to decide from the

> evidence admitted at trial whether the government has carried its burden of proof
> beyond a reasonable doubt.

*United States v. Meises*, 645 F.3d 5, 17-18 (1st Cir. 2011) (internal quotation marks omitted); *see also* 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 701.05 (noting that, to protect the jury's role as fact-finder, courts must be wary of lay opinion testimony whose "sole function is to answer the same question that the trier of fact is to consider in its deliberations").

This is also not the first time the Antitrust Division has relied on improper testimony from a lay witness to buttress a questionable fraud case: In *United States v. Fenzi*, 670 F.3d 778 (7th Cir. 2012), the Court of Appeals for the Seventh Circuit ordered that the defendant be acquitted on fraud charges brought by the Antitrust Division in connection with the bidding for a city contract because the Division relied on improper lay opinion testimony from a government investigator to establish the materiality of the alleged misstatements to the city. *See id.* at 781. The Seventh Circuit observed that at some point, the Antitrust Division "realized it didn't have an antitrust case" and "decided to charge fraud rather than an antitrust violation." *Id.* at 780-81. But as in the present case, "the theory behind the charge of fraud . . . was never made clear at trial," and was ultimately supported by improper lay opinion testimony from a government agent, requiring reversal. *Id.* at 783.

Because Ms. Shannon's testimony usurped the jury's function and told the jury to convict Mr. Bennett, the admission of Ms. Shannon's testimony was prejudicial error. The Court should order a new trial on this basis alone.

### B. The Government's Improper Remarks During Closing Arguments Deprived Mr. Bennett Of A Fair Trial

The Court also should grant a new trial because the government used an improper appeal to the jury's "community conscience" in a misguided effort to prejudice the jury against Mr.

Bennett simply because he was not an American.  In particular, in summation, the government

told the jury to convict Mr. Bennett, who came to the United States from Canada, because "[y]ou

cannot *come into this country*, get a Government funded project, and conveniently fail to pay

attention to the rules that apply."  (3/15/16 Tr. at 39 (emphasis added)).  Defense counsel

objected and moved for a mistrial, but the Court denied the motion.  (3/17/16 Tr. at 71, 157).  In

the alternative, defense counsel asked for a curative instruction, but the Court denied that as well.

(3/15/16 Tr. at 71, 157).

      A "prosecutor should not use arguments calculated to inflame the passions or prejudices

of the jury," and if "the only conceivable purpose of the prosecutor's [remarks] was to prejudice

the jury," the remarks are improper.  *United States v. Modica*, 663 F.2d 1173, 1180 (2d Cir.

1981); *United States v. Johnson*, 231 F.3d 43, 47 (D.C. Cir. 2000) (remarks "designed to inflame

the passions or prejudices" of jurors are not permitted).  In determining whether to order a new

trial based on improper arguments by the prosecutor, the Court should look at three factors: the

scope of the improper comments in the overall trial context, the effect of any curative

instructions given, and the strength of the evidence against the defendant.  *See United States v.

Mastrangelo*, 172 F.3d 288, 297 (3d Cir. 1999).

      Here, these considerations all weigh in favor of a new trial.  As an initial matter, the

government's remarks were an improper appeal to the jury's "community conscience," designed

to inflame and incite emotions and fears of foreigners, and to place jurors into an us-versus-them

mindset.  *United States v. Solivan*, 937 F.2d 1146, 1148, 1151 (6th Cir. 1991) (ordering new trial

based on government remark in summation: "I'm asking you to tell her and all of the other drug

dealers like her . . . [t]hat we don't want that stuff in Northern Kentucky and that anybody who

brings that stuff in Northern Kentucky . . . .") (emphasis omitted).

Further, each of the factors this Court should review indicates that the remarks were prejudicial: the remarks came in the government's summation, when they would have most impact; the Court refused to give any curative instruction; and the evidence was not strong, for all of the reasons set forth in support of Mr. Bennett's Rule 29 motion. The fact that the government's remark was "isolated to one portion of the trial, closing argument," does "not ameliorate [its] prejudicial impact," where the remark was "misleading, inflammatory and prejudiced defendant's right to a fair trial." *Solivan*, 937 F.2d at 1155. In this context, the government's improper remarks could well have tipped the balance toward a conviction.

Other courts have held similar comments to be sufficiently prejudicial to warrant a new trial. *See, e.g.*, *Solivan*, 937 F.2d at 1148, 1151; *United States v. Cannon*, 88 F.3d 1495, 1502 (8th Cir. 1996) (ordering new trial based on government statement: "[t]here are bad people in the world, ladies and gentlemen. We are lucky where we live not to come in contact with as many as there may be in other parts of the country. But there are still some around here"), *abrogated on other grounds by Watson v. United States*, 552 U.S. 74 (2007); *see also Pappas v. Middle Earth Condo. Association*, 963 F.2d 534, 539-41 (2d Cir. 1992) (reversing judgment because of counsel's improper appeal to regional bias in closing argument, including statement that plaintiff's skiing party can "come up here from New Jersey to Vermont to enjoy what we experience every year").

The prejudice caused by the government's improper appeal to the jury's community conscience was magnified by the way the government repeatedly misstated the record in both its main and rebuttal summations. For example:

1) The government stated, as to the "principal contract documents," that "Mr. Griffiths read them . . . and the defendant read them." (3/15/16 Tr. at 42-43). In fact, as

discussed above, the evidence showed that BEI never received these documents, which the government knew.  (2/23/16 Tr. at 84).

2) The government stated that "if the defendant and his company were playing by the rules, another company would have gotten the work" instead of BEI.  (3/15/16 Tr. at 24).  In fact, the government knew that no evidence demonstrated that any competitor provided a better value than BEI, under a "best value" standard, and the evidence showed instead that BEI's only competitor for the Lagoon A bidding, Safety Kleen, was not the best value.  (2/24/16 Tr. at 135; GX 223).

3) The government stated that "Tejpar and Griffiths both testified they had no problem getting or reading their emails.  Tejpar was on the same server, the benvan server as the defendant."  (3/15/16 Tr. at 175).  In fact, neither witness said this, and to the contrary, both witnesses testified to having some difficulty receiving emails, which the government knew.  (3/2/16 Tr. at 46-47; 2/23/16 Tr. at 60; 2/25/16 Tr. at 111-12, 115; D 6013).

4) The government stated that Bill McDermott—Sevenson's CFO—said in an email that the 2002 cruise was "breaking U.S. statutes."  (3/15/16 Tr. at 171).  In fact, the government knew that no such email from McDermott exists.

5) The government stated that Mr. Bennett's dyslexia "doesn't affect someone's comprehension."  (3/15/16 Tr. at 13).  In fact, an expert witness testified that Mr. Bennett's dyslexia *would* affect Mr. Bennett's reading comprehension, particularly with regard to lengthy documents or documents in a small font, and could affect his listening comprehension as well.  (3/7/16 Tr. at 56-58, 81).

Considered on the whole, the government's multiple misstatements of the record in its summations violated Mr. Bennett's due process rights, and this violation requires a new trial. *See United States v. Valentine*, 820 F.2d 565, 570 (2d Cir. 1987) (holding that new trial is required when the defendant's due process rights were violated by the prosecutor's knowing misrepresentation of the evidence). When these misstatements are considered in combination with the government's improper appeal to the jury's community conscience, they resulted in a fundamentally unfair trial for Mr. Bennett.

Because the government's prejudicial comments could have contributed to Mr. Bennett's conviction, the Court must order a new trial. *Solivan*, 937 F.2d at 1157 (new trial required where "we cannot say that the government has demonstrated, beyond a reasonable doubt, that the prejudicial comments did not contribute to the defendant's conviction").

## **CONCLUSION**

For the foregoing reasons, Mr. Bennett respectfully requests that the Court enter a

judgment of acquittal on all counts or, alternatively, order a new trial on any surviving count.

Dated: New York, New York
        April 22, 2016

MORVILLO, ABRAMOWITZ, GRAND,
    IASON & ANELLO, P.C.

By:   ___/s/ Robert Anello_____
       Robert J. Anello
       Richard F. Albert
       Brian A. Jacobs
       Jacob W. Mermelstein
       Peter Janowski
       Jocelyn Courtney Kaoutzanis
       565 Fifth Avenue
       New York, NY 10017
       (212) 856-9600