UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Susan D. Wigenton |
| | | U.S. District Judge |
| v. | : | |
| JOHN A. BENNETT, | : | Criminal No. 09-656 |
| Defendant. | | |

---

## GOVERNMENT'S OPPOSITION TO DEFENDANT JOHN A. BENNETT'S RENEWED MOTION FOR A JUDGMENT OF ACQUITTAL OR, ALTERNATIVELY, FOR A NEW TRIAL

---

JEFFREY D. MARTINO
Chief
MICHELLE O. RINDONE
Assistant Chief
New York Office
Antitrust Division
Department of Justice


HELEN CHRISTODOULOU
DANIEL TRACER
MIKHAIL VANYO
Trial Attorneys, Antitrust Division
26 Federal Plaza, Room 3630
New York, New York 10278
(212) 335-8000

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES...............................................................................................ii

INTRODUCTION..........................................................................................................1

RELEVANT BACKGROUND.......................................................................................1

ARGUMENT.................................................................................................................2

I.  The Defendant's Rule 29 Motion Should Be Denied..................................................3

   A.  Legal Standard................................................................................................3

   B.  The Government Presented Sufficient Evidence at Trial to Prove the Defendant's Guilt on Count Two................................................................................................................4

      1.  The Defendant Made Material Misrepresentations to the EPA through Deceitful Conduct and False Representations .. ...........................................................5

      2.  The Defendant's Crimes Were Designed to Overcharge the EPA.............................11

   C.  The Government's Proof at Trial Was Sufficient to Convict the Defendant of Conspiracy to Commit Major Fraud Against the United States and to Pay Kickbacks to a Prime Contractor.................................................................................................15

II.  The Defendant's Request for a New Trial Under Rule 33 Should Be Denied........................23

   A.  Legal Standard...............................................................................................23

   B.  The USACE Witness's Testimony Was Correctly Admitted and Was Not Substantially Prejudicial .................................................................................................... ...24

      1.  The USACE Witness Provided Proper Lay Testimony Under Federal Rule of Evidence 701……………………………………………………………………........24

      2.  The USACE Witness's Lay Testimony Was Not Unduly Prejudicial......................28

   C.  The Government's Closing Arguments Were Responsive to the Defendant's Arguments and Did Not Deprive the Defendant of a Fair Trial.... .......................................32

CONCLUSION ............................................................................................39

## **TABLE OF AUTHORITIES**

### **Cases**

*Donlin v. Philips Lighting N. Am. Corp.*,
    581 F.3d 73 (3d Cir. 2009)..................................................................... 25

*Forrest v. Beloit Corp.*,
    424 F.3d 344 (3d Cir. 2005)................................................................... 23

*Lightning Lube, Inc. v. Witco Corp.*,
    4 F.3d 1153 (3d Cir. 1993)..................................................................... 24

*Neder v. United States*,
    527 U.S. 1 (1999)............................................................................... 5, 10

*Oelsner v. United States*,
    60 Fed. App'x 412 (3d Cir. 2003)......................................................... 32

*Potter v. Gov't of V.I.*,
    No. 2003 Cr. 131, 2006 WL 2568446 (D.V.I. Aug. 24, 2006)............... 32

*Richardson v. Marsh*,
    481 U.S. 200 (1987)............................................................................... 31

*Teen-Ed, Inc. v. Kimball Intern., Inc.*,
    620 F.2d 399 (3d Cir. 1980)................................................................... 24

*United States v. Allen*,
    No. 14 Cr. 272, 2016 WL 615705 (S.D.N.Y. Feb. 16, 2016)................... 6

*United States v. Anderskow*,
    88 F.3d 245 (3d Cir. 1996)....................................................................... 3

*United States v. Asher*,
    854 F.2d 1483 (3d Cir. 1988)................................................................. 12

*United States v. Basroon*,
    38 Fed. App'x 772 (3d Cir. 2002)........................................................... 5

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015)................................................................... 14

*United States v. Boyer*,
    694 F.2d 58 (3rd Cir. 1982)................................................................... 12

*United States v. Brodie,*
    403 F.3d 123 (3rd Cir. 2005) ................................................................... 3, 4, 16

*United States v. Burger,*
    No. 99-CR-439, 2000 WL 33910676 (N.D. Cal. June 6, 2000) ............................ 18

*United States v. Cannon,*
    88 F.3d 1495 (8th Cir. 1996) ......................................................................... 35

*United States v. Cen-Card Agency/C.C.A.C.,*
    724 F.Supp. 313 (D.N.J. 1989) ...................................................................... 12

*United States v. Colton,*
    231 F.3d 890 (4th Cir. 2000) ........................................................................... 5

*United States v. Copple,*
    24 F.3d 535 (3d Cir. 1994) ............................................................................ 23

*United States v. Davis,*
    524 Fed. App'x 835 (3d Cir. 2013) ................................................................. 25

*United States v. Dempsey,*
    629 Fed. App'x 223 (3d Cir. 2015) ................................................................. 24

*United States v. Dent,*
    149 F.3d 180 (3d Cir. 1998) ............................................................................ 4

*United States v. Dobson,*
    419 F.3d 231 (3d Cir. 2005) ............................................................................ 6

*United States v. Flores,*
    454 F.3d 149 (3d Cir. 2006) ............................................................................ 3

*United States v. Fumo,*
    No. 06 Cr. 0319, 2009 WL 1688482 (E.D. Pa. June 17, 2009) ......................... 5, 6

*United States v. Gee,*
    226 F.3d 885 (7th Cir. 2000) ......................................................................... 10

*United States v. Georgiou,*
    777 F.3d 125 (3d Cir. 2015) ..................................................................... 23, 28

*United States v. Green,*
    25 F.3d 206 (3d Cir. 1994) ............................................................................ 32

*United States v. Hart*,
   273 F.3d 363 (3d Cir. 2001)..............................................................................3

*United States v. Hedaithy*,
   392 F.3d 580 (3d Cir. 2004)........................................................................12, 14

*United States v. Hodge*,
   150 F.3d 1148 (9th Cir. 1998) ........................................................................11

*United States v. Hodge*,
   321 F.3d 429 (3d Cir. 2003)..............................................................................3

*United States v. Hoffecker*,
   530 F.3d 137 (3d Cir. 2008)............................................................................23

*United States v. Iglesias*,
   535 F.3d 150 (3d Cir. 2008)..............................................................................3

*United States v. Leon*,
   739 F.2d 885 (3d Cir. 1984)..............................................................................4

*United States v. Locascio*,
   6 F.3d 924 (2d Cir. 1993)...............................................................................32

*United States v. Martin*,
   411 F.Supp.2d 370 (S.D.N.Y. 2006) .................................................................6

*United States v. Mastrangelo*,
   172 F.3d 288 (3d Cir. 1999)............................................................................33

*United States v. Modica*,
   663 F.2d 1173 (2d Cir. 1981)..........................................................................33

*United States v. Olatunji*,
   872 F.2d 1161 (3d Cir. 1989)............................................................................5

*United States v. Osser*,
   864 F.2d 1056 (3d Cir. 1988)......................................................................8, 12

*United States v. Patten*,
   226 U.S. 525 (1913)..........................................................................................4

*United States v. Russo*,
   166 Fed. App'x 654 (3d Cir. 2006)..................................................................12

*United States v. Scanzello*,
   832 F.2d 18 (3d Cir. 1987)................................................................... 4

*United States v. Smith*,
   294 F.3d 473 (3d Cir. 2002)........................................................... 4, 16

*United States v. Solivan*,
   937 F.2d 1146 (6th Cir. 1991) ........................................................ 35

*United States v. United States Gypsum Co.*,
   600 F.2d 414 (3d Cir. 1979).............................................................. 4

*United States v. Vega*,
   813 F.3d 386 (1st Cir. 2013).................................................... 25, 26

*United States v. Weingold*,
   844 F.Supp. 1560 (D.N.J. 1994) ................................................... 12

*United States v. Werme*,
   939 F.2d 108 (3d Cir. 1991)........................................................... 32

*United States v. William Savran & Assoc., Inc.*,
   755 F.Supp. 1165 (E.D.N.Y. 1991) .............................................. 12

*United States v. Wright*
   665 F.3d 560, 573 (3d Cir. 2012), *as amended* (Feb. 7, 2012) ................ 5

*United States v. Wolfe*,
   245 F.3d 257 (3d Cir. 2001)............................................................. 3

*United States v. Young*,
   470 U.S. 1 (1985)............................................................................ 32

**Statutes**

18 U.S.C. § 1031 ................................................................................................... 1

18 U.S.C. § 371 ..................................................................................................... 1

**Rules**

Federal Rule of Criminal Procedure 29 .............................................................. *passim*

Federal Rule of Criminal Procedure 33 .............................................................. *passim*

Federal Rule of Evidence 701 .................................................................................. 24

## INTRODUCTION

The government respectfully submits this memorandum of law in opposition to the defendant's post-verdict motion for a judgment of acquittal and motion for a new trial under Rule 29 and Rule 33 of the Federal Rules of Criminal Procedure.  By his motions, the defendant seeks a judgment of acquittal on the grounds that the evidence admitted at trial was insufficient to sustain the conviction and, in the alternative, he seeks a new trial on the grounds that the government improperly introduced lay opinion testimony and made supposedly prejudicial and inaccurate remarks during the government's closing arguments.  For the reasons stated below, the defendant's motions should be denied in their entirety.

## RELEVANT BACKGROUND

The defendant was indicted on August 31, 2009 of two counts, conspiracy, in violation of 18 U.S.C. § 371, and major fraud against the United States, in violation of 18 U.S.C. § 1031, for engaging in a scheme to pay kickbacks and defraud the government, namely the United States Environmental Protection Agency ("EPA"), at the Federal Creosote Superfund Site in Manville, New Jersey ("Federal Creosote").

The defendant filed pre-trial motions on October 23, 2015 and January 22, 2016.  Among these motions, the defendant moved to dismiss the Indictment, arguing that the government had failed to state an offense or adequately plead that the defendant engaged in any fraud, including fraud in connection with the defendant's overbilling of the EPA in connection with soil disposal services (the "soil switch"), that the defendant was harmed by the government's failure to indict in a timely fashion, and that the Indictment was returned beyond the applicable statute of limitations. (ECF No. 281).  After hearing oral argument on the motion to dismiss on January 27, 2016, this Court denied the defendant's motion to dismiss in its entirety.  (ECF No. 284).

1

The trial commenced on February 22, 2016.  The government called five witnesses to testify in its case-in-chief.  Included among those witnesses were two of the defendant's employees and co-conspirators, Robert Griffiths and Zul Tejpar.  The defense called six witnesses, including the defendant.  In addition to the testimony, the parties offered, and the Court admitted, 310 exhibits into evidence.  The jury deliberated on March 16, 2016 and returned a verdict of guilty against the defendant on both counts.  Trial Verdict, 3/16/16, Transcript ("Tr.") at 6-8.

## ARGUMENT

The defendant moves for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure on the basis that the evidence at trial was insufficient to support his conviction of major fraud against the United States charged in Count Two, claiming that the government failed to prove that anyone at Bennett Environmental, Inc. ("Bennett Environmental") knowingly made a material misrepresentation or that the defendant acted with the specific intent to defraud as alleged in the Indictment, and failed to prove the major fraud or kickback objects of the conspiracy charged in Count One.  The defendant also requests a new trial under Rule 33 of the Federal Rules of Criminal Procedure due to the introduction of allegedly improper lay opinion testimony and supposedly prejudicial and inaccurate remarks during the government's closing arguments.

The defendant's motion should be denied in its entirety because the evidence admitted at trial overwhelmingly proved that the defendant committed major fraud against the United States and knowingly participated in a conspiracy to pay kickbacks and commit major fraud against the United States.  Furthermore, the Court's rulings regarding the lay opinion testimony and the government's remarks during closing arguments were proper, and in light of evidence produced at trial, a new trial is not warranted in the interests of justice.

2

I.      **The Defendant's Rule 29 Motion Should Be Denied**

   A.  **Legal Standard**

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, "[a]fter the government closes its evidence or after the close of all evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[1] Fed. R. Crim. P. 29. "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Iglesias*, 535 F.3d 150, 155 (3d Cir. 2008) (internal quotation marks omitted); *accord United States v. Hodge*, 321 F.3d 429, 439 (3d Cir. 2003) ("Our review of the sufficiency of the evidence after a guilty verdict is 'highly deferential.'") (quoting *United States v. Hart*, 273 F.3d 363, 371 (3d Cir. 2001)).

In reviewing a Rule 29 post-verdict motion for judgment of acquittal, the district court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Wolfe*, 245 F.3d 257, 261 (3d Cir. 2001).  The court is required to "draw all reasonable inferences in favor of the jury verdict." *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996).  In evaluating a motion for acquittal, "a court 'must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury.'" *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).

---

[1] Rule 29(b) allows the Court to reserve decision on the motion, let the trial proceed, submit the case to the jury, and decide the motion after the jury returns a verdict of guilty.  Fed. R. Crim. P. 29(b)

Further, in conducting the sufficiency inquiry, the district court "[does] not view the government's evidence in isolation, but rather, in conjunction and as a whole." *Brodie*, 403 F.3d at 134; *see also United States v. United States Gypsum Co.*, 600 F.2d 414, 417 (3d Cir. 1979) ("'[T]he character and effect of a conspiracy [is] not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'") (quoting *United States v. Patten*, 226 U.S. 525 (1913)) (parenthesis in the original).  All credibility issues must be resolved in the government's favor. *United States v. Scanzello*, 832 F.2d 18, 21 (3d Cir. 1987).  "To sustain a conspiracy conviction, the 'contention that the evidence also permits a less sinister conclusion is immaterial . . . [T]he evidence need not be inconsistent with every conclusion save that of guilt.'" *United States v. Smith*, 294 F.3d 473, 478 (3d Cir. 2002) (quoting *United States v. Dent*, 149 F.3d 180, 188 (3d Cir. 1998)).  Thus, a finding of insufficiency should "be confined to cases where the prosecution's failure is clear." *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984); *see also Smith*, 294 F.3d at 476–77.

### B.  The Government Presented Sufficient Evidence at Trial to Prove the Defendant's Guilt on Count Two

The defendant first argues that the government failed to present sufficient evidence to prove his guilt on Count Two.  Count Two focuses on the defendant's fraud in connection with Bennett Environmental's award of the Phase Two Federal Creosote contract in and around May 2002.  In making arguments that largely rehash those he unavailingly advanced in his pretrial motions, the defendant argues that whatever unseemly conduct may have been afoot at Bennett Environmental with respect to the Phase Two contract, there was no evidence at trial that the defendant made material misrepresentations or that he acted with the intent to defraud his victim, the EPA, of any money or property.  However, the testimony of his co-conspirators as well as the exhibits introduced at trial plainly show that the defendant engaged in a scheme to defraud that

4

was perpetrated through deceit and lies, and whose aim was to overcharge the EPA and thereby deprive it of money and property.  Drawing all inferences in the government's favor, the evidence was more than sufficient for the jury to convict the defendant of Count Two.

### 1. The Defendant Made Material Misrepresentations to the EPA through Deceitful Conduct and False Representations

The defendant argues that neither he nor anyone else associated with Bennett Environmental knowingly made any material misrepresentations as required under the major fraud statute.  Def. Mot. at 11.  That assertion stands in stark contrast to the government's evidence at trial.  As an initial matter, the defendant incorrectly focuses solely on the signed purchase orders introduced into evidence at trial.  Even apart from those signed representations, the defendant and his co-conspirators engaged in fraud through deceit and half-truths that were designed to deprive the EPA of money and property.  Moreover, the signed purchase orders further constituted material misrepresentations that were part of the defendant's scheme to deprive the EPA of money and property.

A scheme to defraud requires material misrepresentations.  *Neder v. United States*, 527 U.S. 1, 25 (1999).  "[A] false statement is 'material' if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *United States v. Fumo*, No. 06 Cr. 0319, 2009 WL 1688482, at *6 (E.D. Pa. June 17, 2009) (quoting *Neder*, 527 U.S. at 16).  Critically, however, the misrepresentation itself need not be a literal lie.  *See*, *e.g.*, *United States v. Wright*, 665 F.3d 560, 573 (3d Cir. 2012), *as amended* (Feb. 7, 2012); *United States v. Basroon*, 38 Fed. App'x 772, 779-80 (3d Cir. 2002); *United States v. Colton*, 231 F.3d 890, 897-98 (4th Cir. 2000); *United States v. Olatunji*, 872 F.2d 1161 (3d Cir. 1989) (holding that fraudulent representations may be effected by deceitful statements of half-truths or the concealment of material facts and the devising of a scheme for obtaining money or

5

property by such statements or concealments); *United States v. Martin*, 411 F.Supp.2d 370, 372-73 (S.D.N.Y. 2006) ("[A] misrepresentation or omission is not a necessary element of a 'scheme to defraud' under the wire fraud statute.").  A scheme to defraud may involve "a departure from fundamental honesty, moral uprightedness, or fair play and candid dealings in the general light of the community."  *United States v. Dobson*, 419 F.3d 231, 239 (3d Cir. 2005) (internal quotations omitted).  "The Third Circuit has broadly defined a scheme to defraud as involving *any effort at deceit* which aims, in part, to deprive another of money or property."  *Fumo*, 2009 WL 1688482, at *3 (emphasis added); *see also United States v. Allen*, No. 14 Cr. 272, 2016 WL 615705, at *2 (S.D.N.Y. Feb. 16, 2016) ("[D]eception . . . irreducibly entails some act that gives the victim a false impression, and in this case a jury could reasonably find that defendants gave [their victims a] false impression.") (internal quotations omitted).

The defendant engaged in a scheme to defraud through both his and his company's deceitful conduct throughout Phase Two and Phase Three of the bidding at Federal Creosote, as well as through the particular purchase orders that Bennett Environmental entered into in connection with those phases.[2]  First and foremost, the evidence at trial proved that the defendant's conduct involved bid-rigging and secret kickbacks to Gordon McDonald, the project manager for prime contractor Sevenson Environmental Services, Inc. ("Sevenson") at Federal Creosote, that was designed to deceive and mislead the EPA into believing that the winning bidder was selected pursuant to a competitive bidding process, and free and clear of any kickbacks.  For instance, Griffiths testified that specifications were changed on the bidding of Phase Two to allow Bennett Environmental to win at an artificially inflated price, while making

---

[2] The government provided notice to the defendant of both of these forms of fraudulent misrepresentations in its June 26, 2015 supplemental voluntary bill of particulars.

it appear to the EPA that competitive bidding had been followed and there was no overcharge.

*See, e.g.*, Griffiths Testimony, 2/23/16 Tr. at 176:

> Q:    Did you tell anybody at the EPA about your arrangement with McDonald
>       to build in that [$]13.50?
> A:    No.
> Q:    And, again, why not?
> A:    Because I felt if I did let the EPA know, they would call the police or the
>       FBI because it was illegal.

Tejpar also testified that the nature of the scheme was to deceive and mislead the EPA:

> Q:    And to your knowledge, did anyone else at Bennett Environmental ever
>       disclose to the Army Corps or the EPA the payment of kickbacks by
>       Bennett Environmental to Sevenson?
> A:     No.
> Q:    And why not?
> A:    Well, it wasn't -- we were breaking the law. Everybody knew that. Why
>       would we tell anybody about that?

Tejpar Testimony, 3/02/16 Tr. at 180.

Both witnesses testified that the defendant was aware of, and approved of, this fraudulent

conduct, including the bid-rigging, the markup, and the kickbacks.  For example, Griffiths

testified as follows:

> Q:    And during all that time, was there any doubt in your mind that the
>       defendant was aware that you had done all these things at Federal
>       Creosote?
> A:    There's no doubt in my mind, he was an active conspirator with me.

Griffiths Testimony, 2/25/16 Tr. at 20-21, and:

> Q:    And did you later come to learn additional information about GMEC?
> A:    Yes.
> Q:    And what did you come to learn?
> A:    I learned that it was a company owned by Mr. McDonald and that he also
>       called it Gordon McDonald Environmental Consulting . . .
> Q:    And who at Bennett Environmental did you share that with?
> A:    I specifically remember telling Mr. Stern and Mr. Bennett. I don't
>       remember telling Mr. Tejpar about it.

Griffiths Testimony, 2/24/16 Tr. at 59-60.  And Tejpar testified:

> Q:     Okay. And did they all agree, including John Bennett, to the extra [$]13.50
>        per ton?
> A:     Yeah.

Tejpar Testimony, 3/02/16 Tr. at 93.  Under these circumstances the defendant's engagement in,

and failure to disclose, the bid-rigging, mark-ups and the payment of kickbacks was deceptive

and misleading and, hence, fraudulent.  *See United States v. Osser*, 864 F.2d 1056, 1057 (3d Cir.

1988) (affirming conviction for mail fraud based on a scheme to defraud where the defendant

orchestrated "a classic bid rigging and kick-back arrangement" to deceive the city of

Philadelphia) (internal quotations omitted).  The Court should not interfere with the jury's

findings on this point.

 Moreover, the defendant authorized his employees to sign purchase orders each time

Bennett Environmental won a contract at Federal Creosote, including the purchase order for

Phase Two.  Griffiths testified:

> Q:     And were you given that permission to sign that purchase order?
> A:     Yes.
> Q:     And who gave you that permission?
> A:     Mr. Bennett.

Griffiths Testimony, 2/23/16 Tr. at 87, and

> Q:     Who decided at Bennett Environmental who should sign this purchase
>        order?
> A:     I had continued authorization to keep putting my name on purchase orders.

*Id*. at 173. The Purchase Order for Phase Two, the basis for Count Two, stated that "the vendor

[Bennett Environmental] shall furnish all requirements to perform and complete the following,

*all in strict compliance with the principal contracts documents*."  GX-26a, pg. 24 (emphasis

added).  Testimony from government witnesses as well as from the defendant himself established

that this clause included the Federal Acquisition Regulation (FAR) prohibition against

kickbacks, and that by signing this purchase order Bennett Environmental represented that it was

in compliance with this prohibition.  *See, e.g.*, Griffiths Testimony, 2/23/16 Tr. at 175:

> Q:  And to your understanding, were you in fact in strict compliance?
> A:  No.
> Q:  And why not?
> A:  There were many ways we had violated the anti-kickback provisions
>     regarding the bid rigging and the kickbacks and the inflation of the price
>     and pretty much violated every section of it that I remember.

and Bennett Testimony, 3/09/16 Tr. at 24:

> Q:  You understand, right, that the principle contract documents means
>     Sevenson's contract documents?
> A:  That's right.
> Q:  And you understand that those include rules against kickbacks that we saw
>     before?
> A:  Yeah.

Trial testimony also established that this purchase order was shared with the defendant.  Griffiths

testified that "Mr. Bennett, Mr. Stern, every manager -- every manager at the company saw" the

purchase order.  Griffiths Testimony, 2/23/16 Tr. at 173.  Accordingly, the signing and

submission of this purchase order constituted a material misrepresentation designed to deceive

and mislead the EPA about the payment of kickbacks and markup.  The testimony of witnesses

from the EPA and the United States Army Corps of Engineers ("USACE"), Rich Puvogel and

Mari Shannon respectively, also showed that these representations were material inasmuch as

they were important to their decision-making processes.  For example, Puvogel testified:

> Q:  Why was a competitive bidding process important to the EPA?
> A:  Supervise a fair price for the services being offered.
> Q:  And why is that important?
> A:  It's important because there's limited funding to conduct this work and the
>     EPA would like to get the most for its money.

Puvogel Testimony, 2/22/16 Tr. at 100.

9

To try and get around the clear evidence that this purchase order constituted a material misrepresentation, the defendant asks this Court to do exactly what it should refrain from doing in adjudicating a Rule 29 motion – to weigh this alongside other evidence and find that it was unlikely that the defendant was aware of the misrepresentation contained in the purchase order. Def. Mot. at 13-14 ("The Government's theory that Mr. Bennett materially misrepresented in the Phase II purchase order that he would comply with the Anti-Kickback Act and not pay unlawful kickbacks thus relies on a series of illegitimate inferences. . . The evidence does not sufficiently support any of these inferences.").  However, under Rule 29, the Court must draw all reasonable inferences in the government's favor, and inferences do not become "illegitimate" simply because they point to the defendant's guilt.  Accordingly, the jury was permitted to observe pertinent clauses in Bennett Environmental's contract and infer that the company's CEO, the defendant, was aware of them.  Indeed, any notion that a sophisticated and experienced international businessman would not know that multimillion dollar contracts with the government included regulations against kickbacks is belied by the testimony in this case of both the defendant and his co-conspirators.

Cases cited by the defendant to the contrary are inapposite.  In *United States v. Gee*, 226 F.3d 885 (7th Cir. 2000), the Seventh Circuit reversed the defendants' convictions on mail and wire fraud based on a scheme to sell devices that enabled end users to access channels from cable companies without paying.  *Id.* at 890.  In reversing the conviction, the court noted that the "government did not proffer any evidence that defendants made any false or misleading statements" to their end users or to the cable companies.  *Gee*, 226 F.3d at 892.  Therefore, the defendants could not be held liable for making any material misrepresentation as required by *Neder*.  *Id.*  In other words, the problem in *Gee* was that the defendants' crimes were more

10

properly characterized as theft, not fraud.  In *United States v. Hodge*, 150 F.3d 1148 (9th Cir. 1998), the Ninth Circuit reversed the defendant's conviction of wire fraud where a scientist had requested Federal grant money, but failed to carry out the research for which the grant funds were provided.  Central to the court's holding, however, was that the defendant's requests were for "advances" only, and the defendant never actually lied to the government about what, if any, research he had carried out or sought reimbursement.  *Hodge*, 150 F.3d at 1151 ("Hodge did not ask reimbursement for any outlays made. In the documents resulting in convictions, Hodge sought only advances.").  Thus, while the court noted that the government would be entitled to get its money back from the defendant based on unjust enrichment, there was simply no evidence that the defendant deceived, or intended to deceive, the government.  *Id.*  By contrast, the defendant here engaged in deceptive conduct through bid-rigging, mark-ups, kickbacks, and false representations that was directly targeted to deceive and mislead the EPA.

Accordingly, the government provided sufficient evidence at trial from which the jury properly found that the defendant engaged in a scheme to defraud.

### 2.   The Defendant's Crimes were Designed to Overcharge the EPA

The defendant also argues that he did not act with intent to defraud.  This argument is entirely predicated on the fact that Bennett Environmental's two sets of bids for the work on Phase Two (March 2002 bid and May 2002 re-bid) were ultimately the same price - $498.50. Def. Mot. at 18-19 ("The evidence . . . affirmatively demonstrated the absence of any overcharge, in that it demonstrated that BEI maintained a consistent bid both before and after it purportedly agreed to pay McDonald $13.50 per ton").  The testimony of government witnesses as well as the exhibits introduced at trial, however, established that the defendant agreed to inflate Bennett Environmental's price charged to the EPA by $13.50 per ton specifically to

account for kickbacks to McDonald.  Indeed, the same evidence showed that Bennett Environmental did not have to raise its price in Phase Two because McDonald revised specifications to cause the other bidders to raise their prices even higher.  Through this overcharge, the defendant's scheme was plainly targeted to deprive the EPA of money.

A scheme to defraud must include the "specific intent to defraud" such that "some actual harm or injury was at least contemplated" toward a victim.  *United States v. Weingold,* 844 F.Supp. 1560, 1574 (D.N.J. 1994) (quoting *United States v. William Savran & Assoc., Inc.*, 755 F.Supp. 1165, 1180-81 (E.D.N.Y. 1991)).  "Additionally, the object of the alleged scheme or artifice to defraud must be a traditionally recognized property right."  *United States v. Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004).  It is well settled in the Third Circuit that such harm includes pecuniary loss that is attendant to a procurement and kickback scheme.  *See United States v. Asher*, 854 F.2d 1483 (3d Cir. 1988); *United States v. Osser*, 864 F.2d 1056 (3d Cir. 1988).  The government may prove such intent to defraud by showing that the defendant made material misrepresentations of fact with reckless disregard to their truth or falsity.  *United States v. Cen-Card Agency/C.C.A.C.*, 724 F.Supp. 313, 316-17 (D.N.J. 1989) (citing *United States v. Boyer*, 694 F.2d 58, 59–60 (3rd Cir. 1982)).  Indeed, "it is well-established that, [w]hen the necessary result of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself."  *United States v. Russo*, 166 Fed. App'x 654, 659 (3d Cir. 2006) (internal quotations omitted).

The government's proof at trial plainly demonstrated that the goal of the defendant's scheme to defraud was to win contracts at artificially inflated prices. Griffiths testified explicitly that this was the goal of the scheme. For example, Griffiths testified:

> Q:   And did this price include the [$]13.50 that you talked about earlier?
> A:   It included a [$]13.50 increase from our original pricing on both line items. One was [$]405, and we added [$]13.50 of kickback to get a [$]418. And the other original price was [$]485 and we added [$]13.50 to get [$]498.

Griffiths Testimony, 2/23/16 Tr. at 172. Similarly, Tejpar testified that about the scheme's effect of overcharging the EPA:

> Q:   And the $13.50 negotiated with Sevenson for work, what did you understand that to mean?
> A:   Rob was able to increase our price because of last look. So he was able to increase it by $13.50, and he was going to share part of that extra increase with Sevenson and ourselves and entertainment.

Tejpar Testimony, 3/02/16 Tr. at 93. This fact was also evident from the documentary evidence at trial. An email sent to the defendant on June 10, 2002 specifically stated that Bennett Environmental had "marked up our original price by [$13.50] from [$]485 to [$]498.50" and that portions of that markup would be for "entertainment," "Bennett," and "General Monitoring." GX-233. On the basis of this email alone – a contemporaneous communication of the criminal scheme – the jury was entitled to find that the defendant's scheme to defraud was intended to deprive the EPA of money and property through a fraudulent overcharge.

To get around all of this evidence, the defendant simply points out that Bennett Environmental's bid did not actually change, *i.e.*, Bennett Environmental never actually submitted a bid of $485. From that fact – and that fact alone – the defendant argues that there was a failure of proof that the defendant's scheme targeted money or property. This argument inappropriately asks the Court to step in and weigh evidence. It is not the province of the Court,

13

however, on a Rule 29 motion to conclude that a lack of change in a submitted price overrides the overwhelming evidence that there was in fact an agreement to raise prices.  This is especially true given that the defendant's argument about the lack of change in prices was made extensively to, and apparently rejected by, the jury. *See, e.g.*, Defendant's Closing Argument, 3/15/16 Tr. at 153-54 ("[L]adies and gentlemen, ask them where the bid is for $485.00.") and DX-9000.  The jury had an adequate basis upon which to find the defendant's guilt with respect to Count Two, and the defendant's motion should be denied.[3]

---

[3] Notably, the defendant's scheme was also calculated to deprive the EPA of its valuable intangible rights to control its assets and to material information necessary to make discretionary economic decisions.  The Third Circuit has accepted a similar loss of control theory where a scheme to defraud interfered with the victim's intangible rights to exclusive control.  *See United States v. Hedaithy*, 392 F.3d 580, 603 (3d Cir. 2004) (holding that company's intangible interest in the confidentiality of its materials constituted a property right and that the Supreme Court had never rejected the "loss of control" theory of property rights with respect to non-regulatory matters); *see also United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) (recognizing that in the Second Circuit "cognizable harm occurs where the defendant's scheme den[ies] the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions.") (internal quotations omitted).

**C.** **The Government's Proof at Trial Was Sufficient to Convict the Defendant of Conspiracy to Commit Major Fraud Against the United States and to Pay Kickbacks to a Prime Contractor**

The defendant's Rule 29 motion also asserts that the government did not present sufficient evidence to prove the major fraud and kickback objects of the conspiracy charged in Count One. Count One alleges, in part, that the defendant conspired and agreed with his employees and others to pay more than $1.3 million in kickbacks to McDonald and to include the amount of the kickbacks in the sub-contract price his company charged to the EPA. In exchange for these kickbacks, the defendant and his co-conspirators received last looks at competitors' bid prices and other assistance from McDonald that ensured that Bennett Environmental won contracts at Federal Creosote. The witness testimony and documents introduced at trial overwhelmingly proved that the defendant knowingly participated in a conspiracy to pay kickbacks and defraud the government as set forth in the Indictment. Drawing all reasonable inferences in favor of the jury's verdict, the evidence was more than sufficient for the jury to convict the defendant on Count One.

The elements of the conspiracy offense are: (1) that two or more persons agreed to commit an offense against the United States; (2) that the defendant was a party to or member of that agreement; (3) that the defendant joined the agreement or conspiracy knowing of its objectives to commit an offense against the United States and intending to join together with at least one other alleged conspirator to achieve those objectives; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and intent to achieve a common goal or objective to commit an offense against the United States; and (4) that at some point during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further objectives of the agreement. Jury Charge, 3/14/16 Tr. at 223.

15

In reviewing the sufficiency of the government's evidence in a conspiracy case, the evidence must not be viewed in isolation, but rather, "in conjunction and as a whole." *Brodie*, 403 F.3d at 134.  Conspiracy is not to be judged by "dismembering it and viewing its separate parts, but only by looking at it as a whole." *Id.* (citations omitted).  When considering a motion for acquittal on a conspiracy count, any claim that "the evidence also permits a less sinister conclusion is immaterial . . . [T]he evidence need not be inconsistent with every conclusion save that of guilt." *Id.* (quoting *Smith*, 294 F.3d at 478).

The defendant primarily argues that the jury could have inferred that the kickbacks were provided in "an effort to simply build general good will" or "to get future private jobs with Sevenson by building its relationship with Sevenson, not as a way to get an improper advantage in bidding."  Def. Mot. at 21.  The witness testimony and documents produced at trial overwhelmingly proved that the defendant knowingly participated in a conspiracy to defraud the EPA and to pay kickbacks in exchange for last looks and other assistance from McDonald.

The evidence showed that, between approximately December 2001 and August 2004, the defendant agreed with Griffiths, Tejpar and others to pay over $1.3 million dollars in kickbacks to McDonald and others at Sevenson in exchange for which McDonald provided last looks at competitors' bid prices and other assistance to ensure that the defendant's company won sub-contracts at Federal Creosote. Griffiths and Tejpar testified at length over the course of almost two weeks to the defendant's central role in the conspiracy.  Hundreds of admitted exhibits – emails, phone records, Tejpar's day planner, and other documents – corroborated Griffiths's and Tejpar's testimony and provided further evidence that the defendant was a knowing participant in the conspiracy to pay kickbacks and commit major fraud against the United States.

16

Tejpar, who had worked closely with the defendant for more than a decade, testified that he, the defendant, Griffiths and others, "provided kickbacks to an employee of the prime contractor at the Federal Creosote site. And in return for those kickbacks, [Bennett Environmental] received last looks at the bids that other bidders were putting in, and so were able to put in the winning bid." Tejpar Testimony, 3/02/16 Tr. at 34-35.  He testified that as part of the scheme, and in exchange for the kickbacks, McDonald "was going to try to make it – he was going to try to make sure we won the contract , so – allowing – giving us information, allowing us to look at the competitors' bids as well. So he was going to make sure what we won."  Tejpar Testimony, 3/02/16 Tr. at 62; GX-213.  Tejpar testified that the defendant understood that the reason Bennett Environmental was getting intelligence about competitors' bids was in exchange for kickbacks to McDonald.  Tejpar Testimony, 3/02/16 Tr. at 69-70. Rather than providing the payments and gifts "to build general good will" as the defendant argues, Def. Mot. at 20-21, as described below, the evidence shows that the defendant and his co-conspirators provided these payments and gifts to improperly obtain last looks and other favorable treatment from McDonald in order to guarantee that Bennett Environmental won sub-contracts at Federal Creosote.

Griffiths and Tejpar testified about numerous emails between themselves, the defendant, and others that discussed the last looks they were getting from McDonald.  *See, e.g.*, GX-224 ("I will get the last look before closing"); GX-225 ("I will be the last submitted and we'll have the last look"). Tejpar testified that a "last look" "means that we would get a last look at the competitor's bids, so that we could put in a lower price and win the contract;" it "basically means that we're cheating on bids." Tejpar Testimony, 3/02/16 Tr. at 74.  Tejpar testified that the defendant understood that is what last look meant, and that he had "several" conversations with

the defendant about the last looks they were getting from McDonald. Tejpar Testimony, 3/02/16 Tr. at 84-87. Griffiths provided similar testimony. *See, e.g*, Griffiths Testimony, 2/23/16 Tr. at 126, 133, 157, 164. Tejpar recounted one occasion where the defendant told him that Griffiths "was with Gord McDonald and they're opening up the bids and then he'll put in our pricing." *Id*. at 86. In response to questions regarding this conversation and the defendant's demeanor, Tejpar testified: "We all knew what was going on. We all knew this was illegal. It was against the rules." Tejpar Testimony, 3/02/16 Tr. at 87. Contrary to the defendant's assertion, a reasonable jury could infer that, irrespective of whether the Bennett Environmental received the prime contract document from Sevenson, the defendant and his co-conspirators paid McDonald to get favorable treatment and knew that this kickback and fraud conduct was improper.[4]

For each of the bids, Griffiths and Tejpar testified that the defendant was responsible for determining the final bid price and, in fact, would have the "final authority" on how much Bennett Environmental was going to bid. Griffiths Testimony, 2/23/2016 Tr. at 158-159, 163, 172; Tejpar Testimony, 3/02/16 Tr. at 76, 81, 165-166. Griffiths also testified that the defendant had the "final authority" in deciding whether Bennett Environmental would use the last look information from McDonald to win as the lowest bidder or with a higher bid price as "best value." Griffiths Testimony, 2/23/2016 Tr. at 158-159.

---

[4] The only case cited by the defendant, *United States v. Burger*, No., 99-CR-439 (SI), 2000 WL 33910676 (N.D. Cal. June 6, 2000), is wholly inapplicable. In that case, the defendant moved to dismiss certain Anti-Kickback Act counts based primarily on a lack of notice as to the applicability of the Anti-Kickback statute for United States Department of Housing and Urban Development ("HUD") contracts, noting that the Anti-Kickback statute "applies only to federal procurement contracts." *Id.* at *2. The court held that the statute did apply to HUD contracts but dismissed the counts under the rule of lenity as neither the statute, indictment, or actions of HUD provided fair notice that previously permitted fee-splitting practices were considered kickbacks under the statute. *Id.* at *6. In this case, there has been no question that the payments and gifts to McDonald and others at Sevenson are improper under the statute and that the defendant was aware of it. As noted above, Tejpar and Griffiths both testified that the defendant was aware that the kickback and fraud arrangement was improper at the time. In addition, the defendant himself testified that he was aware that kickbacks were prohibited, and that paying for inside information or "last looks" was wrong. Bennett Testimony, 3/09/16 Tr. at 22-24.

As part of the kickbacks for last looks arrangement, the defendant agreed to "increase [Bennett Environmental's] price because of the last look. So [Griffiths] was able to increase it by [$]13.50, and he was going to share part of that extra increase with Sevenson and ourselves and entertainment."  Tejpar Testimony, 3/02/16 Tr. at 93; *See also*, Griffiths Testimony, 2/24/16 Tr. at 68 ("Mr. Bennett and Mr. Richardson were aware of and approved of the kickback scheme…").  The defendant "agreed" to the 50-30-20 breakdown of the $13.50 per ton increase in the price: 50 percent to "invoiced to subs," 30 percent to "entertainment / business development," and 20 percent as "Bennett profit."  GX-162; *See, e.g.*, Tejpar Testimony, 3/02/16 Tr. at 92-93.

Griffiths and Tejpar both testified that the defendant specifically knew and approved of the "entertainment / business development" kickbacks from the $13.50 overcharge.  Griffiths testified that the defendant "really [] just approved of my spending and approved the $6.50 per ton invoices [from the $13.50], and he approved of this cruise, and approved my expense reports, and reimbursed me for the cost that I incurred to continue with this behavior." Griffiths Testimony, 2/23/16, Tr. at 185.  In addition, Griffiths testified that he had discussions with the defendant about his expense reports where the defendant approved specific kickbacks, such as the Mediterranean cruise and prescription drugs for McDonald's parents.  *See, e.g.*, *Id.* at 185; Griffiths Testimony, 2/24/16 Tr. at 18.

Tejpar testified that the defendant also approved even those "exceptionally high" entertainment kickback expenses on Griffiths' expense report that Tejpar brought to the defendant's attention.  Tejpar Testimony, 3/02/16 Tr. at 95.  One such kickback from the entertainment / business development portion of the $13.50 overcharge that the defendant approved was the CAD$8,700 plasma television sent to McDonald's home. GX-159.  Contrary

19

to the defendant's assertion that "the defendant did not learn about the television until one month

after it had already been purchased and shipped," Def. Mot. at 22, Griffiths sent an email to the

defendant and Tejpar *before* purchasing the plasma television for McDonald, which stated: "Just

as an FYI, I'm going to do a lot of Christmas shopping. Big on my list are: Gord, wine, and

maybe some electronics.  Big ticket, plasma tv."  GX-263; Tejpar Testimony, 3/02/16 Tr. at 128,

Griffiths Testimony, 2/24/26, Tr. at 11.  Tejpar testified that the defendant "authorized" the

plasma television, as well as prescription drugs for McDonald's parents and other expenses, after

he and the defendant discussed Griffiths' subsequent expense report.  Tejpar Testimony, 3/02/16

Tr. at 134-135.  Tejpar had also made a contemporaneous notation in his day timer to speak with

that defendant about the expense. GX-348 ("JB: check Rob's expenses – 17k").

Tejpar and Griffiths testified that the defendant "knew" and "approved" of the

Mediterranean cruise kickback for McDonald and other senior executives from Sevenson that

was paid for from "the 30 percent entertainment part" of the $13.50 per ton overcharge.  Tejpar

Testimony, 3/02/16 Tr. at 109-10; Griffiths Testimony, 2/23/2016 Tr. at 185.  In addition, the

defendant was sent an email from Griffiths before the cruise to obtain his authorization for the

kickback and to explain that the cost of the cruise would come from the "entertainment" portion

of the $13.50 mark-up of the bid price.  GX-233; Griffiths Testimony, 2/24/16 Tr. at 36-43.

Subsequently, the defendant signed the $80,532 check to the travel agency for the cruise and

initialed one of Griffiths' expense reports that included charges from the cruise. GX-781A; GX-

155;  Tejpar Testimony, 3/02/16 Tr. at 112, 120.  Rather than being "deliberately excluded from

key communications about the cruise" as the defendant contends, Def. Mot. at 22, the evidence

not only shows the defendant's authorization of this kickback, but also shows that the defendant

was involved in subsequently helping to cover up the cruise kickback after Sevenson's counsel became aware of it. Tejpar Testimony, 3/02/16 Tr. at 119.

The evidence also showed that the defendant understood that the "invoiced to subs" portion of the $13.50 overcharge was "the money that was going to be paid to GMEC" and that this was "the actual kickback." Tejpar Testimony, 3/02/16 Tr. at 135. Griffiths testified that the defendant knew and "approved" of the kickback payments to GMEC. Griffiths Testimony, 2/24/16 Tr. at 91, 110-111. He also testified that, while he had not told Tejpar, he did ultimately tell the defendant that GMEC was owned by McDonald. Griffiths Testimony, 2/24/16 Tr. at 60-61. Contrary to the defendant's assertion, whether the defendant knew that GMEC was McDonald's shell company was irrelevant because, at a minimum, the defendant knew that the GMEC payments were part of the $13.50 overcharge that were being paid in exchange for favorable treatment from McDonald. Def. Mot. at 21. Tejpar testified that while he was not aware that GMEC was McDonald's company, he and the defendant nevertheless knew that it was part of the $13.50 kickback:

> Q:    And what did you understand GMEC to be at the time, in this 2001 through 2004 time period?
> A:    At the time we were led to believe that [GMEC was] actually a subcontractor doing environmental testing on the Federal Creosote site. And Sevenson was suppose[d] to pay for this environmental testing but they had asked GMEC to invoice us as opposed to invoicing them. So we were paying for something that Sevenson should be paying for.
> Q:    And why did Bennett Environmental agree to pay Sevenson's invoices?
> A:    Well, it was in return for getting the last look at the competitors' bids. It was the kickback.

Tejpar Testimony, 3/02/16 Tr. at 135-136. Moreover, Tejpar testified that he had "several conversations" with the defendant about making the kickback payments to GMEC, which were noted in his day timer (GX-348), and that the defendant signed the first check to GMEC (GX-

103), and one of the wire transfers to GMEC (GX-117).  *See also*, Tejpar Testimony, 3/02/16 Tr. at 141, 145, 151-155.  As part of the scheme, Bennett Environmental paid $1,114,240 through 12 wire transfer payments to GMEC.  GX-990.

Throughout the charged conspiracy, the defendant and his co-conspirators continued to pay kickbacks to McDonald in exchange for which McDonald provided the defendant and his co-conspirators with last looks and inside information. As Griffiths stated during his testimony: "[w]e agreed that the kickback conspiracy amount of $13.50 would continue to be applied on all future work at the Federal Creosote site." Griffiths Testimony, 2/24/16 Tr. at 151. In exchange for over $1.3 million in kickbacks and through the last looks, the defendant and his company were steered sub-contracts at Federal Creosote in Spring 2002 (Phase Two), Spring 2003 (Phase Three Transportation and Disposal), October 2003 (Phase Three Sub-Title C Disposal) and December 2003 (re-bid of Phase Three Transportation and Disposal).  *See, e.g.*, Griffiths Testimony, 2/23/16 Tr. at 132-33, 141-42, 147-48; Griffiths Testimony, 2/24/16 Tr. at 129, 157-158, 179-182; Tejpar Testimony, 3/02/16 Tr. at 169, 172-73.

Based on the evidence described above, drawing all reasonable inferences in favor of the government, a rational juror could have found that the defendant agreed with at least one other person to pay kickbacks in exchange for favorable treatment in the form of last looks and other assistance from McDonald to win sub-contracts at Federal Creosote and to commit major fraud against the United States.  As such, the defendant's motion should be denied.

## II.   The Defendant's Request for a New Trial Under Rule 33 Should Be Denied

### A.  Legal Standard

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  The defendant seeks to overturn the jury's guilty verdict under Rule 33 based on the content of a USACE employee's lay testimony and the government's closing and rebuttal arguments.

According to the Third Circuit, "[a] new trial should be ordered only when substantial prejudice has occurred . . . and if the interest of justice so requires."  *United States v. Georgiou*, 777 F.3d 125, 144 (3d Cir. 2015) (internal quotations and citations omitted).  In other words, the court must conclude that "'the allegedly improper statements or conduct make it 'reasonably probable' that the verdict was influenced by the resulting prejudice.'"  *Id.* (quoting *Forrest v. Beloit Corp.*, 424 F.3d 344, 351 (3d Cir. 2005)); *see also United States v. Hoffecker*, 530 F.3d 137, 168 (3d Cir. 2008) (quoting *United States v. Copple*, 24 F.3d 535, 547 n. 17 (3d Cir. 1994)) (Where multiple errors are alleged, a new trial may be granted only where the errors, "'when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'").  This is a heavy burden, and the defendant has not alleged any actual prosecutorial misconduct, much less misconduct that led to his conviction.  Either way, the testimony and government argument cited by the defendant would have been harmless.  *See Copple*, 24 F.3d at 547 (holding that harmless errors that do not deprive a defendant of a fair trial are not a basis for a Rule 33 motion).

**B. The USACE Witness's Testimony Was Correctly Admitted and Was Not Substantially Prejudicial**

During its case in chief, the government put forward testimony from USACE employee Mari Shannon.  As this Court correctly ruled, Shannon's lay witness testimony was grounded in her experience as a USACE contracting officer, including on the Federal Creosote site, and the defendant was able to cross-examine Shannon on the bases for her statements. Shannon Testimony, 3/01/16 Tr. at 122, 158-59, 195. The defendant re-raises this issue in a motion under Rule 33, wrongly claiming that Shannon deprived the defendant of his right to a fair trial by providing expert witness testimony as to his knowledge and guilt.

**1.  The USACE Witness Provided Proper Lay Testimony Under Federal Rule of Evidence 701**

The Third Circuit "favors the admission of opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." *See Teen-Ed, Inc. v. Kimball Intern., Inc.,* 620 F.2d 399, 403 (3d Cir. 1980); *see also United States v. Dempsey*, 629 Fed. App'x 223, 227 (3d Cir. 2015) ("We afford broad discretion to the admission of lay testimony provided that it is well founded on personal knowledge and susceptible to specific cross-examination.") (internal quotations and citations omitted).  The defendant's argument fails to recognize a clear line of precedent that allows an experienced lay witness that could otherwise qualify as an expert to testify under Rule 701 when the witness is testifying based on her own perceptions and "knowledge and participation in the day-to-day affairs of [the] business." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993).  As the Third Circuit recently stated:

> This [rule] does not mean that an expert is always necessary whenever the testimony is of a specialized or technical nature. When a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is

> specialized or technical—because the testimony is based upon the
> layperson's personal knowledge rather than on specialized
> knowledge within the scope of Rule 702.

*United States v. Davis*, 524 Fed. App'x 835, 841-42 (3d Cir. 2013) (quoting *Donlin v. Philips
Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009)).  In *Davis*, the lay witness testified about
documents and the inferences he could draw from them "based upon his day-to-day knowledge
as an employee" of the company in the relevant department.  *Id.* at 842.

Shannon's testimony falls squarely within this line of precedent.  She was a contracting
officer at the USACE for almost 20 years, worked in the office that oversaw contracting at
Federal Creosote, and worked on the Federal Creosote project herself, including on sub-contract
consent packages for Bennett Environmental.  Shannon Testimony, 3/01/16 Tr. at 82-85. She
testified that she was familiar with the contracts at issue based on her experience at the USACE,
as well as the rules governing USACE projects.  *Id.* at 84-85. All of her testimony was expressly
based on her experience as a USACE contracting officer,[5] not as an expert in the field (even
though she could have been qualified as one).  *Davis*, 524 Fed. App'x at 841-42.

This case is unlike the First Circuit case *United States v. Vega*, 813 F.3d 386, 393-95 (1st
Cir. 2016), which is relied upon by the defendant.  In that case, the court found lay testimony
explaining how the defendant had violated complex Medicare laws to be inappropriate.  *Id.*  The
lay witnesses in *Vega* were not putative victims testifying based on their experience working on
the very project that was defrauded.  *Id.*  Rather, they were applying their independent

---

[5] *See, e.g.*, Shannon Testimony, 3/1/16 Tr. at 103:
        Q: Can you put that in every day terms based on your experience at the Army Corps?
  and *Id.* at 110:
        Q: Did you review consent packages like this as part of your work with the Army Corps?
        A: I did.
        Q: And did you review them for Federal Creosote?
        A: I did.

specialized knowledge to the facts of the *Vega* case.  *Id.* at 394-95.[6]  Here, Shannon's testimony

was clearly tied to her role as a contracting officer for subcontracts at Federal Creosote, and it

was limited to her understanding of what general patterns of conduct would have violated the

rules she applied in her daily work.  *Id.* at 395 ("the term 'personal knowledge' refers, generally,

to the product of a witness's process of observing patterns and drawing logical conclusions.").

As the *Vega* court itself recognizes, lay witnesses may notice patterns of behavior across

criminal operations and use logic to conclude that a defendant's behavior fits such patterns

without needing to qualify as an expert.  *Id.*  Because Shannon's testimony is "well founded on

personal knowledge and susceptible to cross-examination," it is admissible lay testimony.  *Id.*

(internal quotations and citations omitted).

       Moreover, Shannon's testimony did not usurp the role of the jury or make claims as to

the defendant's knowledge.  In the part of Shannon's testimony cited by the defendant, she

merely recited her expectations for what conduct was appropriate for subcontractors and what

subcontractors generally know based on her routine experience.  *See* Def. Mot. at 26-27 (quoting

Shannon Testimony, 3/01/16 Tr. at 121-123).  For example:

> Q:    [B]ased on ***your experience*** at the Army Corps, would paying for
>       sports and concert tickets for the prime contractor be acceptable
>       under the anti-kickback rules?
> A:    Not at all.
> Q:    And would you expect subcontractors to know that?
> A:    I would.

Shannon Testimony, 3/01/16 Tr. 122 (*emphasis added*).  The rest of the objected-to questions

followed the same pattern.  All of Shannon's statements were grounded in her experience as a

---

[6] Though the First Circuit found the testimony of two lay witnesses to have been impermissible in *Vega*, it further held that the admission of their testimony was harmless.  *Id.* at 395-96.

contracting officer for the USACE.   At no point did she testify about the defendant's personal knowledge, as the defendant suggests.[7]

Finally, despite the defendant's claims to the contrary (Def. Mot. at 29-30), Shannon's testimony served a useful and proper purpose by providing the jury with the perspective of the defendant's victim.  Across her testimony, Shannon informed the jury of the USACE's role and its expectations for how its subcontractors would behave and keep abreast of the regulations governing their work.  She also testified about the materiality of the defendant's misconduct, making it clear that the USACE would not approve of kickbacks and fraud, or of efforts to claim ignorance to excuse such misconduct.  These are not improper legal conclusions or an attempt to usurp the role of the jury, but appropriate testimony providing the jury with the victim's perspective.  If the defendant's position were to be upheld, it would effectively prevent the government from offering victim testimony, as fraud victims typically state their expectations (and the bases for those expectations) and how they were harmed by the defendant's conduct.  Furthermore, it would seriously undermine the government's ability to establish materiality and reliance on the part of fraud victims, as the defendant equivocates testimony addressing those questions with expert testimony that "Mr. Bennett was guilty."  Def. Mot. at 25.

---

[7] The defendant claims that Shannon testified to what the defendant "must have known."  Def. Mot. at 30.  Of course, Shannon never made such a statement.  Instead, as the cited testimony makes clear, Shannon merely testified to her expectations for what subcontractors would know about the FAR, which governed their work.  This was appropriate victim witness testimony based on Shannon's many years working for the USACE, including on Federal Creosote.  Furthermore, on cross-examination, Shannon testified that she did not believe that the prime contract was sent by the USACE contract specialist for Federal Creosote to the defendant, that she was not party to communications between Sevenson and Bennett regarding expectations under its sub-contract, and she was not aware of what the defendant knew or did not know regarding the contracting documents or the FAR.  Shannon Testimony, 3/01/16 Tr. at 125, 167, 194.

## 2.   The USACE Witness's Lay Testimony Was Not Unduly Prejudicial

Shannon's testimony was properly allowed by the Court, but, even if it were not, her testimony did not improperly and "substantial[ly] prejudice" the defendant.  *Georgiou*, 777 F.3d at 144.  As a preliminary matter, the disputed excerpt of her testimony occupied a few minutes in the middle of a three and a half week trial, and the defendant was given a full opportunity to cross-examine Shannon about her statements.[8]  Furthermore, the defendant conveniently omits three facts in arguing for a new trial based on Shannon's testimony.[9]  First, defense expert witness Christopher Ryan offered similar testimony; second, the defendant himself testified that he knew that paying kickbacks was improper; and third, the Court gave a specific jury instruction to address the defendant's concerns with Shannon's testimony.  Therefore, even if Shannon's testimony was inappropriate, its admission did not substantially prejudice the defendant and does not merit a new trial.

Shannon's testimony had no prejudicial effect because the defendant's own witness, industry expert Christopher Ryan, provided similar testimony. On cross-examination, Ryan testified that there was no doubt that the Anti-Kickback Act "applies to a subcontractor."  Ryan Testimony, 3/04/16 Tr. at 158.  He further testified that the anti-kickback provision was contained in the prime contract.  *Id.*  Ryan also testified that it was important for industry participants, like the defendant, to be familiar with the anti-kickback statute, so much so that knowledge of those rules went "without saying" for Ryan's employees.  *Id.* at 164-65.

---

[8] In fact, over the course of her cross-examination, Shannon was explicit in stating that she was testifying about what she did in her experience. *See*, *e.g.*, Shannon Testimony, 3/01/16 Tr. at 137-40, 145-46.  Defense counsel also briefly used the opportunity to clarify Shannon's statements about what she believed was improper conduct based on her experience at USACE. *Id.* at 160-61.

[9] Unlike Rule 29, Rule 33 only offers a post-trial remedy.  As a result, the entire record, not just the government's case, should be reviewed in ruling on such a motion.

Significantly, on cross-examination, Ryan was presented with similar fact scenarios to those

posed to Shannon, and, like Shannon, Ryan testified that such conduct would be inappropriate.

> Q:    I'm going to ask you hypotheticals based on your experience.  You
>       couldn't let's say win a project and then thank the person who gave
>       you the project by sending them on a cruise, right?
> A:    That would be over the top, yes.
> Q:    And in your mind, that's over the top.  In other words, not
>       appropriate based on your experience?
> A:    Correct.
> …
> Q:    Same type of hypothetical.  Before you win work, you want to say
>       thank you to somebody and offer the company, of course the
>       people there, to pay their personal expenses.  Also doesn't comport
>       with what the language we read about kickbacks; right?
> A:    Yeah….
> Q:    So hypothetically, to pay thousands of dollars in personal expenses
>       to thank someone who gave you work on a Government contract,
>       that does not comport with the language we saw.  That's right?
> A:    Correct.

*Id.* 166-67.  Ryan further testified that various forms of kickbacks were inappropriate in the

industry, such as paying non-reimbursable expenses to reward favorable treatment, paying

project managers for confidential bid information, buying prescription drugs for favorable

treatment, buying electronics for a person's home in exchange for favorable treatment, giving a

ski trip to build a client relationship, or providing a cruise or other vacations for a project

manager or client executives.  *Id.* 169-173.   Ryan's testimony paralleled the disputed elements

of Shannon's testimony, and he provided the same basic answers: that paying various forms of

kickbacks for preferential treatment was inappropriate in the industry.  The existence of this

testimony, from a defense witness no less, critically undermines any claim by the defendant that

the same statements from Shannon substantially prejudiced him and require a new trial.

　　　　The defendant removed all doubt as to his knowledge of the kickback rules by testifying

that he, in fact, was aware that paying kickbacks at Federal Creosote would have been illegal.  In

line with the testimony of Shannon and Ryan, the defendant stated that a quid pro quo of

payments for favorable treatment was improper.

> Q:     You also testified that you understood though that you couldn't
>        pay someone to get inside information?
> A:     Definitely not.
> …
> Q:     Okay, I mean, it would be inappropriate for you to pay someone
>        with the expectation that in return they would give you some kind
>        of inside information.  So a quid pro quo.
> A:     That would be wrong.
> Q:     Something for something else.
> A:     That would be wrong.
> Q:     That would be wrong.  And fair to say that would be called a
>        kickback?
> A:     Yes, uh huh.

Bennett Testimony, 3/09/16 Tr. at 21-22. The defendant further testified that he understood that

the anti-kickback provisions were part of the prime contract, and that Bennett Environmental was

obligated to comply with anti-kickback provisions through its purchase orders.  *Id*. at 23-24.  In

light of the defendant's testimony, the jury did not need to draw inferences from Shannon's

statements about what subcontractors should have known about the rule prohibiting kickbacks.

They had the defendant's own statements revealing that he knew those rules applied to him, so

the payments he made for inside information were "wrong."  *Id*. at 23.

    Finally, in an explicit effort to remove all risk that Shannon's testimony could have

substantially prejudiced the defendant, the government requested an enhanced jury instruction

clarifying that Shannon's views on the rules did not govern this case.  During the charging

conference, the government stated the following:

> So where it says that, "your second duty is to apply the law," in
> light of some of the questions and answers that came out with Miss
> Shannon, we think it would be prudent for the record to make it
> slightly clearer and to specifically say, even if you heard any
> witnesses give opinions as to the law or how the facts apply to the

> law, it is up to the Judge to give the law and up to the jury to apply
> the facts to the law.

Charge Conference, 3/01/16 Tr. at 3. Defense counsel acknowledged that this language was what

they had sought during trial after Shannon testified, *id.*, and it was added to the jury charge.  The

Court read the following language to the jury, which was agreed upon by the parties:

> During this trial you may have heard witnesses testify as to what
> they believe the law was or how [the law] may have applied to
> facts in this case.  I want to stress, though, that you should only
> apply the law as I instruct and it is solely your role to apply the law
> to the facts in this case.

Jury Charge, 3/14/16 Tr. at 213.  Jurors are presumed to follow jury instructions, so this

enhanced instruction would have prevented any statements by Shannon relating to the law and its

application from affecting the jury's verdict.  *See Richardson v. Marsh*, 481 U.S. 200, 206-7

(1987) (recognizing the "almost invariable assumption of the law that jurors follow their

instructions," including as to what witness testimony to consider).  Therefore, the defendant

could not have been substantially prejudiced by Shannon's testimony even under the false

premise that it was improper.

   Taken as a whole, Shannon's victim witness testimony was admissible and, based on her

experience, showed the jury the perspective of the USACE, including its expectations for the

behavior and regulatory know-how of its subcontractors.  Even if Shannon's statements were

improperly admitted, which is not the case, they did not substantially prejudice the defendant.

The defendant's own industry expert provided similar testimony, and the defendant himself

acknowledged that payments in exchange for confidential information were "wrong."  Such

testimony essentially nullifies the independent impact of Shannon's parallel testimony.

Furthermore, to remove all doubt, the jury was provided an enhanced charge, with language

agreed upon by the defendant, instructing the jury that it was to follow the law as provided by the

Court and apply the facts to the law itself, witnesses testimony notwithstanding.  Therefore,

Shannon's proper, non-prejudicial statements do not merit a re-trial under Rule 33.

###   C.   The Government's Closing Arguments Were Responsive to the Defendant's Arguments and Did Not Deprive the Defendant of a Fair Trial

Finally, the defendant argues that he was deprived of a fair trial when the government

stated in summation that "you cannot *come into this country*, get a Government funded contract,

and conveniently fail to pay attention to the rules that apply."  Def. Mot. at 33.  The defendant

argues that, in the context of a three-and-a-half week trial, these four words created such grave

injustice that a new trial is necessary.  This argument falls far short of the legal standard under

Rule 33.  The government's remark was brief, generic, and, wholly apart from being intended to

elicit prejudice, it was targeted to rebut a specific argument that the defendant had put forth

earlier in the trial.  The five other "misstatements" identified by the defendant fall even farther

from the standard.  They were mostly reasonable inferences to urge upon the jury, and in one

case, a momentary misstatement that the government corrected on the spot.

In the Third Circuit, prosecutors are given "'considerable latitude' in laying out the

evidence and suggesting to a jury that they may draw permissible inferences from the evidence."

*Oelsner v. United States*, 60 Fed. App'x 412, 418 n.7 (3d Cir. 2003) (citing *United States v.*

*Green*, 25 F.3d 206, 210 (3d Cir. 1994) and *United States v. Werme*, 939 F.2d 108, 117 (3d Cir.

1991)).  Likewise, "[p]rosecutors are allowed some leeway when responding to arguments made

by defense counsel."  *Potter v. Gov't of V.I.*, No. 2003 Cr. 131, 2006 WL 2568446, at *5 (D.V.I.

Aug. 24, 2006) (citing *United States v. Young*, 470 U.S. 1, 14 (1985)).  Defendants who claim

prosecutorial misconduct thus face a "heavy burden" as the misconduct alleged must be so

severe and significant as to result in the denial of their right to a fair trial.  *Oelsner*, 60 Fed.

App'x at 418 n.7 (citing *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993)).  Courts look

32

at three factors in determining whether a new trial is warranted: "the scope of the improper comments in the overall trial context, the effect of any curative instructions given, and the strength of the evidence against the defendant." *United States v. Mastrangelo*, 172 F.3d 288, 297 (3d Cir. 1999).

       As a threshold matter, it was simply not the case that the "only conceivable purpose" of the remark "to come into this country" was to prejudice the jury, as required to show an improper appeal to a jury's community conscience. *See United States v. Modica*, 663 F.2d 1173, 1180 (2d Cir. 1981).  Rather, the remarks were intended to address a specific defense argument made at trial: that the defendant may have been unaware of the regulations due to the density and complexity of the FAR.  Indeed, at one point during the cross examination of Shannon, the USACE witness, defense counsel went so far as to illustrate this point by parading a hardcopy volume of the FAR in front of the jury:

> Q:    You're quite familiar with [the FAR]?
> A:    I can't tell where you to go look and pull one out. So if you wanted me to do that, I probably would fail. But on the other hand, I'm familiar with looking up regulations and reading regulations and knowing the FAR, yes, sir.
> Q:    Okay. And the FAR is actually a pretty lengthy, detailed complex set of rules, isn't it?
> A:    It is, sir.
> Q:    I'm holding in my hand what we've marked for identification as DX-7450. I'm not going to admit – I'm not going to offer it in evidence. CCH Federal Acquisitions Regulation. Does this look like the FAR to you?
> A:    It does. I've seen that book.
> Q:    Oh, yeah. And my copy here is 2,195 pages.
> A:    Uh huh.
> Q:    But I guess it's got an index, so maybe it's a little shorter than that.
> A:    Does it have an index?
> Q:    It's big and it's complicated; right?
> A:    It's cumbersome, yes.

33

Shannon Testimony, 3/01/16 Tr. at 133.  Accordingly, the government was well within the leeway given to prosecutors to rebut this argument and point out to the jury how ludicrous it would be for a sophisticated and experienced international businessman to think that his company could obtain work for the government that would not be bound by "complicated" regulations, or that those regulations could be ignored.  The passing reference to "come into this country" and to "pay attention to the rules" was thus proper non-prejudicial argument.

Even assuming *arguendo* that these words were prejudicial, the defendant has not met his burden of showing that a new trial would be warranted under the Third Circuit's three factor test. Indeed, each factor weighs heavily against such a drastic remedy.  First, the remarks are almost negligible as compared to the whole trial – a passing reference in the context of a three-and-a-half week trial.  Indeed, the innocuous fact that the defendant was Canadian (and Welsh) came up many times throughout the trial, mostly through defense counsel.  *See, e.g.*, Defendant's Opening Statement, 2/22/16 Tr. at 41 ("So, who is John Bennett? Well, he's a Canadian citizen. He's been married to his wife for 58 years. He's got three children and eight grandchildren. He was born in Wales to a working class family.").  Second, this Court's charge to the jury provided in no uncertain terms that the jury should not take the defendant's nationality into account. Jury Charge, 3/14/16 Tr. at 214 ("You should also not be influenced by any person's race, color, religion, national ancestry, or gender, profession, occupation, economic circumstances or position in life, or in the community.").  Third, the evidence in this case was overwhelming. Between the testimony of two cooperating witnesses who worked alongside the defendant; dozens of emails he sent and received outlining the kickbacks and fraud; over a hundred phone calls with McDonald; checks and wire transfers signed by the defendant; and every conceivable

type of over-the-top entertainment provided by his sales team, it defies reason to think that these four words could "have tipped the balance toward a conviction."  Def. Mot. at 34.

This case is also easily distinguishable from the handful of rare cases cited by the defendant where convictions have been reversed based on full sentences and arguments by the prosecutors that were obviously, and inappropriately, intended to appeal to the jury's local fears and prejudices, and where such remarks were not directed to rebut any particular defense argument.  *See, e.g.*, *United States v. Solivan*, 937 F.2d 1146, 1147-48 (6th Cir. 1991) (reversing conviction where the prosecutor, in the context of a drug trial, appealed directly to the community's fears about local drug dealing: "I'm asking you to tell her and all of the other drug dealers like her . . . [t]hat we don't want that stuff in Northern Kentucky and that anybody who brings that stuff in Northern Kentucky . . ."); *United States v. Cannon*, 88 F.3d 1495 (8th Cir. 1996) *abrogated on other grounds by Watson v. United States*, 552 U.S. 74 (2007) ("We believe that by twice calling the African–American Defendants 'bad people' and by calling attention to the fact that the defendants were not locals, the prosecutor gave the jury an improper and convenient hook on which to hang their verdict.").

Finally, the remaining "misstatements" identified by the defendant mischaracterized the government's arguments, were simply reasonable inferences and rhetorical arguments based on properly admitted evidence at trial, or a momentary mischaracterization that was corrected on the spot:

(1) The defendant incorrectly argues that the prosecutor misstated that the "defendant read" the "principal contract documents."  Def. Mot. at 34-35. In fact, the prosecutor's argument, read in context, was referring to the fact that a number of individuals,

including the defendant, had read the anti-kickback provision from the principal contract

documents during the trial:

> That was -- this was the purchase order for the most important work that Bennett Environmental had at that time, the single largest active project. And it stated that Bennett Environmental was to be in strict compliance. This was standard language that all the contracts that Bennett signed. And strict compliance with what, ladies and gentlemen? With the Anti-Kickback Act, which was part of the principal contract documents. Mr. Griffiths read them. Miss Shannon read them. Mr. Ryan read them. And the defendant read them.

Government's Summation, 3/15/16 Tr. at 42-43. Indeed, the defendant himself did

acknowledge his familiarity with the prohibition against paying kickbacks, and the fact

that this was part of the principal contract documents. *See, e.g.,* Bennett Testimony,

3/09/16 Tr. at 24:

> Q:    You understand, right, that the principle contract documents means Sevenson's contract documents?
> A:    That's right.
> Q:    And you understand that those include rules against kickbacks that we saw before?
> A:    Yeah.

(2) The defendant next argues that the prosecutor stated that if the defendant had not

committed fraud, another company would have gotten the work.  Def. Mot. at 35.

However, it was perfectly reasonable for the prosecutor to argue, and the jury to infer,

that Bennett Environmental would not have been awarded the Phase Two contract had

they not been the low bidder.  Indeed, that is ostensibly why McDonald approached

Griffiths in the first place and proposed the scheme.  According to Griffiths' testimony:

> Q:    What was your reaction on hearing that conversation?
> A:    A little -- not flabbergasted, but extremely concerned, shocked. You know, they had this casual conversation in front of me saying: Hey, you're done. You're not getting any more work on this job. So I was perplexed.

Griffiths Testimony, 2/23/16 Tr. at 121.

36

(3) The defendant also argues that the prosecutor stated that Tejpar and Griffiths had no

problem getting their emails. Def. Mot. at 35. These witnesses did in fact testify,

however, that they ultimately received their emails and there was no problem with

Bennett Environmental's computers that was not resolved. *See, e.g.*, Griffiths Testimony,

2/23/16 Tr. at 60:

> Q      Okay. And do you ever recall any times when there was one of what these
> so called IT support issues that was not resolved at Bennett
> Environmental?
> A:     No.

and Tejpar Testimony, 3/02/16 Tr. at 47:

> Q:     Alright. Did you have any issues in getting your emails during your time at
> Bennett?
> A:     Not to the point I would recall today. I mean, I'm sure I had trouble with
> email, like everybody does, but not that I can recall.

(4) The defendant also tries to allege that the prosecutor erroneously claimed in rebuttal that

there was an incriminating email sent from Sevenson CFO Bill McDermott. Def. Mot. at

35. However, it was obvious from context of the rebuttal, as well as from the

prosecutor's spontaneous correction, that the email being referred to was conveying a

message from McDermott, even if the email itself was not authored by McDermott. *See*

Government's Rebuttal Argument, 3/15/16 Tr. at 171 ("In the email McDermott is --

Rick Stern is saying that McDermott is calling because of his concern.") and GX-248.

(5) The defendant argues that the prosecutor stated that dyslexia does not affect one's

comprehension. Def. Mot. at 35. The defendant's own expert did in fact testify that

dyslexia does not affect comprehension generally.

> Q:     Dyslexia doesn't mean, and we talked about this before, you don't
> understand things?
> A:     Correct. *It's not a comprehension difficulty*, although reading
> comprehension can be impacted at times if there are too many errors, or if

37

> he's reading a lot, you get fatigued. Then sometimes that fatigue . . . can lead to misreading or misunderstanding the text. But *it doesn't affect one's ability to understand information*.

Dr. Spencer Wetter Testimony, 3/07/16 Tr. at 81 (emphasis added).

Accordingly, the defendant has not properly alleged any misstatements by the prosecutors.  Moreover, even if some of these statements were not literally accurate, such inaccuracies fall far short of the Third Circuit's standard for granting a new trial.  The alleged misstatements are all passing references in the context of a three-and-a-half week trial featuring overwhelming evidence of the defendant's guilt, and were included solely within attorney argument.  *See* Jury Charge, 3/14/16 Tr. at 215 ("The following are not evidence: . . .  statements and arguments of the lawyers for the parties in this case.").  In sum, the defendant has pointed to no serious misstatements that could have affected his right to a fair trial.  His failure to demonstrate any such misstatements, let alone any grave prejudice resulting therefrom, is fatal to his motion.

## <u>CONCLUSION</u>

Based on the forgoing reasons, the government respectfully requests that the Court deny the defendant's motions for a judgment of acquittal and new trial under Rules 29 and 33 in their entirety.

Respectfully Submitted,

Dated:  May 23, 2016                               /s/   Helen Christodoulou
                                                                      HELEN CHRISTODOULOU
                                                                      DANIEL TRACER
                                                                      MIKHAIL VANYO
                                                                      Trial Attorneys
                                                                      United States Department of Justice
                                                                      Antitrust Division
                                                                      26 Federal Plaza, Room 3630
                                                                      New York, New York 10278
                                                                      (212) 335-8035